UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TALTECH LIMITED,

                          Plaintiff,

v.

ESQUEL ENTERPRISES LTD.,

                          Defendant.

No.  C04-974Z

ORDER

## I.    **INTRODUCTION**

This matter comes before the Court pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd 517 U.S. 370 (1996), to construe various terms of the patents at issue in this case.  The Court held a hearing on December 12, 2005, and asked for supplemental briefing on certain terms.  The Court has reviewed all of the briefing, the records and files herein, and now enters the following Order.

## II.   **DISCUSSION**

### A.    **Background**

On April 29, 2004, Esquel Enterprises Ltd. filed a complaint for declaratory judgment and other relief against TAL Apparel Limited and Taltech Limited (collectively "Taltech") in this Court.  Compl., docket no. 1.  On April 30, 2004, Taltech Limited filed a complaint

1  alleging patent infringement against Esquel Apparel Inc. and Esquel Enterprises Ltd.

2  (collectively "Esquel") in the Eastern District of Texas, Case No. 2-04CV-179.  On July 27,

3  2005, the Eastern District of Texas transferred its case to the Western District of

4  Washington, Case No. C05-1318TSZ.  On October 18, 2005, pursuant to a stipulation of the

5  parties, the Court consolidated the two cases into the present case.  Minute Order, docket no.

6  86.  On January 9, 2005, the Court entered an Order Regarding Case Style and Effect of

7  Judgment, which ordered that the case be referred to as Taltech Limited, Plaintiff, v. Esquel

8  Enterprises Ltd., Defendant, and further ordered that specified unnamed parties would be

9  bound by orders and judgments in the case.  Order, docket no. 148.

10      Taltech alleges infringement of its patents for a "wash-n-wear" dress shirt product and

11  methods of producing "pucker free" seams in dress shirts, including 100% cotton shirts.  See

12  Taltech's Compl., docket no. 22, ¶ 1 (Case No. C05-1318TSZ).  The United States patents at

13  issue here (collectively "the patents-in-suit") are: (1) U.S. Patent No. 5,568,779 (the " '779

14  Patent"), which is entitled "Pucker Free Garment Seam and Method of Manufacture" and

15  which issued October 29, 1996, and (2) U.S. Patent No. 5,590,615 (the " '615 Patent"),

16  which is entitled "Pucker Free Garment Seam and Method of Manufacture" and which issued

17  January 7, 1997.  Joint Claim Chart, docket no. 85, Exs. B and C.

18      The parties now ask this Court to construe thirteen claim terms contained in both the

19  '779 and the '615 Patents.[1]

20      **B.    Legal Standard for Claim Construction**

21      Claim construction is "a matter of law exclusively for the court," even if the case is

22  designated to go to a jury trial.  Markman, 52 F.3d at 970-71.  "While a judge is well-

23  ─────────────────

24  [1] The parties originally disputed fifteen claim terms; however, Esquel has agreed to adopt
    Taltech's proposed construction of two terms.  Accordingly, the Court construes "density

25  of . . . grams per square meter" to mean "density of material as defined by the weight of
    material per unit of surface area" and construes the term "olefinic" to mean "a generic fiber

26  category in which the fiber forming substance is any long-chain synthetic polymer composed
    of at least 85 percent by weight of ethylene, propylene, or other olefin units."

ORDER  2–

equipped to interpret the legal aspects of the [patent] document, he or she must also interpret the technical aspects of the [patent] document, and indeed its overall meaning, from the vantage point of one skilled in the art." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999).

To interpret the claims of a patent, a court first looks to "the intrinsic evidence of record: the claim, the specification, and, if in evidence, the prosecution history." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1373 (Fed. Cir. 2004). The intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). A court may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) (internal quotations omitted). Extrinsic evidence is most useful to help a court understand the underlying technology and the way in which one skilled in the art might use the claim terms. See Phillips, 415 F.3d at 1318-19; Pitney Bowes, 182 F.3d at 1309. Extrinsic evidence, however, is less reliable than intrinsic evidence in determining how to interpret claim terms. Phillips, 415 F.3d at 1318-19. Courts may rely on extrinsic evidence to construe claim terms only if "the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms." Pitney Bowes, 182 F.3d at 1308-09; see also Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1332 (Fed. Cir. 2001) ("Relying on extrinsic evidence to construe a claim is 'proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence.'"

Primarily, then, a court focuses on intrinsic evidence to construct the claims. Within the intrinsic evidence, a court first looks to the words of the claims themselves to define the scope of the patented invention. Vitronics, 90 F.3d at 1582. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled

ORDER  3–

1  the right to exclude." Phillips, 415 F.3d at 1312 (internal quotations omitted). The words of

2  a claim "are generally given their ordinary and customary meaning." Id. (quoting Vitronics,

3  90 F.3d at 1582). "[T]he ordinary and customary meaning of a claim term is the meaning

4  that the term would have to a person of ordinary skill in the art in question at the time of the

5  invention, i.e., as of the effective filing date of the patent application." Id. at 1313. "[T]he

6  person of ordinary skill in the art is deemed to read the claim term not only in the context of

7  the particular claim in which the disputed term appears, but in the context of the entire

8  patent, including the specification." Id.; see also ACTV, Inc. v. Walt Disney Co., 346 F.3d

9  1082, 1088 (Fed. Cir. 2003) (considering the context of surrounding words of the claim);

10  Vitronics, 90 F.3d at 1582 (considering other claims of the patent in question). "In some

11  cases, the ordinary meaning of claim language as understood by a person of skill in the art

12  may be readily apparent even to lay persons, and claim construction in such cases involves

13  little more than the application of the widely accepted meaning of commonly understood

14  words." Phillips, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries

15  may be helpful." Id.

16      Claims are also read in light of the patent specification, which includes not only the

17  claims but also the abstract, background of invention, summary of invention, and detailed

18  description sections of the patent. See Signtech USA, Ltd. v. Vutek, Inc., 174 F.3d 1352,

19  1355 (Fed. Cir. 1999). At the same time, a court must avoid importing limitations from the

20  specification into the claims. Phillips, 415 F.3d at 1323. The Federal Circuit has "cautioned

21  against limiting the claimed invention to preferred embodiments or specific examples in the

22  specification." Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002);

23  see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1117

24  (Fed. Cir. 2004) (stating that "particular embodiments appearing in the written description

25  will not be used to limit claim language that has broader effect"); Home Diagnostics, Inc. v.

26  Lifescan, Inc., 381 F.3d 1352, 1357 (Fed. Cir. 2004) ("A patentee may claim an invention

ORDER  4–

1  broadly and expect enforcement of the full scope of that language absent a clear disavowal or

2  contrary definition in the specification.").

3       In determining proper claim construction, a court should also consider a patent's

4  prosecution history, if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution history

5  "consists of the complete record of the proceedings before the PTO and includes the prior art

6  cited during the examination of the patent."  Id.  The prosecution history can demonstrate

7  "how the inventor understood the invention and whether the inventor limited the invention in

8  the course of prosecution, making the claim scope narrower than it would otherwise be."  Id.

9  Although the prosecution history may provide an "interpretive context" for the claims,

10  "courts may not read limitations into the claims."  Rambus Inc. v. Infineon Tech. AG, 318

11  F.3d 1081, 1088 (Fed. Cir. 2003).

12       A court must interpret the claims consistently across all patents that derive from the

13  same parent application and share many common terms.  See NTP, Inc. v. Research In

14  Motion, Ltd., 418 F.3d 1282, 1293 (Fed. Cir. 2005).  This is relevant here because the

15  patents-in-suit are based on a single patent application, with the '615 Patent issuing from a

16  continuation of the '779 Patent.  As a result, the Court's constructions outlined below apply

17  consistently across both the '779 Patent and the '615 Patent.

18       **C.    <u>Summary of Disputed Claim Terms</u>**

19       The parties dispute thirteen terms contained in the claims of the '779 Patent and the

20  '615 Patent.  Four of the asserted claims are independent claims (i.e., Claims 1 and 20 of the

21  '779 Patent, and Claims 1 and 19 of the '615 Patent), and the remaining claims are

22  dependent claims.  Some of the asserted claims are method claims (i.e., Claims 1, 3-7, 10,

23  12, 17-19 of the '779 Patent, and Claims 1, 2, 4, 10-14, 17-18 of the '615 Patent) and others

24  are product claims (i.e., Claims 20, 22-26 of the '779 Patent, and Claims 19, 20, 26-29 of the

25  '615 Patent).

26

ORDER  5–

1

    **D.**      <u>Construction of Claim Terms in the '779 and '615 Patents</u>

2

        **1.**    <u>"Upper Surface" and "Lower Surface"</u>

3

      Both the method and product claims of the patents-in-suit describe the first and

4

second garment components and the bonding element as each having an "upper surface" and

5

a "lower surface."  For example, in Claim 1 of the '779 Patent, a method claim, step (d) of

6

the seam manufacturing process requires "folding the first garment component over the

7

bonding element such that the **upper surface** of the first garment component is folded over

8

and abuts an **upper surface** of the bonding element," and step (e) requires "folding a portion

9

of the second garment component such that a **lower surface** of the second garment

10

component abuts the **lower surface** of the bonding element."  '779 Patent at 6:40-47

11

(emphasis added).  In Claim 20 of the '779 Patent, a product claim, the seam is defined as

12

comprising "a bonding element . . . having an **upper and lower surface**," "a first garment

13

component having an **upper and lower surface**," and "a second garment component having

14

an **upper and lower surface**."  '779 Patent at 8:7-19 (emphasis added).  The '615 Patent

15

similarly uses the terms in Claims 1 and 19, method and product claims, respectively.  <u>See,</u>

16

<u>e.g.</u>, '615 Patent at 6:48-51, 8:4-16.

17

      Taltech asks the Court to construe "upper surface" and "lower surface" to have

18

different meanings depending on whether the terms appear in the method or the product

19

claims.  Regarding the method claims, Taltech construes the terms as follows:

20

21

      *Upper surface and lower surface are designated at the time the first set stitch*
      *is applied to fix the garment components and bonding element together*, and
      the upper and lower surfaces of a component/element are opposing surfaces

22

      through a thickness of the component/element, providing that the upper surface
      and lower surface designations of the garment components remain consistent

23

      around folds required in the claim.

24

      Regarding the product claims, Taltech construes the terms as follows:

25

26

Upper and lower surfaces of a component/element *in the final seam* are opposing surfaces through a thickness of a component/element, providing that the upper surface and lower surface designations of the garment components remain consistent around folds required in the claim.

The words in italics show how the two definitions differ from each other.  Taltech relies on the claims, on the specifications, on the opinion of Taltech's expert, Mr. Jack Nienke, and on a technical treatise.

Esquel asks the Court to construe the terms the same for method and product claims:

The terms "upper surface" and "lower surface," as applied to each of the first and second garment components and the bonding element, mean the entire surface of each that is oriented up or down, respectively, as discerned at the beginning of the seam manufacturing process when the components are flat, such that there is only a single upper surface and a single lower surface for each garment component and the bonding element and the designation of a surface as upper and lower does not change regardless of any subsequent folding or other reorientation of a garment component or the bonding element.

Esquel relies on the specifications and on the ordinary meanings of the terms.

The Court must decide four separate issues: first, whether the Court should construe the terms differently depending on whether the terms appear in method or product claims; second, when the terms must be defined; third, whether the terms require a particular orientation at the time of designation; and fourth, how to account for the manufacturing steps in the method claims and the structural folds in the product claims.

First, the Court must determine whether it may construe the terms differently depending on whether the terms appear in method or product claims.  Based on the well-established patent law principle that "claim terms are normally used consistently throughout the patent," Phillips, 415 F.3d at 1314, Esquel argues that Taltech has improperly submitted two different proposed constructions to the Court, one for its method claims and one for its product claims.  Although none of the cases relied upon by Esquel squarely address the consistency issue across method and product claims, the cases repeatedly recite the "rule" requiring the same construction of a claim term that appears in more than one claim in a

ORDER  7–

1   patent.  See Nazomi Commc'ns, Inc. v. ARM Holdings, PLC, 403 F.3d 1364, 1370 (Fed.

2   Cir. 2005); Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1371 (Fed. Cir.

3   2003); CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1159 (Fed. Cir. 1997).  Taltech

4   has failed to bring any case to the Court's attention that provides an exception to the rule for

5   claim construction across method and product claims.

6          Instead, Taltech argues that different constructions are necessary because of another

7   well-established patent rule, which states that product claims are not limited by a particular

8   manufacturing process.  See AFG Indus., Inc. v. Cardinal IG Co., 375 F.3d 1367, 1372-73

9   (Fed. Cir. 2004) (declining to "impermissibly import a process limitation into a pure product

10  claim"); Vanguard Prods. Corp. v. Parker Hannifin Corp., 234 F.3d 1370, 1372 (Fed. Cir.

11  2000) ("A novel product that meets the criteria of patentability is not limited to the process

12  by which it was made.").  The Court recognizes and honors this rule, but disagrees with

13  Taltech's application of the rule to the present case.  If the Court adopts the construction that

14  Taltech has proposed for its method claims for all claims, there would not be any

15  impermissible importation of a process limitation into Taltech's product claims.  Taltech's

16  proposed construction for its method claims merely designates the "upper" and "lower"

17  surfaces at the time the first set stitch is applied to fix the garment components and the

18  bonding element together.  This fixing of garment components and the bonding element

19  together by a first set stitch is already required by the language of Taltech's product claims.

20  In other words, Claim 20 of the '779 Patent and Claim 19 of the '615 Patent define the

21  invention as comprising, in part, a first set stitch that fixes the garment components and the

22  bonding element together.  '779 Patent at 8:25-30; '615 Patent at 8:17-22.  Thus, Taltech's

23  proposed construction for its method claims does not import any limitation into the product

24  claims that does not already exist.  The Court construes the terms "upper surface" and "lower

25  surface" the same across all method and product claims.

26

ORDER   8–

1    Second, the Court must determine the point in the manufacturing process when these

2    labels are attached.  Regarding its method claims, Taltech argues that the designations should

3    be made when the first stitch is applied.  For its product claims, Taltech argues that the

4    designations refer to the final seam.  Esquel argues that the designations should be made "at

5    the beginning of the seam manufacturing process when the components are flat."  Esquel's

6    proposed construction is vague and improperly limits the claims to require the garment

7    components to be flat.  The Court finds Taltech's proposed construction for its method

8    claims more specific and more accurate.  The first set stitch is what fixes the positions of the

9    garment components and the bonding element with respect to each other.  See Claim 1(c) of

10   the '779 Patent at 6:37-39; Claim 1(d) of the '615 Patent 6:44-47.

11   This construction regarding the timing of the designation of "upper surface" and

12   "lower surface" is consistent with the specifications.  Figures 3a and 4a show that the

13   orientation of upper and lower surfaces of the garment components and the bonding element

14   are meaningful only when they are brought together to form a seam, which is at the point in

15   the seam manufacturing process when the first set stitch is applied.  This construction is also

16   consistent with the extrinsic evidence.  Taltech's expert, Mr. Nienke, asserts that one of

17   ordinary skill in the art would understand that the appropriate time of designating the upper

18   and lower surfaces is at the time of applying the first set stitch because it is at this time that

19   the garment components are actually fixed together to build the seam.  Nienke Decl., docket

20   no. 96, ¶ 16.  The technical treatise submitted by Taltech illustrates that stitches provide

21   meaning for the relative positions of flat or folded fabrics in seams.  See Harold Carr &

22   Barbara Latham, The Technology of Clothing Manufacture 46 (2d ed. Blackwell Sciences

23   1994) (docket no. 94, Ex. G at 46).

24   Third, the Court must determine whether the terms require a particular orientation at

25   the time of designation.  Taltech argues that the terms merely denote relative surfaces and

26   thus no particular orientation is required.  Esquel argues that the "upper surface" faces up

ORDER   9–

and that the "lower surface" faces down at the time of designation.  Taltech argues that

"[c]ase precedent could not be more clear" that "upper and lower surfaces are not limited to

those that point upward and downward, respectively."  Taltech's Responsive Brief, docket

no. 108, at 6 (citing Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354 (Fed.

Cir. 2004)).  Taltech misreads Lighting World, which states that "[n]othing in the patent

suggests that the 'upper surface' of the support member *ceases to be* the 'upper surface' if

the fixture is turned upside down or placed in some other orientation."  382 F.3d at 1365

(emphasis added).  Lighting World implies that an "upper surface" of an object faces up *at*

*the time of designation* and then retains its "upper" designation even if it later faces some

other orientation.

The widely accepted and ordinary meaning of "upper" is to face up and "lower" is to

face down.  Taltech does not argue that a person of ordinary skill in the art would otherwise

interpret the terms.  These terms must be construed to carry their ordinary meaning.  See

Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("All the limitations

of a claim must be considered meaningful . . .").  The specifications also show a particular

orientation at the time of designation.  Figures 3a and 4a show the "upper surface" of the

garment components and bonding element facing up and the "lower surfaces" facing down at

the time the first set stitch 38 is applied, so long as the labeling in Figure 4a takes place on

the unfolded portion of the second garment component.[2]  See '779 Patent at 4:4-14, 5:31-42;

'615 Patent at 4:5-15, 5:32-43; Figs. 3a and 4a.  For these reasons, the Court concludes that a

particular orientation is required at the time of designation.  Lighting World does not conflict

with this conclusion.

---

[2] The Court declines to adopt Esquel's proposed convention for labeling the surfaces from
the bottom of the seam construction and working upwards, see Esquel's Supplemental Brief,
docket no. 140, at 13-15, because it improperly imports a limitation from a preferred
embodiment into the claims.

1    Fourth, the Court must account for the manufacturing steps in the method claims and

2  the structural folds in the product claims.  Taltech's proposed construction uses language that

3  refers to the folding of the garment components, whereas Esquel's proposed construction

4  refers to "any subsequent folding or other reorientation of a garment component or the

5  bonding element."  Because the claims do not include any folding of the bonding element,

6  Esquel's inclusion of the bonding element is erroneous.  See Claim 1(d) and 1(e) and Claim

7  20 of the '779 Patent at 6:40-46, 8:10-24; Claim 1(e) and 19 of the '615 Patent at 6:48-51,

8  8:23-26.  Furthermore, Esquel's reference to "any subsequent folding or other reorientation"

9  is vague.

10    Accordingly, the Court adopts Taltech's proposed construction, with modification,

11  and construes the terms "upper surface" and "lower surface," for both method and product

12  claims, as follows:

13

14    "Upper surface" and "lower surface" are designated at the time the first set
    stitch is applied, and the upper and lower surfaces of a component/element are
    opposing surfaces through a thickness of the component/element, providing
15    that the "upper surface" faces upward and the "lower surface" faces downward
    at the time of designation along the unfolded portions of the garment
16    components, and providing that the upper surface and lower surface
    designations of the garment components remain consistent around folds
17    required in the claim.

18    **2.    "Set Stitch"**

19    The term "set stitch" is found in both the method and product claims of the patents-in-

20  suit.  For example, in Claim 1 of the '779 Patent, a method claim, step (c) of the seam

21  manufacturing process requires "sewing the first and second garment components and the

22  bonding element together by a first **set stitch** running along the seam."  '779 Patent at 6:37-

23  39 (emphasis added).  In Claim 20 of the '779 Patent, a product claim, the seam is defined as

24  comprising "a first **set stitch** running along a first side of the seam and traversing through the

25  bonding element . . . the first garment component . . . and . . . the second garment component

26

ORDER   11–

1    . . . ." '779 Patent at 8:25-30 (emphasis added). The '615 Patent similarly uses the term in

2    Claims 1 and 19, method and product claims, respectively. '615 Patent at 6:44-47, 8:17-22.

3        Taltech asks the Court to construe "set stitch" to mean "a stitch that 'sets' or firmly

4    joins at least the bonding element and two layers of garment material to define their

5    relationship in the garment seam but does not pass through the outer layer of garment

6    material in the finished seam." Taltech relies on the claims, on the specifications, on the

7    prosecution history of the patents-in-suit, and on the opinion of Taltech's expert, Mr.

8    Nienke. Esquel asks the Court to construe "set stitch" to mean "a stitch used to hold two or

9    more components together and is not visible in the final product." Esquel relies on the

10   specifications, on the prosecution history of the '615 Patent, on a dictionary definition of

11   "set," and on the opinion of Esquel's expert, Mr. Larry Haddock.

12       The parties agree that the "set stitch" "sets or joins." The parties disagree on whether

13   the bonding element needs to be included in what is set or joined. Taltech also refers to "two

14   layers of garment material," whereas Esquel refers to "two or more components" as being set

15   by the stitch. Lastly, Taltech and Esquel use different language to convey that a set stitch

16   does not pass through the outer layer of garment material and thus is not visible in the final

17   product.

18       The first issue is whether the bonding element needs to be included in what is set or

19   joined by a "set stitch." Every term found in a claim is presumed to have meaning and

20   purpose. See RF Delaware, Inc. v. Pac. Keystone Techs., Inc., 326 F.3d 1255, 1264 (Fed.

21   Cir. 2003). Taltech argues that the term "set" distinguishes a stitch that joins at least a

22   bonding element and two layers of garment material from a stitch that merely joins two

23   layers of garment material. Claims 1 and 20 of the '779 Patent and Claims 1 and 19 of the

24   '615 Patent describe the "first set stitch" as traversing through the bonding element and the

25   first and second garment components. '779 Patent at 6:37-39, 8:25-30; '615 Patent at 6:44-

26   47, 8:17-22. In contrast, the "second stitch," in which the word "set" is notably missing, is

described in Claims 1 and 19 of the '615 Patent as traversing through the first and second garment components and not the bonding element.  '615 Patent at 6:56-60, 8:23-26; see ACTV, 346 F.3d at 1088 (considering the context of surrounding words of the claim).  This distinction between "first set stitch" and "second stitch" lends support to Taltech's proposed construction.  However, in Claims 1 and 20 of the '779 Patent, the "second stitch" traverses through *the bonding element* in addition to the first and second garment components.  '779 Patent at 6:47-49, 8:31-37.  As a result, the claims do not consistently use "set" to distinguish a stitch that joins a bonding element to other components from one that does not.

Taltech argues that the specifications show that a set stitch joins a bonding element to other components.  '779 Patent at 4:4-9, 5:31-38; '615 Patent at 4:5-10, 5:32-39.  While this may be true, the Court refuses to import a limitation from the specifications into the claims. See Teleflex, 299 F.3d at 1328.

The expert testimony relied upon by Taltech does not require a set stitch to join a bonding element to other components.  Although Mr. Nienke recites Taltech's proposed construction (Nienke Decl., docket no. 96, ¶ 22), he discusses how the term is used in the industry to describe a stitch where a seam is being constructed just using fabrics (i.e., not including a bonding element).  See Nienke Decl. ¶ 23.

Taltech argues that the prosecution history of the '779 Patent supports its proposed construction.  See '779 Prosecution History, March 11, 1996, Amendment Filed Under 37 C.F.R. § 115, docket no. 85, Ex. D (part 2) at 13.  Except for showing that the term "set" was added to the "first stitch" claim language, this evidence does not explain why the word "set" was added, other than "to clarify" and "to improve readability."  Id.  These proclaimed reasons are not particularly useful in assisting the Court's construction of "set stitch."  What is clear is that nothing in the prosecution history of the '779 Patent indicates an intent to require the presence of a bonding element in the materials fixed by a "set stitch."

1    For all these reasons, the Court does not require that a bonding element be included in

2    what is set or joined by a "set stitch."

3    Next the Court must address Taltech's reference to "two layers of garment material"

4    versus Esquel's reference to "two or more components."  At the <u>Markman</u> hearing, Taltech

5    emphasized that stitch 48 in Figure 4a is a set stitch and that it joins a bonding element to

6    two layers of garment material (i.e., a folded over portion of a single garment component, the

7    second garment component) and does not join a bonding element to two garment

8    components.  '779 Patent at 4:7-9 (describing first set stitch 38 in Figure 3a as "set sleeve

9    stitch"), 5:34-42 (describing stitch 48 in Figure 4a as "needle set sleeve").  Although this is

10   an accurate description of stitch 48 in Figure 4a, the Court hesitates to introduce a new term,

11   "layers of garment material," into the definition of set stitch, when "garment component" is

12   one of the disputed terms that the Court has been asked to construe.  On a related note, at the

13   <u>Markman</u> hearing, Esquel pointed out that although it advocates a construction in which a

14   bonding element is not *required* to be joined by a set stitch, it does not urge the adoption of a

15   construction that precludes the joining of a bonding element to a garment component by a set

16   stitch.  The Court modifies the first part of Taltech's proposed construction to read: "A stitch

17   that sets or joins *at least a garment component and a bonding element together*, or *at least*

18   *two garment components together*, to define their relationship in the garment seam . . . ."

19   Regarding the second part of the parties' proposed constructions of "set stitch," the

20   prosecution history of the '615 Patent supports Taltech's construction that a "set stitch"

21   "does not pass through the outer layer of garment material in the finished seam."  '615

22   Prosecution History, March 11, 1996, Preliminary Amendment Filed Under 37 C.F.R. § 115,

23   docket no. 85, Ex. E at 10.  The Preliminary Amendment discusses how the "Benstock

24   stitches" are deficient because they "fail[] to show a 'first set stitch' . . . and a 'second stitch'

25   as claimed" in that they "protrude through the top fabric ply."  <u>Id.</u>  Esquel's proposed

26   construction states that a set stitch "is not visible in the final product."  Esquel's proposed

construction does not appear to conflict with Taltech's proposed construction, but merely states it a different way.  Taltech's proposed construction is more aligned with the wording in the prosecution history of the '615 Patent and will be adopted; however, for the same reason outlined above, the Court will use the construed term "garment component" in place of "layer of garment material."

Accordingly, the Court adopts Taltech's proposed construction, with modification, and construes the term "set stitch" to mean "a stitch that 'sets' or joins at least a garment component and a bonding element together, or at least two garment components together, to define their relationship in the garment seam, but does not pass through the outer garment component in the finished seam."

### 3.   "Abuts"

The term "abuts" is found in both the method and product claims of the patents-in-suit.  For example, in Claim 1 of the '779 Patent, a method claim, step (b) of the seam manufacturing process requires "placing a bonding element . . . such that a lower surface of the bonding element **abuts** an upper surface of the first garment component."  '779 Patent at 6:33-36 (emphasis added).  Similarly, steps (d) and (e) require that an upper or lower surface of a garment component "abuts" an upper or lower surface of the bonding element.  '779 Patent at 6:40-46.   In Claim 20 of the '779 Patent, a product claim, the seam is defined as comprising "a second garment component . . . such that . . . a portion of said upper surface of the second garment component **abuts** a lower surface of the first garment component . . . " and "a first set stitch . . . traversing through the bonding element . . . the first garment component . . . and . . . the second garment component which **abuts** said lower surface of the first garment component."  '779 Patent at 8:18-30 (emphasis added).  The '615 Patent similarly uses the term in Claims 1 and 19, method and product claims, respectively.  '615 Patent at 6:48-51, 8:12-22.

1    Taltech asks the Court to construe "abuts" to mean "to touch, border on, or end at a

2    surface, including being directly bonded to that surface."  Taltech relies on the patent

3    specifications, on a dictionary definition of "abut," and on patent publications in the garment

4    industry such as U.S. Russell Patent No. 4,333,980 (Taltech's <u>Markman</u> Ex. 10).  Esquel

5    asks the Court to construe "abuts" to mean "touching (i.e., having direct contact) at a

6    border."  Esquel relies on the patent specifications, on the prosecution history of Taltech's

7    related U.S. Patent No. 6,079,343 (the " '343 Patent"), on the opinion of Esquel's expert,

8    Mr. Haddock, and on the deposition testimony of Taltech's expert, Mr. Nienke.

9    The point of contention concerning the construction of "abuts" is whether touching,

10    i.e., having direct contact, is required.  Esquel argues that touching is required, whereas

11    Taltech argues that "abuts" does not necessarily require direct contact.  Taltech argues that

12    "the two surfaces of garment components are deemed abutting where adhesive holds the two

13    abutting surfaces together."  In other words, the surfaces of garment components that are

14    separated by a bonding element would "abut" under Taltech's proposed construction.

15    The Court finds Esquel's proposed construction more persuasive.  Although neither

16    party relied on the claims, the Court first looks to them to interpret the disputed term.  As

17    outlined above, Claim 20 of the '779 Patent and Claim 19 of the '615 Patent use the term

18    "abuts" to refer to contact between the surfaces of first and second garment components,

19    whereas Claim 1 of the '779 Patent and Claim 1 of the '615 Patent use the term "abuts" to

20    refer to contact between a surface of a garment component and *a surface of a bonding*

21    *element*.  Given the latter use of "abuts," Taltech's proposed construction makes no sense.

22    The surfaces of garment components cannot "abut" if there is a bonding element in between

23    them.  If that were the case, Claim 1 of both patents would not have used the term "abuts" to

24    describe the contact between the surfaces of a garment component *and a bonding element*.

25    Taltech's proposed construction ignores the existence of a bonding element when using the

26

term "abuts;" however, the claims themselves do not ignore the existence of a bonding

element when using the term "abuts."

Furthermore, Taltech's reliance on the following excerpt from the specifications is

misplaced:

> Preferably, the bonding element 32 comprises an adhesive web which flows during ironing onto the **abutting surfaces of the garment components** to create a very strong bond between the garment components along the garment seam 12.

'779 Patent at 6:1-5; '615 Patent at 6:3-7 (emphasis added).  Taltech argues that this excerpt

shows that "the 'abutting surfaces of the garment components' need not necessarily touch –

as the bonding element is between the two abutting surfaces of the garment components."

Taltech's argument is not persuasive.  Taltech has taken the phrase "abutting surfaces of the

garment components" out of context.  The surfaces of the first and second garment

components are not abutting each other.  The subject of the sentence is "the bonding element

32" and the bonding element is the object that is abutting the surfaces of the garment

components.  This interpretation is supported by the claims, which describe the bonding

element as abutting the first and second garment components prior to fusing the seam

together.  See '779 Patent at 6:33-36, 6:40-46, 8:10-21; '615 Patent at 6:42-43, 6:48-51, 8:4-

11.  The only time that the claims clearly describe one garment component abutting another

is when there is no bonding element between them.  See '779 Patent at 8:21-24 (". . . a

portion of said upper surface of the second garment component abuts a lower surface of the

first garment component along the seam"); '615 Patent at 8:13-16 (". . . a portion of the

upper surface of the second garment component abuts at least a portion of the lower surface

of the first garment component"); Fig. 3b.  Taltech's interpretation of the specifications

would be more persuasive if the sentence following the quoted excerpt stated as follows:

"This bond prevents the first garment component 20 from separating from the [**abutting**]

garment component 22 during the subsequent laundering of the garment." '779 Patent at 6:5-8. However, the term "abutting" does not appear in that sentence.

Other parts of the specifications also support Esquel's proposed construction that "abuts" does not signify a relationship between the surfaces of two garment components with a bonding element in between them. See '779 Patent at 4:8-17, 4:59-63; '615 Patent at 4:10-18, 4:60-64; Fig. 3b.[3] These specification excerpts do not ignore the existence of the bonding element when using the term "abuts." Under Taltech's proposed construction, the specifications would state that Figure 3b depicts the upper surface 24 of the first garment component 20 abutting the lower surface 30 of the second garment component 22. The specifications include no such statement.

The claims further support Esquel's proposed construction because the claims have used the term "abuts" interchangeably with the term "contacts." Claim 1(b) of the '779 Patent speaks of "placing a bonding element . . . along the seam such that a lower surface of the bonding element **abuts** an upper surface of the first garment component." '779 Patent at 6:33-36 (emphasis added). The analogous Claim 1(c) of the '615 Patent speaks of "placing the bonding element along the seam . . . such that the lower surface of the bonding element **contacts** at the seam the upper surface of the first garment component." '615 Patent at 6:39-43 (emphasis added). This is direct evidence from the claims themselves that the term "abuts" requires contact.

The extrinsic evidence supports Esquel's proposed construction requiring contact or touching. First, the prosecution history of the '343 Patent supports Esquel's proposed construction that the term "abuts" requires direct contact. The term "abuts" was used in some of the pending claims to describe a relationship of "direct contact" between the

---

[3] The patent appears to contain an error in that it should say "36" rather than "26" to refer to the lower surface of the bonding element in the '779 Patent at 4:62 and in the '615 Patent at 4:63. See '779 Patent at 3:52-53 and '615 Patent at 3:53-54 ("The bonding element 32 has an upper surface 34 and a lower surface 36.").

thermoplastic adhesive (i.e., the bonding element) and the garment components.  Docket no.

85, Ex. F (part 2) at 32 ("a single strip of thermoplastic adhesive is in *direct contact* with

both the first and second garment component [sic] forming the seam") (emphasis added).

Second, the dictionary definition provided by Taltech – i.e., "abut . . . to touch along a

border or with a projecting part . . . to terminate at a point of contact . . . to lean for support .

. . to border on" – supports *Esquel's* position that the term requires touching and contact.

See Merriam Webster's Collegiate Dictionary 5 (10th ed. 1993) (docket no. 94, Ex. A at 2).

Nothing in this dictionary definition supports Taltech's proposed construction to expand the

definition of "abuts" to include "being directly bonded to that surface."  Third, Taltech's

expert, Mr. Nienke, testified in a deposition on September 16, 2005, that had he not spoken

with the attorneys in this case he would have defined "abut" simply to mean "touch."

Nienke Dep. at 9:3-10 (Esquel's Markman Ex. 1).

At the Markman hearing, Taltech argued that Esquel's proposed construction

language of "at a border" is ambiguous.  The Court agrees.  Taltech suggested replacing the

"at a border" language with "along a surface."  Rather than adopting Taltech's suggestion,

which may improperly limit the claims, the Court simply omits Esquel's proposed "at a

border" language from the Court's construction.

Accordingly, the Court adopts Esquel's proposed construction, with modification, and

construes the term "abuts" to mean "touching (i.e., having direct contact)."

### 4.    **"Garment Component"**

The term "garment component" is found in both the method and product claims of the

patents-in-suit.  For example, in Claim 1 of the '779 Patent, a method claim, step (a) of the

seam manufacturing process requires "placing the first **garment component** in an adjacent

relationship to the second **garment component** so as to define a seam."  '779 Patent at 6:30-

32 (emphasis added).  In Claim 20 of the '779 Patent, a product claim, the seam is defined as

comprising "a first **garment component** having an upper and lower surface" and "a second

ORDER   19–

1   **garment component** having an upper and lower surface." '779 Patent at 8:10-11, 8:18-19

2   (emphasis added).  The '615 Patent similarly uses the term in Claims 1 and 19, method and

3   product claims, respectively.  '615 Patent at 6:31-36, 8:4-5, 8:12-13.

4       Taltech asks the Court to construe "garment component" to mean "a structural part of

5   a garment, such as a front panel, yoke, rear panel, and sleeve.  An interlining is not a garment

6   component."  Taltech relies on the specifications and on the opinion of Taltech's expert, Mr.

7   Nienke.  Esquel asks the Court to construe "garment component" to mean "any element of an

8   article of clothing," including an interlining, a bonding element or thread.  Esquel relies on

9   the patent specifications, on a dictionary definition of "component," and on a technical

10  treatise.

11      The Court finds Taltech's proposed construction more persuasive.  Claim 6 of the

12  '779 Patent and Claim 13 of the '615 Patent state that ". . . said first **garment component**

13  comprises a front panel, yoke, and rear panel of a dress shirt and said second **garment**

14  **component** comprises a shirt sleeve . . . " '779 Patent at 7:10-13; '615 Patent at 7:40-42

15  (emphasis added).  The specifications state that "a pucker free garment seam 12" consists of

16  "a first **garment component** 20, such as a component consisting of a dress shirt front panel

17  16, yoke 14, and rear panel; a second **garment component** 22 such as a dress shirt sleeve 12

18  [sic];[4] and a bonding element 32." '779 Patent at 5:60-65; '615 Patent at 5:62-67 (emphasis

19  added); see also Fig. 2; '779 Patent at 3:44-47; '615 Patent at 3:45-48 (defining first garment

20  component as comprising a front panel, shirt yoke and rear panel and the second garment

21  component as comprising a shirt sleeve).  The examples of a "garment component" identified

22  in the claims and specifications are those that Taltech includes in its proposed construction

23

24  _____

25  [4] The patent appears to contain an error in that it should say "13" rather than "12" to refer to
    the shirt sleeve in the '779 Patent at 5:64 and in the '615 Patent at 5:66.  See '779 Patent at

26  3:46-47 and '615 Patent at 3:48 ("the second garment component comprises a shirt sleeve
    13.").

1   of the term.  Although this is not an exhaustive list of possible garment components, nothing

2   in the intrinsic evidence supports Esquel's broad construction of the term.

3       First, a bonding element is not a garment component.  The specifications, as outlined

4   above, separately list the bonding element as its own thing, and not as an example of a

5   garment component.  '779 Patent at 5:58-65; '615 Patent at 5:60-67; see also '779 Patent at

6   6:26-56 (Claim 1 separately refers to garment components and bonding elements as distinct

7   objects); '615 Patent at 6:28-67 (same).  Nothing in the intrinsic evidence indicates that the

8   terms should be used interchangeably.

9       Second, an interlining is not a garment component.  The specifications of the patents-

10  in-suit state: "Interlinings are known in the art to provide stiffness to **garment components**."

11  '779 Patent at 5:1-2; '615 Patent at 5:2-3 (emphasis added).  This sentence only makes sense

12  if the Court interprets interlinings and garment components to be distinct categories.

13  Esquel's genus and species analogy, see Esquel's Responsive Brief, docket no. 111, at 12

14  n.6, is not persuasive because there is no evidence in the patent for the proposition that

15  interlinings are a subset of the broader category of garment components.  Esquel argues that

16  garment components should specifically include "fusible and non-fusible interlinings . . . and

17  fusible webs or nets;" however, Esquel's interpretation is unsupported by the intrinsic

18  evidence.  Esquel relies on parts of the specification of the '779 Patent that have no bearing

19  on the construction of the term "garment component."  See Esquel's Opening Brief, docket

20  no. 97, at 21 (citing '779 Patent at 3:51-4:3, 4:66-5:1).

21      Third, thread is not a garment component.  Esquel argues to the contrary and relies on

22  the characterization of "components of garments" in a technical treatise that includes

23  interlinings and thread as examples of "components of garments."  See Peyton B. Hudson,

24  Guide to Apparel Manufacturing 51-63 (Rev. 2d ed. MEDIA Apparel, Inc. 1989) (docket no.

25  97, Ex. E).  The Court does not rely on extrinsic evidence that is inconsistent with the

26  intrinsic evidence.  In this case, the specifications state that "the sewing **thread** contracts

ORDER  21–

upon being laundered and pulls on opposing **garment components** at the garment seam which in turn causes the **garment components** to buckle . . . ." '779 Patent at 1:22-26; '615 Patent at 1:26-29 (emphasis added). Thread acts on the garment components, indicating that it must be a distinct object. The specifications' reference to garment components as coming together at a seam and as buckling are further evidence that a garment component is a fabric panel, not thread.

To interpret the term "garment component," the Court does not rely on the expert testimony provided by Taltech. See Nienke Decl., docket no. 96, ¶ 28. Mr. Nienke's opinion regarding the term "garment component" is merely conclusory. See Phillips, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."). The intrinsic evidence is sufficient to support Taltech's proposed construction.

Accordingly, the Court adopts Taltech's proposed construction, with modification, and construes the term "garment component" to mean "a structural part of a garment, such as a front panel, yoke, rear panel, and sleeve. A bonding element, an interlining, and thread are not garment components."

### 5.   **"A Bonding Element"**

The term "a bonding element" is found in both the method and product claims of the patents-in-suit. For example, in Claim 1 of the '779 Patent, a method claim, step (b) of the seam manufacturing process requires "placing **a bonding element** having at least a thermal adhesive component along the seam . . . ." '779 Patent at 6:33-34 (emphasis added). In Claim 20 of the '779 Patent, a product claim, the seam is defined as comprising "**a bonding element** having at least a thermal adhesive component and having an upper and lower surface." '779 Patent at 8:8-9 (emphasis added). The '615 Patent similarly uses the term in Claims 1 and 19, method and product claims, respectively. '615 Patent at 6:37-39, 8:2-3.

1    Taltech asks the Court to construe "a bonding element" to mean "one or more

2    substances or constituents of a whole that bind, fasten, fuse, confine, or hold together."

3    Taltech argues that Federal Circuit case law does not restrict the indefinite article "a" to

4    mean a *single* substance.  Esquel asks the Court to construe "a bonding element" to mean "a

5    single component or constituent that facilitates a binding, fastening, fusing, confining or

6    holding together."  Esquel relies on the use of "a" and "the" in the claim language, on the

7    specifications, and on the prosecution history of the '615 Patent.

8    The parties' dispute centers on the meaning of the article "a," specifically whether the

9    article limits the number of bonding elements to only one or whether it covers one or more

10   bonding elements.  The Federal Circuit "has repeatedly emphasized that an indefinite article

11   'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims

12   containing the transitional phrase 'comprising.'"  KCJ Corp. v. Kinetics Concepts, Inc., 223

13   F.3d 1351, 1356 (Fed. Cir. 2000).  To overcome this presumption, the intrinsic evidence

14   must demonstrate a "clear intent" to limit the article to a singular interpretation.  Id.  In KCJ,

15   the claim language, "a . . . continuous . . . chamber," did not specify the number of

16   chambers.  Id. at 1357.  In other words, there was no "numerical qualifier" in the claim

17   language.  Id.  Furthermore, the written description did not restrict the invention to only one

18   chamber.  Id.  As a result, the Federal Circuit held that "'a . . . continuous . . . chamber'

19   covers one or more continuous chambers."  Id.

20   Esquel seeks to limit the scope of "a bonding element" to "a single bonding element"

21   because Figures 3(a)-3(c) and 4(a)-4(c) depict a single bonding element.  While an example

22   described in a specification provides context for claim interpretation, it does not constitute a

23   "clear statement of scope" to limit the claims.  See Teleflex, 299 F.3d at 1327-28.  In

24   Teleflex, the Federal Circuit rejected the interpretation that a "clip" was limited to having a

25   single pair of legs as depicted in the specification because neither "single" nor "pair of legs"

26   appeared in the claims.  Id. at 1327.  The Federal Circuit "cautioned against limiting the

ORDER   23–

1   claimed invention to preferred embodiments or specific examples in the specification." <u>Id.</u> at

2   1328.  Similarly here, the Court does not interpret "a bonding element" to be a single

3   bonding element merely because it is depicted that way in the specifications when the word

4   "single" does not appear in the claims to qualify "a bonding element."  The present case

5   stands in stark contrast to the case relied upon by Esquel in which the claims described the

6   switch as a "single" switch.  <u>See</u> <u>Innovad Inc. v. Microsoft Corp.</u>, 260 F.3d 1326, 1333 (Fed.

7   Cir. 2001) ("The term 'single' . . . precludes the use of multiple switches . . .").

8       In an effort to limit the scope of the term "a bonding element," Esquel relies on the

9   prosecution history of the '615 Patent, which refers to "the bonding element" as "it."  '615

10  Prosecution History, March 11, 1996, Preliminary Amendment Filed Under 37 C.F.R. § 115,

11  docket no. 85, Ex. E at 7.  However, merely referring to "the bonding element" as "it" does

12  not demonstrate a "clear intent" to limit the term to a singular interpretation.

13      Esquel further argues that the claim language's reference to "the" bonding element

14  after initially defining "a" bonding element shows that "a bonding element" denotes

15  singularity.  The Federal Circuit has squarely rejected this argument.  <u>See</u> <u>Free Motion</u>

16  <u>Fitness, Inc. v. Cybex Int'l, Inc.</u>, 423 F.3d 1343, 1350-51 (Fed. Cir. 2005) (affording the

17  word "the" the same presumptive meaning of "one or more" when used with the transitional

18  phrase "comprising").

19      Because nothing in the intrinsic evidence demonstrates a clear intent to overcome the

20  presumption that the articles "a" or "the" mean "one or more," the Court adopts Taltech's

21  proposed construction and construes the term "a bonding element" to mean "one or more

22  substances or constituents of a whole that bind, fasten, fuse, confine, or hold together."

23          **6/7.   <u>"Adjacent Relationship" and "Juxtaposed Relationship"</u>**

24      The term "adjacent relationship" is found only in the method claims of the '779

25  Patent.  In Claim 1 of the '779 Patent, step (a) of the seam manufacturing process requires

26

1   "placing the first garment component in an **adjacent relationship** to the second garment

2   component so as to define a seam." '779 Patent at 6:30-32 (emphasis added).

3         The term "juxtaposed relationship" is found only in the method claims of the '615

4   Patent.  In Claim 1 of the '615 Patent, step (b) of the seam manufacturing process requires

5   "providing a second garment component in a **juxtaposed relationship** with respect to the

6   first garment component to be joined at a seam to the first garment component." '615 Patent

7   at 6:33-36 (emphasis added).

8         Taltech asks the Court to construe "adjacent relationship" to mean "next to" and

9   "juxtaposed relationship" to mean "placed next to."  Taltech also interprets these terms not to

10  require touching, an interpretation that Esquel does not contest.  Taltech relies on the claims,

11  on the specifications, and on dictionary definitions of "adjacent" and "juxtaposed."  Esquel

12  agrees with Taltech's proposed construction so long as "next to" is given its ordinary

13  meaning, i.e., "immediately following."  Esquel relies on the specifications and on a

14  dictionary definition of "next to."  The parties' dispute centers on whether any intervening

15  material may exist between two garment components that are placed in an "adjacent" or

16  "juxtaposed" relationship.  Taltech interprets "adjacent" and "juxtaposed" to allow

17  intervening material, whereas Esquel's interpretation does not allow any intervening

18  material.

19        In Free Motion, "the district court construed 'adjacent' to mean 'that objects may or

20  may not be in contact, but are not adjacent to each other where there is another object

21  between them.'" 423 F.3d at 1348 (quoting Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,

22  311 F. Supp. 2d. 1297, 1304 (D. Utah 2003)).  On appeal, the Federal Circuit concluded that

23  there were two possible dictionary definitions of "adjacent" to choose from in that case: one

24  definition was "not distant" and the other was "relatively near and having nothing of the

25  same kind intervening." Id. at 1349 (quoting Webster's Third New Int'l Dictionary of the

26  English Language Unabridged 26 (2002)).  After noting that "any reliance on dictionaries"

must "accord[] with the intrinsic evidence," the Federal Circuit vacated the district court's construction that adopted the second dictionary definition because that definition was inconsistent with the intrinsic evidence.  See id. at 1348-49.  Nothing in the patent at issue in Free Motion suggested a concern with an object intervening in between the "adjacent" pivot point and resistance assembly, particularly since the adjacent objects were not of the "same kind."  Id. at 1349.

In the present case, because the adjacent/juxtaposed objects (i.e., garment components) are of the "same kind," Free Motion counsels that an intervening garment component may be a concern.  Nonetheless, the Court is not bound by a dictionary definition discussed in Free Motion.  Although it is true that Figures 3a and 4a depict the adjacent/juxtaposed relationship as having no intervening garment component between the two "adjacent" or "juxtaposed" garment components, the Court declines to limit the claims by the preferred embodiments.  Nothing in the intrinsic evidence demonstrates an intent to preclude the adjacent/juxtaposed relationship where an object intervenes.

Accordingly, the Court adopts Taltech's proposed construction, with modification, and construes the terms "adjacent relationship" and "juxtaposed relationship" to have identical meanings[5] and to mean "next to but not necessarily touching."

### 8.   "Seam"

The term "seam" is found in both the method and product claims of the patents-in-suit.  For example, in Claim 1 of the '779 Patent, a method claim, step (a) of the seam manufacturing process requires "placing the first garment component in an adjacent relationship to the second garment component so as to define a **seam**."  '779 Patent at 6:30-32 (emphasis added).  In Claim 20 of the '779 Patent, a product claim, the "smooth **seam**" is defined as comprising "a bonding element," "a first garment component," "a second garment

---

[5] At the Markman hearing, the parties agreed that the Court should construe the terms "adjacent relationship" and "juxtaposed relationship" the same.

1  component," "a first set stitch," "a second stitch" and "the bonding element of the **seam**

2  having been subjected to a sufficient amount of heat . . . ." '779 Patent at 8:7-43 (emphasis

3  added).  The '615 Patent similarly uses the term in Claims 1 and 19, method and product

4  claims, respectively.  '615 Patent at 6:28-36, 8:1-33.

5       Taltech asks the Court to construe "seam" to mean "two or more plies of fabric

6  material joined together by sewing along a line."  Taltech relies on the opinion of Taltech's

7  expert, Mr. Nienke, and on specialized dictionary definitions of "seam."  Esquel asks the

8  Court to construe "seam" to mean "the place where at least two pieces of fabric are joined by

9  stitches, the width of the seam being defined by the distance between two stitches."  Esquel

10  relies on the claims, on the specifications, and on the opinion of Esquel's expert, Mr.

11  Haddock.  The parties' differences on the construction of "seam" centers on the minimum

12  number of rows of stitches required.  Esquel asserts that at least two rows of stitches are

13  required for a seam, whereas Taltech asserts that no particular number of rows of stitches is

14  required.

15       The Court finds Esquel's proposed construction more persuasive.  The claims define a

16  seam as bounded by two stitches that create two "sides" of a seam: "a first set stitch running

17  along a first side of the **seam** . . . a second stitch running along a second side of the **seam**

18  . . . ." '779 Patent at 8:25, 8:31; '615 Patent at 8:17, 8:23 (emphasis added); see also '615

19  Patent at 6:44, 6:56.  The different sides of the seam are bounded by two different stitches.

20  The specifications also define the "seam width" as the distance (labeled 46 in Fig. 3c)

21  between two stitches (labeled 38 and 40 in Fig. 3c) and note the importance of having the

22  bonding element flow over the entire surface of the seam width for maximum prevention of

23  pucker.  Fig. 3c; '779 Patent at 4:53-59; '615 Patent at 4:54-60.  This definition of "seam

24  width" indicates that more than one row of stitches must define the seam.  See Phillips, 415

25  F.3d at 1321 ("[T]he specification acts as a dictionary when it expressly defines terms used

26  in the claims or when it defines terms by implication." (internal quotation marks omitted)).

ORDER   27–

1   The Court does not rely on extrinsic evidence to interpret "seam" because the intrinsic

2   evidence is sufficient to enable the Court to construe the term.  See Pitney Bowes, 182 F.3d

3   at 1308-09.

4        Accordingly, the Court adopts Esquel's proposed construction, with modification, and

5   construes the term "seam" to mean "the place where at least two pieces of fabric are joined

6   by at least two rows of stitches."

7               **9.   "First" and "Second" Stitch**

8        The terms "first" and "second" are used to describe stitches in both the method and

9   product claims of the patents-in-suit.  For example, in Claim 1 of the '779 Patent, a method

10  claim, step (c) of the seam manufacturing process requires "sewing the first and second

11  garment components and the bonding element together by a **first** set **stitch** running along the

12  seam" and step (f) requires "sewing the first and second garment components and the

13  bonding element together by a **second stitch** running along said seam."  '779 Patent at 6:37-

14  39, 6:47-49 (emphasis added).  In Claim 20 of the '779 Patent, a product claim, the seam is

15  defined as comprising "a **first** set **stitch** running along a first side of the seam and traversing

16  through the bonding element . . . the first garment component . . . and . . . the second garment

17  component . . ." and "a **second stitch** running along a second side of the seam and traversing

18  through the . . . first garment component . . . the bonding element . . . and the second garment

19  component."  '779 Patent at 8:25-30, 8:31-36 (emphasis added).  The '615 Patent uses "first"

20  and "second" to describe stitches in Claims 1 and 19, method and product claims,

21  respectively.  '615 Patent at 6:44-47, 6:56-60, 8:17-26.  In contrast to step (f) in Claim 1 of

22  the '779 Patent, step (f) in Claim 1 of the '615 Patent references both stitches and speaks of

23  "sewing a **second stitch** running along a side of the seam opposite the **first stitch** . . . ."  '615

24  Patent at 6:56-57 (emphasis added).

25       Both parties agree that the "first stitch" is a set stitch and that the "second stitch" is a

26  top stitch.  See, e.g., Taltech's Supplemental Brief, docket no. 137, at 15; Esquel's

ORDER   28–

1   Supplemental Brief, docket no. 140, Ex. A at 2.[6]  The parties' dispute is not over whether

2   these stitches are different types of stitches but whether these stitches must come in a

3   particular order.  Taltech asks the Court to construe "first stitch" to mean "one stitch" and

4   "second stitch" to mean "another stitch different from the first stitch."  Taltech relies on the

5   claims and on the specifications.  Esquel asks the Court to construe "first stitch" to mean

6   "the very first stitch made in the seam manufacturing process" and "second stitch" to mean

7   "the next stitch made in the seam manufacturing process after the 'first set stitch.'"  Esquel

8   relies on the claims, on the specifications, on the prosecution history of the '779 Patent, on

9   dictionary definitions of "first" and "second," on Taltech's "tutorial" (Taltech's <u>Markman</u>

10  Ex. 7), on the Esquel animation (Esquel's <u>Markman</u> Ex. 3), and on admissions made by

11  Taltech's counsel at the <u>Markman</u> hearing.

12      While it is true that "[t]he use of the terms 'first' and 'second' is a common patent-

13  law convention to distinguish between repeated instances of an element or limitation," <u>see</u>

14  <u>3M Innovative Props. Co. v. Avery Dennison Corp.</u>, 350 F.3d 1365, 1371 (Fed. Cir. 2003),

15  the patents-in-suit do <u>not</u> use the terms "first" and "second" to distinguish between repeated

16  instances of the same thing.  Rather, the patents-in-suit use the terms "first" and "second" to

17  distinguish between different types of stitches.  As a result, the <u>3M</u> "common patent-law

18  convention" does not apply in the present case.

19      The Court first looks to the claims to construe "first stitch" and "second stitch."  Step

20  (f) in Claim 1 of the '615 Patent speaks of "sewing a second stitch running along a side of

21  the seam *opposite the first stitch* such that . . . ."  '615 Patent at 6:56-57 (emphasis added).

22  _____

23  [6] The patents use "first stitch" and "first set stitch" interchangeably.  The prosecution history
    of the '779 Patent shows that the word "set" was added to Independent Claims 17 and 34,

24  which became Independent Claims 1 and 20, to clarify that the "first stitch" is a "set stitch."
    '779 Prosecution History, March 11, 1996, Amendment Filed Under 37 C.F.R. § 115,

25  docket no. 85, Ex. D (part 2) at 13.  This change, however, was not consistently applied
    throughout the patents-in-suit.  As a result, sometimes the patents refer to the "first stitch"

26  and other times to the "first set stitch."  The Court uses "first stitch" to mean "first set
    stitch."

ORDER   29–

1   This claim language shows that the first stitch must be sewn prior to the sewing of the

2   second stitch.  Taltech admits this by way of its proposed construction of "a method . . .

3   comprising the steps."  See Taltech's Supplemental Brief, docket no. 137, at 8 (arguing that

4   the language and logic of Claim 1 of the '615 Patent requires step (f), the sewing of a second

5   stitch, to occur after step (e), the folding of the first garment component, which in turn must

6   occur after step (d), the sewing of a first set stitch).

7        In multiple instances, Taltech has admitted that the first set stitch is sewn prior to the

8   second top stitch.  Taltech's "tutorial" described how the armhole seam is created in "three

9   steps":

10

11          First, the sleeve is attached, or 'set' to the shirt body with the set stitches [first
            and additional stitches].  The body panel is folded over the set stitches and a
            top stitch [second stitch] is applied.  Next, the sides of the sleeve and shirt
12          body are sewn together with the side seam.

13   Taltech's Tutorial (Taltech's Markman Ex. 7 at 11).  During the Markman hearing, Taltech

14   described how the second top stitch comes after the first set stitch in the preferred

15   embodiments:

16

17          This set stitch 38 [first stitch] goes through the first and second garment
            components and fixes them together and has to do that before this is folded
            over and the top stitch 40 [second stitch] is applied.  You just asked me about
18          the top stitch 40 [second stitch], does it have to take place after the set stitch 38
            [first stitch], and I said yes.

19

20   Markman Hearing Tr., docket no. 130, at 84.

21        The specifications indeed show that the first set stitch 38 is sewn prior to the second

22   top stitch 40 in the preferred embodiments.  See Figs. 3a-3b, 4a-4b.  Although the preferred

23   embodiments alone are insufficient to impose a limitation on the claims, their depiction of

24   the first set stitch preceding the second top stitch is consistent with the language of step (f) in

     Claim 1 of the '615 Patent.

25        The Court must construe "first stitch" and "second stitch" in light of all of the claims,

26   including Claims 17 and 18 of the '779 Patent and Claim 18 of the '615 Patent, which

ORDER  30–

describe sewing an "additional stitch" "prior to the step of sewing the . . . second stitch . . . ."
'779 Patent at 7:59-8:2; '615 Patent at 7:61-67; see Vitronics, 90 F.3d at 1582 (considering other claims of the patent in question).  Esquel's proposed construction – which requires "first stitch" to mean "the very first stitch made in the seam manufacturing process" and "second stitch" to mean "the next stitch made in the seam manufacturing process after the 'first set stitch'" – precludes the sewing of an additional stitch prior to the second stitch, which cannot be correct.  Esquel argues that its proposed construction is consistent with the "additional stitch" claim language because the first set stitch and the additional stitch are sewn simultaneously.  The Court rejects this argument because the first and additional stitches are not necessarily sewn simultaneously.  Claim 18 of the '779 Patent requires the first and additional stitches to be sewn simultaneously, implying, under principles of claim differentiation, that this is not the case in Claim 17.  '779 Patent at 7:57-8:2.  Thus, the additional stitch may be sewn prior to, at the same time as, or after the first stitch.  To the extent the additional stitch occurs after the first stitch, Esquel's proposed construction does not work because this construction would require the second stitch to be the "next" stitch after the first stitch.

The Court must construe the terms "first stitch" and "second stitch" consistently across all method and product claims.  Taltech argues that any temporal limitation is meaningless with respect to its product claims because a product claim may not be limited by its disclosed method of manufacture.  See Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1357 (Fed. Cir. 2003) (declining to superimpose a process limitation on the product claims at issue).  The imposition of a process limitation on Taltech's product claims is unavoidable here because the intrinsic evidence compels the imposition of a temporal limitation.

Taltech's proposed construction is too broad, and Esquel's proposed construction is too narrow.  Accordingly, the Court adopts a construction that combines concepts from both

ORDER  31–

1   of the parties' proposed constructions, and construes the term "first stitch" to mean "one

2   stitch" and the term "second stitch" to mean "another stitch after the first stitch, but not

3   necessarily the next stitch after the first stitch."

4                    **10.    "A method . . . comprising the steps"**

5        The term "a method . . . comprising the steps" is found only in the method claims of

6   the patents-in-suit.  This term constitutes the preamble and transitional phrase of the method

7   claims.  Claim 1 of the '779 Patent claims: "**A method** of manufacturing a smooth garment

8   seam between first and second garment components **comprising the steps**" (a) through (g).

9   '779 Patent at 6:26-28 (emphasis added).  Claim 1 of the '615 Patent claims: "**A method** of

10  manufacturing a pucker free garment seam between first and second garment components

11  **comprising the steps**" (a) through (g).  '615 Patent at 6:28-30 (emphasis added).

12       Taltech originally asked the Court to construe "a method . . . comprising the steps" to

13  mean that "elements (a)-(g) of these method claims may be performed in any order consistent

14  with the language and logic of the respective method claim and consistent with the Taltech

15  '779 and '615 patent specifications."  In its supplemental brief, Taltech altered its proposed

16  construction as follows:

17

18       Elements of the method claims may be performed in any order consistent with
         the language and logic of the respective method claim and consistent with the
19       patent specification, provided that claim 1 of the '779 Patent recites a method
         requiring that steps (c), (d) and (f) be performed after step (b), and that step (g)
20       be performed after step (e).  Claim 1 of the '615 Patent recites a method
         requiring that step (d) be performed after step (c), step (e) be performed after
21       step (d), step (f) be performed after step (e), and step (g) be performed after
         step (e).[7]

22

_____

23  [7] The Court distributed a document entitled "The Court's Preliminary Construction of Claims
    Prior to Markman Hearing" to the parties prior to the Markman hearing to focus the parties'
24  arguments.  The Court's preliminary construction of claims was not binding on the parties
    and was not meant to be reviewed on appeal.  The Court advised that any opinions contained
25  therein were tentative and subject to change.  Taltech altered its proposed construction of "a
    method . . . comprising the steps" in response to the Court's preliminary construction of the
26  term.  See Taltech's Supplemental Brief, docket no. 137, at 6-7.

ORDER   32–

Taltech relies on the claims, on the specifications, on the opinion of Taltech's expert, Mr.

Nienke, on U.S. Bodle Patent No. 2,120,458 (Taltech's <u>Markman</u> Ex. 8) (the "Bodle

Patent"), and on the video shown as part of Taltech's tutorial (Taltech's <u>Markman</u> Ex. 7).

Esquel asks the Court to construe "a method . . . comprising the steps" to mean that

the elements (a)-(g) of these method claims be performed in a particular order.  Esquel

proposes the following constructions for the two patents-in-suit:

> Claim 1 of the '779 Patent recites a method requiring that step (b) be
> performed after step (a), step (c) be performed after step (b), step (d) be
> performed after step (b), step (e) be performed after step (b), step (f) be
> performed after step (c), and step (g) be performed after step (e).

> Claim 1 of the '615 Patent recites a method requiring that step (b) be
> performed after step (a), step (c) be performed after step (b), step (d) be
> performed after step (c), step (e) be performed after step (d), step (f) be
> performed after step (e), and step (g) be performed after step (e).

Esquel relies on the claims, on the specifications, and on the prosecution history of the '779

Patent.

"Unless the steps of a method [claim] actually recite an order, the steps are not

ordinarily construed to require one."  <u>Interactive Gift</u>, 256 F.3d at 1342.  To determine if the

steps of a method claim that do not otherwise recite an order must nonetheless be performed

in the order in which they are written, a court should first "look to the claim language to

determine if, as a matter of logic or grammar, they must be performed in the order written."

<u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citing <u>Interactive Gift</u>,

256 F.3d at 1342-43).  For example, if the second step requires the presence of a structure

that is formed in the first step, then the claim language itself shows that the steps must be

performed in a particular order.  <u>See</u> <u>Loral Fairchild Corp. v. Sony Corp.</u>, 181 F.3d 1313,

1321 (Fed. Cir. 1999); <u>but see</u> <u>Kemin Foods, L.C. v. Pigmentos Vegetales del Centro</u>, 301 F.

Supp. 2d 970, 993 (S.D. Iowa 2004) (not requiring steps (a) and (b) to be performed in the

order listed even though step (b) refers to "said homogeneous liquid" formed in step (a),

because one skilled in the art would understand steps (a) and (b) to be interchangeable).  A

ORDER   33–

1  particular order might also be required if each subsequent step referenced something

2  logically indicating that the prior step had been performed.  See Mantech Envtl. Corp. v.

3  Hudson Envtl. Servs., Inc., 152 F.3d 1368, 1375-76 (Fed. Cir. 1998).  If the claim language

4  does not indicate a particular order, then a court should look to the specification to determine

5  whether it "directly or implicitly requires such a narrow construction."  See Interactive Gift,

6  256 F.3d at 1343.  "If not, the sequence in which such steps are written is not a

7  requirement."  Altiris, 318 F.3d at 1370.

8      In the present case, the claims do not recite an order.  Thus, the presumption is that no

9  order is required.  Under Altiris and Interactive Gift, the presumption may be overcome if the

10  logic or grammar of the claim language requires a particular order, or if the specifications

11  directly or implicitly require a particular order.  See Altiris, 318 F.3d at 1369-70; Interactive

12  Gift, 256 F.3d at 1343.  The Court may look to expert testimony to determine whether the

13  presumption is overcome because "the expert testimony serves the permissible purposes of

14  aiding our understanding of the technology and in helping us view the patent through the

15  eyes of the skilled artisan."  Altiris, 318 F.3d at 1371 (considering expert testimony that it is

16  technologically possible to achieve the invention's purpose by performing the steps in any

17  order).  Although Taltech's expert, Mr. Nienke, did not disclose an opinion on the term "a

18  method . . . comprising the steps" in his expert report, see docket no. 85, Ex. J (part 1), the

19  Court will consider his opinion in construing this term because Esquel has taken the

20  opportunity to question Mr. Nienke regarding this term in a deposition on December 7, 2005.

21  See Nienke Rebuttal Dep. (Esquel's Markman Ex. 2 – complete transcript).

22      The first area of dispute between the parties is whether step (b) must come after step

23  (a) in Claim 1 of the '779 Patent.  These steps involve "placing" the first and second garment

24  components and the bonding element into position to form a seam.  The claim language, as

25  read by a person of ordinary skill in the art, does not require a particular order.  Mr. Nienke

26  testifies on behalf of Taltech that he "absolutely" knows that steps (a) and (b) "can be

1  reversed because the bonding element typically comes from a reel or a supply so that it's

2  continuous and the bonding element is present typically under the foot before the garment

3  components are introduced." Nienke Rebuttal Dep. at 30:23-31:13, 31:21-32:12, 47:15-23

4  (Taltech's <u>Markman</u> Ex. 13 – highlighted deposition transcript); <u>see also</u> Nienke Rebuttal

5  Decl., docket no. 110, ¶ 5 (Taltech's <u>Markman</u> Ex. 11) (explaining how the bonding element

6  can be present (i.e., step (b)) before the garment components are brought together (i.e., step

7  (a)). Contrary to Esquel's argument, Mr. Nienke's testimony is not merely conclusory

8  because he explains how step (b) may be performed prior to, or at the same time as, step (a)

9  given how the bonding element comes from a reel and is typically under the foot before the

10  garment components are introduced. Nienke Rebuttal Dep. at 31:21-32:12 (Taltech's

11  <u>Markman</u> Ex. 13). Mr. Nienke's testimony is unrebutted. Furthermore, the specification of

12  the '779 Patent implicitly requires no particular order to steps (a) and (b) because the

13  description of the seam manufacturing process in the specification begins with the sewing of

14  the first stitch, not with the placement of the garment components and bonding element.

15  '779 Patent at 4:4-7 ("After the bonding element 32, first garment component 20, and second

16  garment component 22 are positioned as shown in [Figure] 3a, a first stitch 38 is sewn along

17  the seam line defined by the first and second garment components."); Fig. 3a (showing first

18  step with the garment components and the bonding element in place and the first stitch

19  sewn). This specification implies that the timing of the positioning of the bonding element

20  and the garment components together is unimportant. The Court concludes that the patent

21  does not require step (b) in Claim 1 of the '779 Patent to come after step (a).

22      Similarly, the parties dispute whether steps (a), (b) and (c) in Claim 1 of the '615

23  Patent need to be performed in any particular order. These steps involve "providing" the

24  first and second garment components and bonding element in positions relative to each other.

25  Again, as with steps (a) and (b) of the '779 Patent, the claim language, as read by a person of

26  ordinary skill in the art, does not require a particular order. Mr. Nienke testifies that steps

1   (a) and (b) in Claim 1 of the '615 Patent can occur simultaneously and that step (c) can occur

2   before, after, or simultaneously with either of steps (a) and (b).  Nienke Rebuttal Decl.,

3   docket no. 110, ¶ 6 (Taltech's <u>Markman</u> Ex. 11).  He further testifies that the order of these

4   steps does not affect the ultimate structure and folding described in the claim.  <u>Id.</u>  This

5   testimony is analogous to the testimony in <u>Altiris</u> that it was technologically possible to

6   achieve the invention's purpose by performing the 'setting' step before, during, or after the

7   'booting normally' step.  <u>See</u> 318 F.3d at 1371.  Mr. Nienke's testimony is unrebutted.

8   Furthermore, as with steps (a) and (b) in Claim 1 of the '779 Patent, the specification of the

9   '615 Patent begins its description of the seam manufacturing process with the sewing of the

10   first stitch, thus indicating that the timing of the positioning of the bonding element and the

11   garment components together is unimportant.  '615 Patent at 4:5-8; Fig. 3a.  The Court

12   concludes that steps (a), (b) and (c) in Claim 1 of the '615 Patent do not need to be

13   performed in any particular order.

14          Both parties agree that the first and second garment components and the bonding

15   element must be in position before the first stitch is sewn.  Thus, step (c) must come after

16   steps (a) and (b) in Claim 1 of the '779 Patent, and step (d) must come after steps (a), (b) and

17   (c) in Claim 1 of the '615 Patent.

18          Both parties also agree that the folding of the first garment component over the

19   bonding element must occur after the bonding element is in place; thus step (d) must come

20   after step (b) in Claim 1 of the '779 Patent, and step (e) must come after step (c) in Claim 1

21   of the '615 Patent.  In Claim 1 of the '615 Patent, step (e) must also come after step (d)

22   because step (e) requires the presence of the first set stitch introduced in step (d).[8]

23

24

25

26   _____

[8] The parties agree that step (e) must come after step (d) in Claim 1 of the '615 Patent.

ORDER   36–

1    The next area of dispute is whether step (e) must come after step (b) in Claim 1 of the

2  '779 Patent.[9]  Step (e) involves the folding of a portion of the second garment component

3  such that the lower surface of the second garment component abuts the lower surface of the

4  bonding element.  Mr. Nienke has testified that step (e) can occur before, after, or

5  simultaneously with the "placing" of the bonding element in step (b).  Nienke Rebuttal Decl.,

6  docket no. 110, ¶ 7 (Taltech's <u>Markman</u> Ex. 11); Nienke Rebuttal Dep. at 51:4-13 (Taltech's

7  <u>Markman</u> Ex. 13).  The Court does not rely on Mr. Nienke's testimony given Taltech's

8  clearly stated position that "in claim 1 of the '779 Patent, the logic and language of the claim

9  indicates that step (d) occurs after step (b) . . . ."  Taltech's Supplemental Brief, docket no.

10  137, at 7.  If step (d) must come after step (b), then so must step (e) because step (d) involves

11  the folding of the first garment component over the bonding element, and step (e) involves

12  the folding of the second garment component over the bonding element.  Both steps (d) and

13  (e) require the presence of the bonding element.  The Court concludes that the logic and the

14  grammar in Claim 1 of the '779 Patent require step (e) to come after step (b).

15    The next area of dispute is whether step (f) must come after step (c) or after step (b) in

16  Claim 1 of the '779 Patent.  In step (b), the bonding element is introduced.  In step (c), the

17  first stitch is sewn.  In step (f), the second stitch is sewn.  Esquel argues that step (f) must be

18  performed after step (c).  The Court agrees because the Court construes "first" and "second"

19  stitch to be temporally limited to that order (see construction of "first stitch" and "second

20  stitch," above).  The Court concludes that step (f) must come after step (c) in Claim 1 of the

21  '779 Patent.

22    Both parties agree that steps (f) and (g) must be performed after step (e) in Claim 1 of

23  the '615 Patent and that step (g) must be performed after step (e) in Claim 1 of the '779

24  Patent.  Indeed, the folding that takes place in step (e) must occur prior to these other steps.

25

26  [9] Claim 18 of the '779 Patent makes it clear that step (e) may come before step (c).  '779
Patent at 7:66-8:2 ("step (e) is performed prior to step (c)").

ORDER   37–

1       This construction, which requires that certain steps be performed in a particular order,

2   is consistent with the specifications' reference to the "progressive manufacturing steps"

3   shown in Figures 3a-3c. '779 Patent at 3:36-37; '615 Patent at 3:37-38. The Court does not,

4   however, impose the strict limitations imposed by the words "after" and "next" from the

5   description of the preferred embodiment shown in Figures 3a-3c. '779 Patent at 4:4-25; '615

6   Patent at 4:5-26. For example, this preferred embodiment requires the first garment

7   component to be folded over the bonding element (i.e., step (d)) after the first stitch is sewn

8   (i.e., step (c)). Neither party proposed a construction requiring that step (d) come after step

9   (c). To so require would be to improperly limit the claims by the preferred embodiment.

10       The prosecution history of the '779 Patent shows that Taltech distinguished the prior

11   art (i.e., the Benstock patent) by stating that this invention prevents seam puckering during

12   subsequent laundering "due to the *novel sequence of steps* and novel positioning of garment

13   components and sewing with respect to a bonding element." '779 Prosecution History,

14   March 11, 1996, Amendment Filed Under 37 C.F.R. § 115, docket no. 85, Ex. D (part 2) at

15   15 (emphasis added). Taltech's reference to the "novel sequence of steps" is not an "explicit

16   argument" requiring that the steps be performed in the exact order as listed in the claims.

17   See Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378-79 (Fed. Cir. 1998)

18   ("[E]xplicit arguments made during prosecution to overcome prior art can lead to narrow

19   claim interpretations . . ."). This statement in the prosecution history is insufficient to

20   overcome the presumption that no order is required.

21       Accordingly, the Court construes the term "a method . . . comprising the steps" as

22   follows:

23

24           Claim 1 of the '779 Patent recites a method requiring that step (c) be
     performed after steps (a) and (b), that steps (d) and (e) be performed after step
     (b), that step (f) be performed after step (c), and that step (g) be performed

25           after step (e).

26

1
2

Claim 1 of the '615 Patent recites a method requiring that step (d) be performed after steps (a), (b) and (c), that step (e) be performed after step (d), and that steps (f) and (g) be performed after step (e).

3
4

### 11. "Folding . . . Such That"

5

The term "folding . . . such that" is found only in the method claims of the patents-in-

6

suit. For example, in Claim 1 of the '779 Patent, a method claim, step (d) of the seam

7

manufacturing process requires "**folding** the first garment component over the bonding

8

element **such that** the upper surface of the first garment component is folded over and abuts

9

an upper surface of the bonding element." '779 Patent at 6:40-43 (emphasis added). Also in

10

Claim 1 of the '779 Patent, step (e) of the seam manufacturing process requires "**folding** a

11

portion of the second garment component **such that** a lower surface of the second garment

12

component abuts the lower surface of the bonding element." '779 Patent at 6:44-46

13

(emphasis added). In Claim 1 of the '615 Patent, step (e) requires "**folding** the first garment

14

component over the bonding element **such that** the upper surface of the first garment

15

component is folded over and abuts an upper surface of the bonding element along the

seam . . . ." '615 Patent at 6:48-51 (emphasis added).

16
17

Taltech asks the Court to construe "folding . . . such that" to mean "folding, which

18

creates, maintains, or results in the relationship described following 'such that.'" Taltech

19

relies on the claims, on the specifications, on dictionary definitions of "such" and "such

20

that," on the opinion of Taltech's expert, Mr. Nienke, and on the Bodle Patent (Taltech's

21

<u>Markman</u> Ex. 8). Esquel asks the Court to construe "folding . . . such that" to mean "folding

22

which creates or results in the relationship described following 'such that.'" Esquel relies on

23

the claims and on the specifications.

24

The parties' dispute centers on Taltech's inclusion of the word "maintains" in its

25

proposed construction. Taltech argues that the relationships described after "such that" are

26

present after folding, but not necessarily as a causal result of the folding. Taltech argues that

ORDER   39–

1   construing "folding . . . such that" to require a causal relationship narrows the ordinary

2   meaning of the term.

3       For the reasons outlined above in the discussion of the term "a method . . . comprising

4   the steps," and specifically regarding the determination that step (e) must come after step (b)

5   in Claim 1 of the '779 Patent, the Court does not rely on the opinion of Taltech's expert, Mr.

6   Nienke, who says that the folding can occur before, or at the same time that, the bonding

7   element is placed along the seam.  See Nienke Rebuttal Decl., docket no. 110, ¶ 7 (Taltech's

8   Markman Ex. 11).  The bonding element must be present prior to the folding of the first and

9   second garment components.

10      Taltech submits the "to the extent that" definition of "such that" in support of its "no

11   causation required" construction.  See Compact Oxford English Dictionary (Catherine

12   Soanes & Sara Hawker eds., Oxford Univ. Press 3d ed. 2005), available at

13   http://www.askoxford.com/concise_oed/such?view=uk (docket no. 94, Ex. C).  Taltech also

14   submits the "of a degree or quality specified" definition of "such that" in support of its

15   construction.  See Dictionary.com Definition of "such that",

16   http://dictionary.reference.com/search?q+such%20that (last visited Aug. 19, 2005) (docket

17   no. 94, Ex. D).  Taltech has not incorporated these definitions into its proposed construction,

18   and these definitions do not preclude an exclusively causal interpretation of "folding . . .

19   such that."

20      Esquel argues that Taltech's proposed construction improperly reads "such that" out

21   of the claim.  See BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC, 303

22   F.3d 1332, 1344 (Fed. Cir. 2002) (rejecting claim construction that reads a limitation out of

23   the claims).  The Court agrees.  "Such that" must be given some meaning that connects the

24   action of "folding" to the relationship described following "such that."  A causal requirement

25   for "such that" is supported by other claim language that demonstrates a clear connection

26   between an action (other than folding) and the relationship described following "such that."

ORDER   40–

1   See, e.g., Claim 1(g) of the '779 Patent at 6:50-52 ("applying sufficient heat and pressure to

2   said bonding element . . . such that said adhesive flows . . .").

3       Accordingly, the Court adopts Esquel's proposed construction and construes the term

4   "folding . . . such that" to mean "folding, which creates or results in the relationship

5   described following 'such that.'"

6              **12.    "Thermal Adhesive Web"**

7       The term "thermal adhesive web" is found in both the method and product claims of

8   the patents-in-suit.  For example, Claim 10 of the '779 Patent, a method claim dependent on

9   Claim 1, requires that "said bonding element is a **thermal adhesive web** or net composed

10  entirely of a thermal adhesive." '779 Patent at 7:25-28 (emphasis added).  Claim 11, a

11  method claim dependent on Claim 10, states that "said **thermal adhesive web** is composed

12  of a plurality of adhesive filaments having a diameter ranging approximately between 20 to

13  80 microns." '779 Patent at 7:29-33 (emphasis added).  Claim 12, another method claim

14  dependent on Claim 10, states that "said **thermal adhesive web** has a density of

15  approximately 10 to 100 grams per square meter." '779 Patent at 7:34-37 (emphasis added).

16  Claim 27 of the '779 Patent, a product claim dependent on Claim 20, states that "said

17  bonding element is a **thermal adhesive web** composed entirely of thermal adhesive." '779

18  Patent at 9:3-5 (emphasis added).  Claims 2-4 of the '615 Patent use the term exactly as it

19  was used in Claims 10-12 of the '779 Patent.  '615 Patent at 7:1-10.  Claim 20 of the '615

20  Patent uses the term exactly as it was used in Claim 27 of the '779 Patent.  '615 Patent at

21  8:34-36.

22      Taltech asks the Court to construe "thermal adhesive web" to mean "a random array

23  of thermal adhesive material."  Taltech relies on the claims, on the specifications, and on the

24  opinion of Taltech's expert, Dr. David Hall.  Esquel asks the Court to construe "thermal

25  adhesive web" to mean "a two dimensional structure made by randomly crossing thermal

26  adhesive fibers" to create openings.  Esquel relies on the specifications and on specialized

1  dictionary definitions of "web."  Both parties agree that "thermal adhesive web" has a

2  "random" element to it.  Both parties use "thermal adhesive" in their proposed constructions

3  of "thermal adhesive web."  The parties' dispute centers on whether a "thermal adhesive

4  web" must be fibrous (i.e., containing filaments) and whether it must have openings.

5      Esquel asserts that a "thermal adhesive web" must be fibrous.  The <u>Glossary of</u>

6  <u>Fusible Interlining Technology</u> defines "adhesive web" as "an adhesive resin in form of a

7  fibrous network."  INDA, Ass'n of the Nonwoven Fabrics Indus., <u>Glossary of Fusible</u>

8  <u>Interlining Technology</u>, Bobbin, Oct. 1981, at 57 (docket no. 97, Ex. J at 57).  The <u>Man-</u>

9  <u>Made Textile Encyclopedia</u> defines "web" as "[a] random fibrous structure used in the

10  manufacture of nonwoven textiles."  <u>Man-Made Textile Encyclopedia</u> 901-02 (1959) (docket

11  no. 97, Ex. B at 901-02).  Despite the reference to "fibrous" structures in these definitions,

12  the Court reads the term "thermal adhesive web" to require fibers or filaments only when the

13  claims themselves use such language.  As outlined above, Claim 11 of the '779 Patent, which

14  has not been placed directly at issue here, defines thermal adhesive web as being composed

15  of filaments having a certain diameter.  In contrast, the language in Claim 10 of the '779

16  Patent merely requires that the thermal adhesive web be composed "entirely of thermal

17  adhesive."  The inclusion of the specific "filaments" limitation in Claim 11 indicates that the

18  limitation does not properly belong in all claims.  The Court applies the principles of claim

19  differentiation to give the other claims a broader scope because to read otherwise would

20  make Claim 11 redundant.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1324-25.

21      In its effort to construe "thermal adhesive web" to include fibers (i.e., filaments),

22  Esquel argues that the '779 Patent specification's "preferred embodiment" refers to "the

23  adhesive web" as being "manufactured from a plurality of *filaments* . . . ."  '779 Patent at

24  3:62-63 (emphasis added).  The Court refuses to import limitations from a "preferred

25  embodiment" outlined in the specification into the claims.  <u>See</u> <u>Eolas Techs. Inc. v.</u>

26

ORDER  42–

1  Microsoft Corp., 399 F.3d 1325, 1337 (Fed. Cir. 2005) (commenting that it is improper to

2  limit claims to the preferred embodiment).

3         In addition to a fibrous structure, Esquel proposes a construction that would require

4  openings in the thermal adhesive web.  The patents-in-suit do not discuss or illustrate

5  "openings" of any kind in the thermal adhesive.  As a result, the Court does not interpret the

6  term to require openings.

7         The specifications of the patents-in-suit distinguish a thermal adhesive "web" from a

8  "net" by characterizing a net as being "more solid structured" than a web.  '779 Patent at

9  3:53-4:2; '615 Patent at 3:54-4:3.  The Court incorporates this language into its construction

10 of the terms "thermal adhesive web" and "thermal adhesive net."  Nothing in the claims

11 indicates that "net" should not be interpreted as being more solid structured than a "web"

12 across all claims.

13        Accordingly, the Court adopts Taltech's proposed construction,[10] with modification,

14 and construes the term "thermal adhesive web" to mean "a random array of thermal adhesive

15 material that is less solid structured than a thermal adhesive net."

16              **13.   "Thermal Adhesive Net"**

17        The term "thermal adhesive net" is found only in the method claims of the patents-in-

18 suit.  For example, Claim 5 of the '779 Patent, a method claim dependent on Claim 1,

19 requires that "said bonding element is a **thermal adhesive net** having a density of

20 approximately 8 to 80 grams per square meter."  '779 Patent at 7:5-7 (emphasis added).

21 Claim 10 of the '779 Patent, another method claim dependent on Claim 1, requires that "said

22 bonding element is a **thermal adhesive** web or **net** composed entirely of a thermal

23 adhesive."  '779 Patent at 7:25-28 (emphasis added).  Claim 12 of the '615 Patent uses the

24

25 _____

26 [10] In adopting Taltech's proposed construction, the Court does not rely on the opinion of
   Taltech's expert, Dr. Hall, see Hall Decl., docket no. 95, ¶¶ 5-6, because it is merely
   conclusory.  See Phillips, 415 F.3d at 1318.

ORDER  43–

1  term in the exact same way as it was used in Claim 5 of the '779 Patent.  '615 Patent at 7:36-

2  39.

3       Taltech asks the Court to construe "thermal adhesive net" to mean "a regular array of

4  thermal adhesive material."  Taltech did not provide any new arguments regarding this term

5  in addition to those presented for the term "thermal adhesive web."  Esquel asks the Court to

6  construe "thermal adhesive net" to mean "a two dimensional structure made by crossing

7  thermal adhesive fibers at regular intervals."  Esquel relies on the specifications and on

8  general purpose and specialized dictionary definitions of "net."  Both parties agree that

9  "thermal adhesive net" has a "regular" element to it.  Both parties use "thermal adhesive" in

10  their proposed constructions of "thermal adhesive net."  The parties' dispute centers on

11  whether a "thermal adhesive net" must be fibrous and whether it must have openings.

12       The Court finds Taltech's less restrictive construction more persuasive.  For the same

13  reasons outlined above in the discussion of "thermal adhesive web," the Court rejects

14  Esquel's requirements that the net be fibrous and have openings.  The Court declines to

15  impose any limitations from the dictionary definitions provided by Esquel onto the claims.

16       As noted in the discussion of "thermal adhesive web," the specifications of the

17  patents-in-suit distinguish a thermal adhesive "web" from a "net" by characterizing a net as

18  being "more solid structured" than a web.  '779 Patent at 3:53-4:2; '615 Patent at 3:54-4:3.

19  The Court incorporates this language into its construction of the terms "thermal adhesive

20  web" and "thermal adhesive net."  Nothing in the claims indicates that "net" should not be

21  interpreted as being more solid structured than a "web" across all claims.

22       Accordingly, the Court adopts Taltech's proposed construction, with modification,

23  and construes the term "thermal adhesive net" to mean "a regular array of thermal adhesive

24  material that is more solid structured than a thermal adhesive web."

25  **III.   <u>CONCLUSION</u>**

26

ORDER   44–

1    The Court has construed the thirteen disputed claim terms in this case as set forth

2  above.

3    IT IS SO ORDERED.

4    DATED this 19th day of January, 2006.

5

6                                          _____
                                           Thomas S. Zilly
7                                          United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   45–