1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10
TALTECH LIMITED, and TAL APPAREL
LIMITED,

11
                            Plaintiffs,

No.  C04-974Z

12
v.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

13
ESQUEL APPAREL, INC., and ESQUEL
ENTERPRISES, LTD.,

14

15
                            Defendants.

16

17

18
        This matter came on for trial on October 2, 2006, before the Court, sitting without a

19
jury.  Plaintiffs Taltech Limited and TAL Apparel Limited were represented by Bradford E.

20
Kile and Charles D. Reed, of Kile Goekjian Reed & McManus, and Brian G. Bodine and

21
Stuart R. Dunwoody, of Davis Wright Tremaine.  Defendants Esquel Enterprises, Ltd. and

22
Esquel Apparel, Inc. were represented by Steven H. Hoeft and Joseph H. Paquin, of

23
McDermott Will & Emery, and Paul D. Swanson, of Lane Powell.  Trial ended on October

24
16, 2006, and the Court took the case under advisement.

25

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   1–

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# I.

# BACKGROUND

On April 29, 2004, Esquel Enterprises, Ltd. filed a Complaint for Declaratory Judgment and Other Relief against TAL Apparel Limited and Taltech Limited in this Court. Compl., docket no. 1.  Esquel Enterprises, Ltd.'s Complaint sought a declaratory judgment of non-infringement.  Id. at ¶¶ 6-12.  On April 30, 2004, Taltech Limited filed a Complaint for Injunctive Relief and Damages for Willful Infringement against Esquel Apparel, Inc. and Esquel Enterprises, Ltd. in the Eastern District of Texas, Case No. 2-04CV-179.  On July 27, 2005, the Eastern District of Texas transferred its case to the Western District of Washington, Case No. C05-1318Z.  On October 18, 2005, pursuant to a stipulation of the parties, the Court consolidated the two cases into the present case.  Minute Order, docket no. 86.  On November 3, 2005, Taltech Limited filed a First Amended Complaint.  Am. Compl., docket no. 89.

On January 9, 2006, the Court entered an Order Regarding Case Style and Effect of Judgment, which ordered that the case be referred to as Taltech Limited, Plaintiff, v. Esquel Enterprises, Ltd., Defendant, and further ordered that Taltech Limited, TAL Apparel Limited, Esquel Enterprises, Ltd., and Esquel Apparel, Inc. would be bound by orders and the judgment in this case.  Order, docket no. 148.  Because that Order did not dismiss any parties, these Findings of Fact and Conclusions of Law refer to the case as Taltech Limited and TAL Apparel Limited, Plaintiffs, v. Esquel Apparel, Inc. and Esquel Enterprises, Ltd., Defendants.

Taltech Limited alleges willful infringement of its patents for a "wash-n-wear" dress shirt product and methods of producing "pucker free" seams in dress shirts, including 100% cotton shirts.  Am. Compl., docket no. 89, ¶ 1.  The patents at issue here (collectively, the "patents-in-suit" or "Taltech patents") are: (1) United States Patent No. 5,568,779 ("the '779 Patent"), and (2) United States Patent No. 5,590,615 ("the '615 Patent"), Exhibits 1 and 2 to

FINDINGS OF FACT and CONCLUSIONS OF LAW   2–

1    the First Amended Complaint, respectively.  In their Answer to the Amended Complaint,

2    Esquel Enterprises, Ltd. and Esquel Apparel, Inc. assert eleven affirmative defenses to

3    Taltech Limited's allegations of patent infringement, and no counterclaims.  Answer, docket

4    no. 114, at 11-15.  The affirmative defenses of no direct infringement, no induced

5    infringement, no willful infringement, patent invalidity (including anticipation, obviousness,

6    and best mode), and inequitable conduct were issues at trial.

7        In December 2005, the Court conducted a <u>Markman</u> hearing to construe various terms

8    of the patents-in-suit.  Thereafter, the Court entered a <u>Markman</u> Order, docket no. 150,

9    construing thirteen terms of the patents-in-suit.  The Court now incorporates by reference

10   each of the terms previously construed for purposes of this litigation.

11       The Court has considered the evidence presented at trial, the exhibits admitted into

12   evidence, the designated deposition testimony of witnesses, the arguments of counsel, and

13   the Court being fully advised, now makes the following Findings of Fact and Conclusions of

14   Law.  These Findings of Fact and Conclusions of Law hold that Esquel Enterprises, Ltd. and

15   Esquel Apparel, Inc. do not infringe claim 11 of the '615 Patent; that Esquel Enterprises,

16   Ltd. and Esquel Apparel, Inc. do not infringe claim 18 of the '779 Patent; that claim 18 of

17   the '779 Patent is invalid under 35 U.S.C. § 112 because the inventor failed to satisfy the

18   "best mode" requirement; and that the '779 Patent is unenforceable because the applicant,

19   John Wong, committed inequitable conduct before the Patent Office by failing to disclose the

20   John Wong Undisclosed Raincoat Seam, and by making material misrepresentations when he

21   disclosed the TAL Disclosed Raincoat Seam.  The Court also finds that this is an exceptional

22   case under 35 U.S.C. § 285.

23

24

25

26

## II.

## FINDINGS OF FACT

**A.     Parties**

1.     Plaintiff Taltech Limited ("Taltech") is a British Virgin Islands holding company formed on May 12, 1998. Taltech holds title to the patents-in-suit. Taltech has its principal place of business in Tortola, Virgin Islands and is a wholly owned subsidiary of South China (Jersey) Holdings Ltd., owned principally by the Lee family of Hong Kong. Dr. Harry Lee is the Managing Director of Taltech, and he has held that position since at least 2000. Dr. Harry Lee is a member of the Board of Directors of Taltech, along with Dr. Richard Lee, Dr. Linus Siu, and Malcolm Matthews. Taltech conducts no business other than holding and licensing patents. Taltech does not manufacture or sell any products. (Joint Agreed Findings of Fact ("JAFF"), docket no. 264, ¶ 1; Pretrial Order Undisputed Facts, docket no. 250, at 4-6, ("PTO") ¶¶ 2, 3).

2.     Plaintiff TAL Apparel Limited ("TAL Apparel" or "TAL") was reformed and incorporated on January 7, 1983, and is a Hong Kong company with its principal place of business in Kowloon, Hong Kong. TAL Apparel is a wholly owned subsidiary of South China (Jersey) Holdings Ltd. Dr. Harry N.S. Lee is the Managing Director of TAL Apparel, and he has held that position since at least 1994. Dr. Harry Lee is a member of the Board of Directors of TAL Apparel, along with Dr. Richard Lee, Malcolm Matthews, and Randy Cheung. (JAFF ¶ 2; PTO ¶¶ 1, 3).

3.     TAL Apparel is in the business of manufacturing garments, such as dress shirts. TAL Apparel competes with Esquel Enterprises, Ltd. in the original equipment manufacturer ("OEM") sale of apparel, including 100% cotton dress shirts, throughout the world, including in the United States. TAL Apparel manufactures dress shirts for sale in the United States under such brand names as Brooks Brothers, Nordstrom, Ralph Lauren, Liz Claiborne, Talbots, J.C. Penney, L.L. Bean, Calvin Klein, Ashworth, Tommy Hilfiger, Jos.

1  A. Bank, and others, and counts among its customers department stores such as Macy's,

2  Belk, Dillard's, and Kohls.  TAL Apparel has an oral, non-exclusive, and royalty free license

3  from Taltech to practice the inventions claimed in the '779 and '615 Patents.  (JAFF ¶¶ 2, 6;

4  PTO ¶¶ 1, 4).

5        4.      The Apparel Group Ltd. ("TAG") is a New York corporation with its principal

6  place of business in Dallas, Texas.  TAG, like Taltech and TAL Apparel, is held by South

7  China (Jersey) Holdings Ltd. of Hong Kong.  The President of TAG's men's division is Mr.

8  Norman Goldberg.  TAG's Board of Directors includes Dr. Richard Lee and Dr. Harry Lee.

9  TAG imports and sells garments including men's and women's dress shirts.  (JAFF ¶ 4; Ex.

10 5).

11       5.      Pen Apparel Sdn. Bhd. ("Pen Apparel") is a garment manufacturing company

12 in Penang, Malaysia.  Pen Apparel manufactures OEM dress shirts and outerwear, including

13 raincoats, for sale throughout the world, including the United States.  Pen Apparel is a sister

14 company with Taltech, TAL Apparel, and TAG, and is owned, in substantial part, by South

15 China (Jersey) Holdings Ltd.  (JAFF ¶ 5; Ex. 5).

16       6.      Defendant Esquel Enterprises, Ltd. ("Esquel"), is a Hong Kong limited liability

17 corporation with its principal place of business in Wanchai, Hong Kong.  Esquel was formed

18 on or about 1977-78 in Hong Kong by Mr. Y. L. Yang and his daughter Marjorie Yang.  At

19 one time, Mr. Yang was a member of the Board of Directors of TAL Apparel, and he started

20 Esquel after he left TAL Apparel.  Ms. Yang is the Chairperson of Esquel, and she has held

21 that position since at least 1995.  Esquel has become a vertically integrated company with

22 cotton farm holdings in mainland China and elsewhere, fabric manufacturing mills and

23 garment manufacturing facilities around the world.  Esquel is a major manufacturer of dress

24 shirts and is a principal competitor of TAL Apparel for the sale of OEM dress shirts around

25 the world.  (JAFF ¶¶ 7, 28; PTO ¶¶ 9, 10).  Esquel manufactures dress shirts in a factory in

26 Gaoming, China, and in its Eastern Garment factory in Penang, Malaysia.  (PTO ¶ 13).

FINDINGS OF FACT and CONCLUSIONS OF LAW   5–

7.      Defendant Esquel Apparel, Inc., ("Esquel Apparel") is a New York corporation, having its principal place of business in New York, New York.  Esquel Apparel has offices in Seattle, Washington; Madison, Wisconsin; Columbus, Ohio; and Portland, Maine.  Esquel Apparel is a wholly owned subsidiary of Esquel Enterprises, Ltd.  Esquel Apparel provides merchandising design and product development services in the United States.

**B.      Patents-In-Suit**

8.      The patents-in-suit are: (1) United States Patent No. 5,568,779 ("the '779 Patent"), which is entitled "Pucker Free Garment Seam and Method of Manufacture," which issued October 29, 1996, and (2) United States Patent No. 5,590,615 ("the '615 Patent"), which is entitled "Pucker Free Garment Seam and Method of Manufacture," which issued January 7, 1997.  The patented invention in both the '779 and the '615 Patents "relates to a pucker free garment seam and method of manufacture," and "[m]ore specifically . . . to an improved garment seam and method of manufacture . . . around a sleeve attachment area . . . ."  '779 Patent at 1:6-11; '615 Patent at 1:9-14.  Both of the patents-in-suit are based on a single patent application filed with the United States Patent and Trademark Office (the "Patent Office") on May 17, 1994 – with the '615 Patent issuing from a continuation of the application for the '779 Patent.  Both patents were drafted with broad language sufficient to cover any type of clothing garment and all garment seams.  As a result, the written description and drawings of both patents are identical.  Ismael Izaguirre was the Patent Office's Primary Examiner for both patents.   (See JAFF ¶¶ 8, 14; PTO ¶ 6).

9.      John Wong is the sole inventor of the patents-in-suit.  Mr. Wong[1] is listed as the "applicant" on the patent applications for the Taltech patents.  (Ex. 3 at 42; Ex. 4 at 55).

10.      Mr. Wong assigned the rights to the pucker free seam invention, which was set forth in a patent application that eventually issued as the '779 Patent, to TAL Apparel in

--------

[1] "Mr. Wong" refers to John Wong, whereas Mr. H.P. Wong refers to Hak Piu Wong.

FINDINGS OF FACT and CONCLUSIONS OF LAW   6–

1  connection with the original application in 1994.  The assignment from John Wong to TAL

2  Apparel, Ltd. was recorded with the Patent Office on July 28, 1994, reel 7182, frame 849.

3  On January 10, 1999, TAL Apparel assigned the rights in the '779 Patent, as well as the

4  rights in the '615 Patent, to Taltech.  (JAFF ¶ 8; PTO ¶ 7; Exs. 7, 8).

5         11.     TAL Apparel and Taltech have licensed rights in the patents-in-suit to third

6  parties.  (PTO ¶ 8).

7         12.     Mr. Wong was the only person who provided information to the attorneys who

8  prosecuted the patent applications for the patents-in-suit.  Mr. Wong testified that he read

9  and understood the patent applications before he signed them.  He understood that he had an

10  obligation to tell the truth and to disclose all material prior art to the patent examiner, and he

11  signed a declaration to that effect.  The prosecution history for the '779 Patent is contained in

12  Exhibit 3, and the prosecution history for the '615 Patent is contained in Exhibit 4.

13  **C.**    **Wrinkle Free Fabric and Pucker Free Seams**

14         13.     Garments are made by sewing together fabric pieces with thread.  The fabrics

15  used to make garments are often made either from 100% cotton fiber or a blend of cotton

16  fiber and other materials, such as polyester.  Garments made with these fabrics wrinkle after

17  being worn or laundered.  A common way to remove wrinkles from a garment is to iron it.

18  (JAFF ¶ 10).

19         14.     In about 1993, materials and techniques were developed which enabled

20  manufacturers to make fabrics truly wrinkle free.

21         15.     With the advent of truly wrinkle free fabrics in about 1993, the elimination of

22  pucker from the garment seams became important because the wrinkle free process did not

23  alone prevent seam pucker in most garments.  Having pucker free seams in addition to

24  wrinkle free fabric was necessary to eliminate the need for ironing.

25

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   7–

16.    "Pucker" is a corrugation of the fabric along the seams of a garment.  Seam pucker is typically caused by thread and fabric shrinkage during laundering.  (PTO ¶ 18). The thread and fabric shrink at different rates.  If the thread shrinks more than the fabric, then the thread pulls against the fabric and causes it to bunch up or corrugate along the seam, resulting in seam pucker.  (JAFF ¶ 11).

17.    A men's dress shirt has many seams which may pucker, including the collar, the front placket, the cuffs, and the armhole area.  The focus of this litigation has been on pucker free armhole seams in men's dress shirts.

18.    Consumers' demand for garments is created by many factors, including fashion, elements of style, shape, texture, color, quality and feel of the fabric, special performance features or finishes, quality of workmanship, and price.  Thus, a pucker free seam is just one of many factors driving consumer demand for garments.  The importance of a pucker free seam to consumer demand relative to other factors has not been proved by Plaintiff by a preponderance of the evidence.

**D.    John Wong's Testimony - The Invention**

19.    Mr. John Wong, the sole inventor of the patents-in-suit, has worked for TAL Apparel or its related companies for approximately 37 years.  He has focused his work for TAL Apparel in the design and manufacture of dress shirts.  He is currently the Senior Manager of the Research and Development Department, and has held that position since 1994.  Mr. Wong testified at trial in English with the aid of a Cantonese interpreter.

20.    After graduating from high school in 1968, and until 1971, Mr. Wong worked as a production trainee in TAL Apparel's Castle Peak Garment Factory in Hong Kong, repairing sewing machines used to make dress shirts.  Mr. Wong received formal training in the vocational training center in the machine shop.  Mr. Wong studied mechanical drawing, and machine theory and operating.

FINDINGS OF FACT and CONCLUSIONS OF LAW   8–

21.     From 1971 to 1979, Mr. Wong worked in quality control at TAL Apparel's ITT Garment Factory in Taiwan.  The ITT factory manufactured men's and women's dress shirts; it did not manufacture raincoats.  From 1979 to 1991, Mr. Wong worked as the Factory Manager in TAL's ITT factory, overseeing the manufacture of dress shirts and approximately 2,000 workers.

22.     From 1992 to 1994, Mr. Wong worked as the Factory Manager in TAL Apparel's Pen Apparel factory in Panang, Malaysia, which had approximately 2,500 workers.  The Pen Apparel factory manufactured dress shirts and "outerwear," the latter of which includes pants, skirts, jackets, and raincoats.  Approximately 65% of the factory's production was dress shirts, and 35% outerwear.  As Factory Manager, Mr. Wong was in charge of managing the quantity of the production of dress shirts and outerwear, including raincoats, and the quality of dress shirt production.  However, Mr. Wong was not charged with overseeing the quality of the raincoats and outerwear produced by the factory.  Mr. Wei, Mr. Wong's assistant manager, was in charge of the day-to-day raincoat and outerwear production.  Mr. Wei reported to Mr. Wong.  Mr. Wong reported to the director of the Pen Apparel factory, Mr. Y. H. Tan.

23.     At trial, Mr. Wong testified on direct that pucker in the armhole seams of dress shirts became a problem that he tried to solve when TAL Apparel switched from using an overlock stitch to a single needle stitch in its manufacture of dress shirts in about 1985.  On cross, Mr. Wong admitted to prior deposition testimony that his efforts to reduce seam pucker started in about 1990.  Mr. Wong tried mechanical solutions to reduce seam pucker, such as adjusting the pressure of the pressure foot and feed dock, and using different sizes of thread and needles.  Later, he tried spraying resin on top of the fabric over the seam and also tried putting glue in the seam, under the top layer of the fabric, but pucker remained a problem in the manufacture of men's dress shirts.

1    24.    Mr. Wong testified at trial that "around end of 1993" Mr. Wong "got the idea"

2    to reduce pucker by using thermal adhesives (referred to in the patents-in-suit as a "bonding

3    element" and also referred to in the testimony as a fusible adhesive or fusible tape) in the

4    armhole seam of a dress shirt, under the top layer of fabric.

5    25.    Mr. Wong got the idea to use thermal adhesives to reduce pucker in dress shirt

6    armhole seams from having seen TAL's Pen Apparel factory use thermal adhesives in

7    raincoat seams.  Mr. Wong testified at trial that he "got the fusible tape from the outerwear

8    department" and put it into an armhole seam of a dress shirt.

9    26.    TAL's Managing Director, Dr. Harry Lee, testified that TAL had used thermal

10   adhesives in raincoat seams to reduce pucker "since before 1990."

11   27.    The thermal adhesive used in TAL's Pen Apparel factory for raincoats was

12   called SL33, manufactured by Vilene.  Mr. Wong characterizes the Vilene SL33 thermal

13   adhesive as a polyamide web.  The Vilene SL33 thermal adhesive was the first adhesive that

14   Mr. Wong experimented with in developing his invention.  Mr. Wong testified that when he

15   first tried the Vilene SL33 thermal adhesive, it was "not workable" in reducing pucker in the

16   armhole seam of a dress shirt.  So he experimented with interlinings, which are fabric strips

17   coated on either or both sides with a thermal adhesive, and which reduced puckering but

18   were too stiff.  The Vilene salesman gave Mr. Wong a Vilene swatch book containing

19   various woven interlinings and adhesives.  Mr. Wong tried the thermal adhesive Vilene SL10

20   and obtained better results in making a pucker free armhole seam.

21   28.    At the end of 1993, Mr. Wong believed he had discovered a method for

22   eliminating pucker in an armhole seam of a dress shirt.

23   29.    Mr. Wong also experimented with different fabrics and different types of

24   thermal adhesives.  He used a double layer of Vilene SL33 with a PQ wrinkle free fabric

25   (55% cotton and 45% polyester blend), and used a single layer of Vilene SL10 with a TC

26   fabric (in which polyester is more than 50%).  A double layer of SL33 and a single layer of

FINDINGS OF FACT and CONCLUSIONS OF LAW    10–

1   SL10 have the same approximate thickness.  As a result of these experiments, he obtained

2   similar results in reducing pucker.  However, by the time Mr. Wong filed his patent

3   application in May of 1994, he preferred to use a double layer of Vilene SL33 with a TC

4   fabric.

5        30.     In developing his pucker free seam invention for dress shirts, Mr. Wong put the

6   thermal adhesive into one of two "standard lap seams" used by TAL in the manufacture of

7   dress shirts.  LSr is a standard lap seam with one set stitch, referred to by Mr. Wong as a

8   "single needle left seam."  LSaw is a standard lap seam with two set stitches, referred to by

9   Mr. Wong as a "single needle left seam with two set stitches."  These standard lap seams are

10  depicted in the publication FEDERAL STANDARD, STITCHES, SEAMS, AND STITCHINGS (Gen.

11  Servs. Admin. 1965).  (Ex. 33, at EPAT 02429 and 02430).

12       31.     In late 1993 or January 1994, Mr. Wong created a dress shirt using a double

13  layer of Vilene SL33 in the armhole seam.  He had it washed five times, and then in January

14  1994 he showed it to Dr. Harry Lee, the Managing Director of TAL Apparel.

15       32.     In "early 1994," Mr. Wong used Vilene SL33 to create another dress shirt with

16  pucker free seams, which he then provided to TAL Apparel's sales department.

17       33.     As of February 15, 1994, Mr. Wong was using Vilene SL33 as the thermal

18  adhesive in his pucker free seam invention.

19       34.     In February or March 1994, Mr. Wong deconstructed a TAL raincoat seam that

20  had been manufactured at TAL's Pen Apparel factory, and he examined the thermal adhesive

21  inside the seam.

22       35.     Mr. Wong completed his development of pucker free seams for dress shirts in

23  early 1994 and filed for a patent on his invention on May 17, 1994.  Remarkably, Mr. Wong

24  has produced no documents reflecting the development of his invention.  Mr. Wong claims

25  he had some papers ("lots of things") about the development of his invention and whatever

26

1   he had, he testified, was turned over to the patent lawyers who prosecuted his patent

2   applications.  None have been produced.

3       36.    TAL Apparel began selling men's wrinkle free, pucker free dress shirts in July

4   1994.  The first retailer to purchase these shirts from TAL Apparel for sale in the United

5   States was John Henry.

6   **E.    Disclosed Prior Art: The TAL Disclosed Raincoat Seam**

7       37.    On March 11, 1996, Attorney Bradford E. Kile, on Mr. Wong's behalf, filed an

8   "Amendment Filed Under 37 C.F.R. § 115," with the Patent Office in connection with the

9   application for the '779 Patent, which was still pending at that time.  (Ex. 3 at 202-218).  At

10  the same time, Mr. Kile filed a similar document in connection with the application for the

11  '615 Patent entitled, "Preliminary Amendment Filed Under 37 C.F.R. § 115."  (Ex. 4 at 36-

12  48).  The Court collectively refers to these amendments as the "1996 Amendments."

13      38.    The relevant portion of each of the 1996 Amendments is identical and provided

14  as follows:

15      In addition to the current prior art of record, applicant's representative has
        recently become aware that applicant has made prior sales in the United States
16      of raincoats that incorporate an adhesive structure along a raincoat seam.  A
        demonstrative cross-sectional view of this raincoat seam is shown below where
17      two top stitches extend through each of the garment components in a manner
        similar to stitches 18 and 20 in the Benstock patent.

18

19          **(Cross-Section of "TAL Disclosed Raincoat Seam")**

20

21

22                          

23

24

25

26      Although this prior art structure for raincoats is operable to prevent seam
        pucker, it is not satisfactory for garments in accordance with the present
        invention, particularly shirts.  The prior raincoat seam structure comprises

FINDINGS OF FACT and CONCLUSIONS OF LAW   12–

1
2
3
4
5
6
7
8

garment component A and garment component B arranged in relation to an adhesive as shown. With this structure, the edge C of garment component B is exposed and not folded with respect to the adhesive or adhesive coated strip. The edge C of the seam is exposed in this design, however, as it is underneath a raincoat lining, such exposure is acceptable. Although the open edge C can be avoided by incorporating an overlock stitch along the edges, this stitch is unacceptable in most applications, particularly shirts, because it increases the thickness of the seam and is uncomfortable as it rubs a wearer. In fact, most retail firms find overlock seam structures unacceptable, particularly in dress shirts. Still further, the appearance of two top stitches protruding through the upper garment ply may be acceptable in the seams of heavy raincoats, but such a configuration is wholly inadequate for most garments, particularly dress shirts. In sum, the prior art raincoat seam structure, shown above, does not specifically teach or fairly suggest the novel claimed seam arrangement of the instant invention.

9
10

(Ex. 3 at 216-218 (Amendment at 15-17); Ex. 4 at 46-47 (Preliminary Amendment at 11-12)). The Court refers to this raincoat seam as the "TAL Disclosed Raincoat Seam."

11
12
13

39.    TAL sold raincoats with the TAL Disclosed Raincoat Seam in the United States more than one year before the May 17, 1994 patent application filing date for the '779 Patent.

14

**F.    John Wong's Knowledge Related to the 1996 Amendments**

15
16
17
18
19

40.    Mr. John Wong drew the TAL Disclosed Raincoat Seam for his lawyer to include in the 1996 Amendments. He drew it from memory. When asked at trial whether he did anything to check to see if the drawing was accurate, he testified "On this one I am familiar, so I can draw it very easily." Any testimony of Mr. Wong to the contrary, see, e.g., November 22, 2004 ITC[2] deposition, Exhibit 836, at 94-95, is not credible.

20
21
22

23
24
25
26

[2] Taltech Limited and TAL Apparel Limited commenced a separate proceeding before the International Trade Commission ("ITC"), entitled In the Matter of Certain Shirts with Pucker-Free Seams and Methods of Producing the Same, ITC Inv. No. 337-TA-517, which was voluntarily dismissed without prejudice by Taltech and TAL shortly before a hearing and an "Initial Determination" on the merits were to take place. The ITC matter sought to enjoin Esquel Enterprises, Limited and Esquel Apparel, Inc. from selling and importing dress shirts into the United States in light of the Taltech patents that are at issue in this litigation. This Court subsequently entered an Order providing that discovery taken in the ITC matter could be used in this litigation by either party as if taken in this litigation. Order, docket no. 71.

FINDINGS OF FACT and CONCLUSIONS OF LAW   13–

41.    At trial, Mr. Wong testified that prior to 1985, most of TAL Apparel's dress shirts used overlock stitches, and in the early 1990s about five to six percent of TAL Apparel's dress shirts used overlock stitches.

42.    At trial, Mr. Wong testified that a seam with two top stitches is a "very normal, normal seam" in dress shirts but having a frayed edge like the one in the TAL Disclosed Raincoat Seam is not normal and the frayed edge is unacceptable in dress shirts.  He also testified that prior to May 1994, TAL Apparel made and sold in the United States shirts, including five to six percent of its dress shirts, that featured two top stitches in the armhole seam.

## G.    John Wong's Credibility

43.    Mr. John Wong's testimony about the source and timing of his "idea" to make a dress shirt armhole seam using a thermal adhesive as a bonding element, the linchpin of the patents-in-suit, has been varied and contradictory over time.  On November 22, 2004, in an ITC deposition, Mr. Wong denied any knowledge about the TAL Disclosed Raincoat Seam. ("not familiar, but I know it can be done this way").  (Ex. 836 at 93, 95).  During the same deposition, Mr. Wong testified that he did not remember if he was the person who informed the attorney prosecuting his patent applications about TAL's sale of raincoats with such a seam.  (Ex. 836 at 95).  On January 23, 2006, in a subsequent deposition taken in this litigation, Mr. Wong testified that he learned about the TAL Disclosed Raincoat Seam "[a]fter I invent my armhole seam" and "[a]fter '94."  (Ex. 838 at 115-116).  He further testified on January 23, 2006, that when he filed his first patent application in May 1994, he "paid no attention" to the raincoat seam and that, in 1994, he did not know and did not check what adhesive was used in the raincoat seam.  (Ex. 838 at 116-18).  He also testified that although he did not think the raincoat seam was related to his invention, he admitted that he was the one who told his lawyer about the raincoat seam.  (Ex. 838 at 131, 136, 141).  It was not until May 3, 2006, at a subsequent deposition taken in this litigation, when Mr. Wong

FINDINGS OF FACT and CONCLUSIONS OF LAW   14–

1    <u>first</u> admitted that the TAL Apparel "raincoat seam was the source of [his] idea for the

2    pucker-free seam for dress shirts." (Ex. 839 at 51). Finally, on May 4, 2006, Mr. Wong

3    admitted that "around 1993" he actually made a dress shirt seam assembled in the same way

4    as a TAL raincoat seam. (Ex. 840 at 25). Mr. Wong's deposition in May 2006 was taken

5    only days before the original cutoff of discovery, and was the result of the Court's granting

6    of Esquel's request to take additional deposition testimony from Mr. Wong. <u>See</u> Minutes,

7    docket no. 173. At trial, Mr. Wong testified that he got the idea of using a thermal adhesive

8    in a dress shirt when, in 1993, he walked through the fourth floor of TAL's Pen Apparel

9    factory, where raincoats were manufactured, and saw the operators using thermal adhesives

10    in raincoat seams.

11        44.    The Court finds that in 1993 Mr. Wong got the idea to use a thermal adhesive

12    to reduce pucker in dress shirt armhole seams from having seen TAL's Pen Apparel factory

13    use a thermal adhesive in raincoat seams. Mr. Wong's testimony to the contrary in his prior

14    depositions was false and misleading. Further, at all times material after 1993 and <u>prior</u> to

15    filing the patent application for the '779 Patent on May 17, 1994, John Wong knew the

16    details of the TAL raincoat seam, including the information only later disclosed in the 1996

17    Amendments. <u>See</u> Findings of Fact 37-39. Although John Wong testified at trial with the

18    aid of an interpreter, the interpreter was only used during a part of his testimony. Although

19    English is a second language for John Wong, he can understand, read, and write English.

20    The deliberate false testimony during the early depositions and the ultimate admissions that

21    the raincoat seams had been the very source of his "idea" can only be explained by John

22    Wong's deliberate attempt to misrepresent the truth during the discovery phase of the ITC

23    matter and during discovery in this case.

24    ///

25    ///

26    ///

FINDINGS OF FACT and CONCLUSIONS OF LAW   15–

**H.    John Wong's Experiments With Bonding Elements of Different Thicknesses**

45.    Mr. John Wong tested various bonding elements prior to filing his first patent application on May 17, 1994, and found that some of the bonding elements were too thick and some were too thin for purposes of his invention.  (JAFF ¶¶ 21, 77).  According to Mr. Wong, if the adhesive was too thick, the resulting seam would be too stiff.  An adhesive that was too thick also created the potential for "strike-through," which happens when the melted adhesive bleeds through the fabric and can be seen from the outside.  If the adhesive was too thin, the bonded layer would not resist puckering.

46.    At trial, Mr. Wong admitted that the thickness of the thermal adhesive was important in terms of how well the pucker free seam performed.

47.    Mr. Wong further testified that at the time he filed his patent application, he believed that thicker fabrics would require thicker thermal adhesives.

48.    When he filed his first patent application on May 17, 1994, Mr. Wong preferred to use a double layer of Vilene SL33 thermal adhesive in his pucker free armhole seam for the three different fabrics that he had tested.  He felt Vilene SL33 was the best one at the time.

49.    The written descriptions of the patents-in-suit recognize that "a bonding element forms an integral part of the present invention." '779 Patent at 3:37-38; '615 Patent at 3:52.  The written descriptions of the patents-in-suit discuss various features of the bonding element, including the types of materials that could be used and the preferred density of the bonding element, noting a range of densities from 10-100 grams per square meter.

50.    The written descriptions of the patents-in-suit do not discuss the importance of the thickness of the bonding element to the performance of the invention.  They do not discuss the problems arising from using a bonding element that is either too thick or too thin.  Nor do they disclose a preferred thickness and they do not mention that the inventor's

preferred thickness was achieved by using a double layer of Vilene SL33.  They do not explain that the inventor's preferred thickness correlated to an approximate density of 37 grams per square meter.

## I. Esquel's Development of a Pucker Free Seam

51.     Personnel in Esquel's Research and Development department, including Yugao Zhang, Esquel's Director of Research and Development, Bai-Shun Chen, Esquel's Assistant Superintendent of Textile Development, and Tian-Xi Li, Esquel's Assistant Manager of the Woven Development Section, began developing a wrinkle free men's dress shirt with a pucker free seam in 2001.

52.     Esquel's senior management, including its Chairperson, Ms. Yang, instructed Esquel's team not to infringe the Taltech patents.  (JAFF ¶ 34).  Mr. Zhang knew about Taltech's '779 and '615 Patents and sought to design around the claimed seam structures and methods of these patents.

53.     In February 2002, Ms. Yang called Dr. Harry Lee and inquired about obtaining a license to the Taltech patents.  Dr. Harry Lee informed Ms. Yang that Taltech would not grant Esquel a license to Taltech patents.  (JAFF ¶ 29).

54.     Mr. Zhang developed an alternate pucker-free seam construction.  Men's dress shirts made with these pucker free seams are the shirts that Taltech now alleges are infringing on the Taltech patents.

55.     On February 11, 2002, Esquel applied for a patent covering its pucker free seam technology.  On March 21, 2006, the Patent Office issued a patent to Esquel entitled, "Wrinkle Free Garment and Method of Manufacture."  (Ex. 279; PTO ¶ 14).

## J. Esquel's Method of Seam Manufacturing

56.     Since 2003, Esquel, through its manufacturing subsidiaries, has manufactured wrinkle free men's dress shirts with pucker free armhole seams for sale in the United States in accordance with a written manufacturing protocol entitled, "Wrinkle Free Seam Taping

FINDINGS OF FACT and CONCLUSIONS OF LAW   17–

1  Protocol for U.S. Market," ("Esquel's Protocol").  (Ex. 24; PTO ¶ 12; Resp. to First Set of

2  Req. for Adm., No. 4; Ex. 422).

3        57.     At trial, Mr. Jack Nienke, in his capacity as a fact witness, not as an expert

4  witness, testified in the Plaintiff's case about his observations of Esquel's method of

5  manufacturing a pucker free armhole seam based upon his visit to Esquel's Eastern Garment

6  Manufacturing Factory in Penang, Malaysia on March 20, 2006.  At trial, the Court held that

7  Mr. Nienke could not testify as an expert witness for the reasons stated on the record.

8  Thereafter, at the Court's suggestion, Plaintiff filed a written offer of proof as to Nienke's

9  proposed expert testimony.  The Court again held that Nienke could not testify as an expert

10  witness but could testify as a fact witness.

11        58.     At trial, the Court watched a video taken during a site inspection at Esquel's

12  Eastern Garment Manufacturing Factory in Penang, Malaysia on March 20, 2006, Exhibit

13  88, which demonstrates Esquel's method of manufacturing a pucker free armhole seam in

14  wrinkle free men's dress shirts.

15        59.     As a 30(b)(6) witness for Esquel, Mr. Zhang testified by deposition that

16  Esquel's pucker free seams in wrinkle free dress shirts made for sale in the United States are

17  manufactured in accordance with Charts D, E, and F of Esquel's Protocol.  (Zhang Dep. on

18  Mar. 23, 2006 at 45:2-9; PTO ¶ 12; JAFF ¶¶ 30 and 84)

19        60.     Esquel's method of manufacturing a pucker free armhole seam uses two U-

20  shaped adhesive tapes in accordance with Esquel's Protocol.  (PTO ¶ 15). One U-shaped

21  tape is sewn to the armhole edge of a sleeve, and another U-shaped tape is sewn to the

22  armhole edge of a body panel.  The U-shaped tapes are affixed to the sleeve or body panel

23  long before a sleeve and body panel are brought together in an adjacent relationship to form

24  an armhole seam.  (Ex. 24, at 4-5; Zhang Dep. Mar. 23, 2006 at 56:6-14; PTO ¶ 15).

25  ///

26  ///

FINDINGS OF FACT and CONCLUSIONS OF LAW   18–

1    61.    Chart D of Esquel's Protocol illustrates a cross-section of a U-shaped tape

2  wrapped around a sleeve and another U-shaped tape wrapped around a body panel (JAFF ¶

3  31):

**Chart D from Esquel's Protocol**



18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

FINDINGS OF FACT and CONCLUSIONS OF LAW   19–

1    62.    Chart E of Esquel's Protocol illustrates a cross-section of the armhole seam

2 taken at the front or back panel after the portion of the sleeve having the U-shaped tape has

3 been folded, after the body panel has been positioned over the unfolded portion of the sleeve,

4

5 and after two set stitches have been sewn affixing the sleeve to the body panel:

6

7

8

9    

10

11

12

13

14

15

16

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

FINDINGS OF FACT and CONCLUSIONS OF LAW   20–

63.    Following these steps, the shirt body panel is folded over the two U-shaped tapes so that the two set stitches previously sewn are covered by the body panel and then a top stitch is sewn.  Chart F of Esquel's Protocol illustrates a cross-section of the armhole seam taken at the front or back panel after these steps have been taken (JAFF ¶ 32):



64.    Esquel uses an adhesive tape manufactured by Bemis Associates, Inc. ("Bemis"), product no. 6330, for the U-shaped tapes in its armhole seams.  The Bemis 6330 product is a thermoplastic material and is a modified ethylene vinyl acetate.  (PTO ¶¶ 16, 17; JAFF ¶¶ 26, 33; Req. for Adm. No. 22, Ex. 422).

**K.    Importing, Offering to Sell and Selling Within the United States**

65.    Esquel's garments, including wrinkle free, pucker free dress shirts, are sold F.O.B. the country of manufacturing, such as F.O.B. Malaysia for dress shirts manufactured in Malaysia.

66.    Esquel alleged in its original complaint for injunctive relief and damages filed in the Eastern District of Texas that: "Since as late as 2003, Esquel has been selling pucker

FINDINGS OF FACT and CONCLUSIONS OF LAW   21–

free, wrinkle free garments in the United States and internationally." Compl., docket no. 1, ¶ 8. Esquel further alleged that it "is engaged worldwide in the sale of textiles and apparel, such as cotton shirts." Id. ¶ 1. Esquel asked for Declaratory Judgment of non-infringement of various Taltech patents, including the '615 and '779 Patents. Id. at 3, ¶ A.

67.     Joanna Ying has been a deputy managing director of Esquel, in charge of sales and marketing since 1991. (Ying Dep. 1:23-24; 2:18-23). She makes several sales trips per year to the United States, during which time she meets with Esquel's customers and potential customers of wrinkle free, pucker free shirts. (Ying Dep. 33:11-14, 62:20-63:12). The purpose of these trips is to sell Esquel's wrinkle free, pucker free shirts to United States retailers. Since 2003, Esquel has sold its wrinkle free, pucker free dress shirts to United States retailers such as Men's Warehouse (Ying Dep. 7:23-8:13), Express (Ying Dep. 66:8-18, 67:5-9), and to J.C. Penney, and Nordstrom (Ying Dep. 10:3-17). The prices quoted to Esquel's United States customers range from $10 to $15 per shirt. (Ying Dep. 12:19-13:3, 13:25-14:6, 25:25-26:5, 26:13-20).

68.     Ms. Yang, the CEO and Chairperson of Esquel, testified during trial. During her trial testimony, she denied that Esquel sold dress shirts to Nordstrom in the United States. However, during her deposition taken on December 7, 2004, she admitted that Esquel "sell[s] all-cotton men's dress shirts to Nordstroms in the United States." (Yang Dep., Ex. 447, at 26-27).

69.     Esquel made at least one offer to sell wrinkle free, pucker free dress shirts in the United States to Brooks Brothers. Esquel hoped to obtain an order of 30,000 dozen shirts at approximately $13 per shirt, but the offer was rejected and Esquel has never sold wrinkle

1    free, pucker free dress shirts to Brooks Brothers.  (Ying Dep. 11:8-15, 25:5-26:3, 33:16-20,

2    75:2-7).

3        70.    Betsy Hentz, Esquel Apparel's Director of Merchandising, travels from her

4    office in Seattle to meet with, and offer products to, Esquel's United States customers in

5    New York, Texas, Washington, Wisconsin, and Oregon.  Ms. Hentz works with customers

6    on product development until they are ready to be referred to Esquel for purchasing.  Ms.

7    Hentz visits Nordstrom's headquarters in Seattle three or four times per year.  The purpose of

8    these visits is to sell Esquel's wrinkle free, pucker free shirts to Nordstrom.  By email dated

9    April 3, 2004, Ms. Hentz advised Koon Lam ("K.L.") Lee, Esquel's Executive Director in

10   charge of sales for the United States and European markets, that "we booked" sales to

11

12   Nordstrom.  (See Ex. 172).

13

14       71.    Mr. K.L. Lee communicates with Esquel's United States customers by email,

15   fax and telephone, and comes to the United States to meet with these customers.  When he

16
     meets in the United States with United States customers, they discuss "what Esquel products
17
     could be made available in terms of product and capacity of our customers," and what the
18
     customers "need in terms of product."  They also discuss prices.  Mr. K.L. Lee denied
19
     providing any written offers to customers during these meetings, but he sometimes receives
20

21   purchase orders from the customers after the meetings.

22       72.    On at least one occasion, Esquel sent samples of wrinkle free, pucker free dress

23
     shirts directly to Esquel Apparel in the United States, for delivery to Nordstrom in the United
24
     States.  (Ex. 169).  As a result, Nordstrom purchased wrinkle free, pucker free dress shirts
25
     from Esquel.  Esquel has sent other samples of wrinkle free, pucker free dress shirts to
26

FINDINGS OF FACT and CONCLUSIONS OF LAW   23–

Esquel Apparel in the United States, and Esquel Apparel has delivered these samples to

United States customers other than Nordstrom.

73.    An Esquel invoice relating to a purchase by J.C. Penney of Esquel's men's

wrinkle free, pucker free dress shirts in 2005 indicates that the "shipment terms" are F.O.B.

Malaysia.  (Ex. 36 at L022758).  A document that appears to be generated by "J.C. Penney

Purchasing Corporation" contains the same purchase order number 0508355 as the Esquel

invoice.  (Ex. 36 at L022760).  Although the J.C. Penney document also states the "terms of

sale" as "FOB – APL LOGISTICS – PENANG, MALAYSIA," the document also states in

bold letters at the top: "CONTRACT ENTERED AT PLANO, TEXAS, U.S.A."

**L.    Indemnity Agreement**

74.    On March 31, 2003, Esquel entered into an indemnity agreement with

Nordstrom, Inc. (the "Indemnity Agreement") (Ex. 76).

75.    The Indemnity Agreement states: "Esquel has agreed to enter into this

Indemnity Agreement to induce Nordstrom to purchase wrinkle free shirts from Esquel."  Ex.

76.  Mr. K.L. Lee testified that it was Esquel's understanding that once Nordstrom purchased

wrinkle free, pucker free shirts from Esquel, Nordstrom would place them in their stores and

sell them to customers in the United States.

76.    The Indemnity Agreement also states: "Esquel has represented to Nordstrom

that it has developed a wrinkle free woven shirt using a unique process developed by Esquel

that does not infringe upon any patent, trademark or copyright rights of any third party" and

"Esquel warrants that the merchandise shipped pursuant to any purchase order submitted by

Nordstrom, including all packaging and labeling does not and will not infringe any patent,

trademark, trade name, copyright, trade secret or other similar right, or utilize any

manufacturing or administrative process that would infringe any such right."

**M.    Asserted Claims**

77.     Taltech's First Amended Complaint alleges that Esquel infringes the '779 and

'615 Patents.  Am. Compl., docket no. 89, ¶¶ 20-27.

78.     Taltech's First Amended Complaint seeks damages and requests a jury.  Id. ¶¶

21, 23, 25, 27, 28.  On August 28, 2006, approximately one month before trial, Taltech

abandoned its claim for damages and its demand for a jury trial.  See Taltech's Statement

with Respect to Damages, docket no. 218.

79.     On October 11, 2005, Taltech asserted that Esquel infringed twenty-nine

claims of the patents-in-suit.  See Taltech's Prehearing Statement Regarding Infringement,

docket no. 82, ¶ 1.  By the commencement of trial, Taltech had narrowed its case to assert

seven claims of infringement.  Specifically, Taltech asserted that Esquel infringed claims 18,

25 and 26 of the '779 Patent and claims 11, 12, 14, and 29 of the '615 Patent (the "Asserted

Claims").

80.     During trial, on October 5, 2006, Esquel orally moved pursuant to Federal Rule

of Civil Procedure 52(c) for entry of judgment of non-infringement as to the Asserted

Claims.  Rather than respond to the motion, Taltech orally moved to withdraw, with

prejudice, five of the seven Asserted Claims.  The Court GRANTED Taltech's unopposed

motion to withdraw, with prejudice, its infringement claims 25 and 26 of the '779 Patent and

claims 12, 14, and 29 of the '615 Patent, and DISMISSED with prejudice claims 25 and 26

of the '779 Patent and claims 12, 14, and 29 of the '615 Patent.  Minute Entry, docket no.

1
2
260.  The Court's granting of Taltech's motion to withdraw, with prejudice, mooted Esquel's

motion for entry of judgment as to the five claims dismissed by the Court.

3
4
        81.      As a result, two method claims remained in the case – claim 18 of

5
the '779 Patent, and claim 11 of the '615 Patent.  The Court allowed briefing on Esquel's

6
motion for entry of judgment as to these remaining claims.  Taltech did not oppose Esquel's

7
motion for entry of judgment as to claim 11 of the '615 Patent.  See Taltech's Brief on

8
Infringement, docket no. 262.  Taltech separately filed a Motion to Dismiss Claim 11 of the

9
'615 Patent with Prejudice, docket no. 263.  On October 11, 2006, the Court GRANTED

10
Esquel's unopposed motion for entry of judgment pursuant to Federal Rule of Civil

11
Procedure 52(c) as to claim 11 of the '615 Patent, and DISMISSED with prejudice claim 11

12
of the '615 Patent.  Minute Entry, docket no. 277.  The Court DENIED Taltech's Motion to

13

14
Dismiss Claim 11 of the '615 Patent with Prejudice, docket no. 263, as moot.  Id.  The Court

15
deferred making Findings of Fact or Conclusions of Law as related to claim 11 of the '615

16
17
Patent.

18
        82.      After October 11, 2006, the trial continued with Taltech's only remaining

19
infringement contention relating to claim 18 of the '779 Patent.  These Findings of Fact and

20
Conclusions of Law are now made to reflect the Court's ruling regarding claim 18 of the

21
'779 Patent as well as claim 11 of the '615 Patent, the latter of which was dismissed during

22
23
trial.

24
**N.      Claim 18 of the '779 Patent**

25
        83.      Claim 18 of the '779 Patent is dependent on independent claim 1 and

26
dependent claim 17 of that patent and therefore contains each and every limitation of claims

FINDINGS OF FACT and CONCLUSIONS OF LAW   26–

1 and 17. (JAFF ¶ 35).

84.    Independent claim 1 of the '779 Patent provides:

A method of manufacturing a smooth garment seam between first and second garment components comprising the steps:

(a) placing the first garment component in an adjacent relationship to the second garment component so as to define a seam;

(b) placing a bonding element having at least a thermal adhesive component along the seam such that a lower surface of the bonding element abuts an upper surface of the first garment component;

(c) sewing the first and second garment components and the bonding element together by a first set stitch running along the seam;

(d) folding the first garment component over the bonding element such that the upper surface of the first garment component is folded over and abuts an upper surface of the bonding element;

(e) folding a portion of the second garment component such that a lower surface of the second garment component abuts the lower surface of the bonding element;

(f) sewing the first and second garment components and the bonding element together by a second stitch running along said seam; and

(g) applying sufficient heat and pressure to said bonding element to cause said thermal adhesive to melt such that said adhesive flows onto said surfaces of the first and second garment components to provide a bond along the seam such that the bonded components will effectively reduce a tendency of the seam to pucker during laundering.

FINDINGS OF FACT and CONCLUSIONS OF LAW   27–

85.    Dependent claim 17 of the '779 Patent provides:

A method of manufacturing a smooth seam as defined in claim 1 and further

comprising the step of:

sewing an additional stitch along the seam such that the additional stitch traverses

through the bonding element, the folded portion of the second garment component, and the

second garment component prior to the step of sewing the first and second components and

the bonding element together by a second stitch running along the seam.

86.    Dependent claim 18 of the '779 Patent provides:

A method of manufacturing a smooth seam as defined in claim 17 wherein:

step (e) is performed prior to step (c) and the first and the additional stitch are sewn

simultaneously.

**O.    Claim 11 of the '615 Patent**

87.    Claim 11 of the '615 Patent is dependent on independent claim 1 of that patent

and therefore contains each and every limitation of claim 1.

88.    Independent claim 1 of the '615 Patent provides:

A method of manufacturing a pucker free garment seam between first and second

garment components comprising the steps:

(a) providing a first garment component having an upper surface and a lower surface;

(b) providing a second garment component in a juxtaposed relationship with respect to

the first garment component to be joined at a seam to the first garment component;

(c) providing a bonding element having an upper and lower surface and at least a

thermal adhesive component and placing the bonding element along the seam formed by the

FINDINGS OF FACT and CONCLUSIONS OF LAW   28–

positioning of the first garment component and the second garment component such that the lower surface of the bonding element contacts at the seam the upper surface of the first garment component;

(d) sewing a first set stitch along a side of the seam such that the first stitch traverses through the bonding element, the first garment component, and the second garment component; and

(e) folding the first garment component over the bonding element such that the upper surface of the first garment component is folded over and abuts an upper surface of the bonding element along the seam, the folded over portion of the first garment component is positioned such that it covers portions of the first stitch that protrude through the bonding element along its upper surface;

(f) sewing a second stitch running along a side of the seam opposite the first stitch such that the second stitch traverses through at least the folded over portion of the first garment component and the second garment component; and

(g) applying sufficient heat and pressure to the bonding element to cause the thermal adhesive to melt such that the adhesive flows onto the surfaces of at least the upper surface of the first garment component to provide a bond along the seam such that the bonded components will effectively reduce a tendency of the seam to pucker during laundering.

89.    Dependent claim 11 of the '615 Patent provides:

A method of manufacturing a smooth seam as defined in claim 1 wherein said thermal adhesive has a melting point ranging from approximately 60 to 160 degrees Celsius.

FINDINGS OF FACT and CONCLUSIONS OF LAW   29–

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**P.    Placing Bonding Element**

90.    Esquel's seam manufacturing process, as shown in Esquel's Protocol, Exhibit 24, requires the abutment (i.e., touching, direct contact) between a lower surface of the bonding element (i.e., the U-shaped tape) and an upper surface of the first garment component (i.e., the body panel) to occur at the time the bonding element (i.e., the U-shaped tape) is sewn to the armhole edge of the first garment component (i.e., the body panel).

91.    The bonding element (i.e., the U-shaped tape) is sewn to the armhole edge of the first garment component (i.e., the body panel) prior to the placement of the bonding element along the seam formed by the positioning of the first garment component (i.e., the body panel) in an adjacent/juxtaposed relationship with the second garment component (i.e., the sleeve).

**Q.    Folding Second Garment Component**

92.    Esquel's seam manufacturing process, as shown in Esquel's Protocol, Exhibit 24, requires the abutment (i.e., touching, direct contact) between a lower surface of the second garment component (i.e., the sleeve) and the lower surface of the bonding element (i.e., the U-shaped tape) to occur at the time the bonding element (i.e., the U-shaped tape) is sewn to the armhole edge of the second garment component (i.e., the sleeve).

93.    The bonding element (i.e., the U-shaped tape) is sewn to the armhole edge of the second garment component (i.e., the sleeve) prior to the folding of a portion of the second garment component (i.e., the sleeve).

FINDINGS OF FACT and CONCLUSIONS OF LAW   30–

**R.      Folding Second Garment Component Before Placing Bonding Element**

94.      In Esquel's seam manufacturing process, the folding of a portion of the second garment component (i.e., the sleeve) occurs prior to the placement of the bonding element along the seam formed by the positioning of the first garment component (i.e., the body panel) in an adjacent/juxtaposed relationship with the second garment component (i.e., the sleeve).

**S.      Alleged Prior Art that Forms Basis for Esquel's Invalidity Contentions**

**1.      Scarbinsky**

95.      Robert Scarbinsky testified by deposition taken on December 16, 2004 in connection with the ITC matter.  (Ex. 370 "ITC Dep.").  At trial, Mr. Scarbinsky's December 16, 2004 deposition was read into the record and part of the video deposition was shown in open court.  Mr. Scarbinsky also testified by deposition taken in this litigation on June 28, 2006 ("Scarbinsky Dep.").

96.      Mr. Scarbinsky is a former employee of Phillips-Van Heusen ("PVH").  He worked for PVH from about 1961 until he retired in December 1995.  From 1975 to 1995, he held the position of Director of Product Research and Product Development for the Manufacturing Unit, a unit which manufactured shirts and blouses.  (Ex. 370 ITC Dep. at 9, 11-12).

97.      At some point in 1993, Mr. Scarbinsky had made shirt seams using fusible polyester webbings for experimental purposes.  (Ex. 370 ITC Dep. at 43-44, 48).  By March 1994, Mr. Scarbinsky had developed shirts with pucker free armhole seams using Vilene SL6

1  thermal adhesives. (Scarbinsky Dep. at 18-23; Ex. 376). In April 1994, Mr. Scarbinksy
2  preferred using a Vilene SL10 adhesive over the Vilene SL6, due to its thickness.

3      98.    The extensive record of the development of Mr. Scarbinsky's pucker free seam
4
5  invention, as shown in Exhibits 374-381, is in stark contrast to the absence of any notes or
6  records maintained by Mr. John Wong concerning the development of his invention claimed
7  in the patents-in-suit.

8      99.    Mr. Scarbinsky testified that he got the idea to use a "polyamide webbing low
9
10 melt adhesive" after watching some of his operators insert the narrow tape into the hem of a
11 girl's dress and iron the hem in lieu of stitching. (Scarbinsky Dep. at 25-26).

12     100.   Despite having access in March 1994 to "a wrinkle free sample made by Pen
13 Apparel in Malaysia," (Ex. 382; Scarbinsky Dep. at 53-55), Mr. Scarbinsky testified that he
14 did not know John Wong, had never heard of John Wong, and did not derive his pucker free
15 seam invention from John Wong. (Ex. 370 ITC Dep. at 110).
16

17     101.   Mr. Scarbinsky testified that even though he was "aware that various forms of
18 fusing [were] used in raincoats," that did not lead him "to think that the same thing could be
19 done in the armhole of a dress shirt." (Ex. 370 ITC Dep. at 140).

20     102.   In the spring of 1994, Mr. Scarbinsky met with Edward Vassallo, a New York
21 patent attorney, to discuss the possibility of patenting his pucker free seam invention. (Ex.
22 370 ITC Dep. at 66-68). On May 25, 1994, seven days <u>after</u> Mr. Wong's patent application
23
24 was filed, Mr. Vassallo wrote a letter to a patent search firm, Mooreland and Moore,
25 requesting a prior art search. In his letter, Mr. Vassallo described Mr. Scarbinsky's pucker
26 free seam invention, and enclosed a sample of a seam before it was fused, another sample

which had been fused, and two drawings depicting cross-sectional views of Mr. Scarbinsky's armhole seams.  (Ex. 574).

103.    Mr. Scarbinsky filed a patent application with the Patent Office on October 25, 1994, Exhibit 383, disclosing and claiming an invention entitled, "Wrinkle Free Shirts and Methods for Making Seam."  Mr. Scarbinsky's invention uses a "fusible webbing" in the armhole sleeve seam.  The Patent Office issued a "Notice of Abandonment" of the Scarbinsky application on April 2, 1998, and cited its reason being the applicant's failure to respond to the Office letter mailed August 18, 1997.

104.    Mr. Scarbinsky's invention was not publically disclosed, used or sold until after May 17, 1994.

105.    There is no evidence that Mr. Wong had any knowledge about Mr. Scarbinsky's pucker free seam work during the prosecution of the patents-in-suit.

## 2.    **Capital Mercury**

106.    Ella Bailey testified by deposition taken on June 13, 2006.  Ms. Bailey has worked for Capital Mercury Apparel for 30 years and was the Senior Vice President of Manufacturing at the time of her deposition.  (Bailey Dep. at 5).  Ms. Bailey testified pursuant to a subpoena, and as Capital Mercury's Rule 30(b)(6) witness.

107.    At her deposition, Ms. Bailey produced a dress shirt that Capital Mercury made as a test product in October 1993.  (Bailey Dep. at 8-10).  To make the shirt produced at Ms. Bailey's deposition, Ms. Bailey testified that Capital Mercury inserted a woven interlining into the armhole seam.  (Bailey Dep. at 11, 57).  Capital Mercury fused the interlining with the garment components at high temperature and pressure; this fusing took place before the

folding over of the sleeve and the sewing of the top stitch. (Bailey Dep. at 13-15). Capital Mercury would not allow the shirt to be retained by the parties after the deposition, and the shirt is not in evidence. (Bailey Dep. at 6-8). The shirt produced at the deposition was found by Ms. Bailey in a closet at her house and was not kept in the ordinary course of business. (Bailey Dep. at 51).

108.    Ms. Bailey described three methods used by Capital Mercury to make wrinkle free shirts with fused armhole seams in the 1993 and early 1994 time period. The second method that she described involved folding and sewing before fusing. (Bailey Dep. at 37-38, 46). However, Ms. Bailey did not produce any samples of shirts produced using this second method. (Bailey Dep. at 52). Although she testified that Capital Mercury searched for documents (Bailey Dep. at 50-51), no documents were produced that disclosed a method of manufacturing a shirt in which the sequence included folding and sewing before fusing. There is insufficient evidence to support Ms. Bailey's contention that Capital Mercury made wrinkle free shirts with fused armhole seams in the 1993 and early 1994 time period in which the method of manufacture involved folding and sewing before fusing.

109.    Ms. Bailey testified that Capital Mercury was producing a dress shirt with a fused armhole seam by February 1994 (Bailey Dep. at 22-23), at which time Capital Mercury showed the shirt to U.S. customers at a trade show in Las Vegas. (Bailey Dep. at 27-28, 33; Ex. 526). Ms. Bailey testified that Capital Mercury's first sale of a dress shirt with a fused armhole seam was around Father's Day in June 1994. (Bailey Dep. at 29). However, she was uncertain about the date because she was not involved in sales. (Bailey Dep. at 64).

FINDINGS OF FACT and CONCLUSIONS OF LAW   34–

### 3.    The John Wong Undisclosed Raincoat Seam

110.    In addition to the TAL Disclosed Raincoat Seam, TAL Apparel made raincoats having an armhole seam with one set stitch and one top stitch for sale in the United States more than one year before May 17, 1994.   (H.P. Wong Dep. at 57; Ex. 839 John Wong Dep. May 3, 2006 at 14).  Mr. Wong testified at trial that this raincoat seam was made at the Pen Apparel factory during the 1992 to 1994 period, when he was Factory Manager.

111.    Mr. John Wong did not disclose this one-set-stitch, one-top-stitch raincoat seam to his patent attorneys or to the Patent Office at any time during the prosecution of the patents-in-suit.  The Court refers to this undisclosed seam as the "John Wong Undisclosed Raincoat Seam."

112.    During his May 3, 2006 deposition, Mr. John Wong drew the John Wong Undisclosed Raincoat Seam, as follows:

**(Cross-Section of the John Wong Undisclosed Raincoat Seam)**



(Ex. 691 at 11 (alternative pagination at 46); Ex. 839 John Wong Dep May 3, 2006 at 14).

FINDINGS OF FACT and CONCLUSIONS OF LAW   35–

113.    At trial, Mr. John Wong testified on direct that he became aware of the John Wong Undisclosed Raincoat Seam "after 1994." Then he testified that he became aware of it at "almost the same time" that he learned about the TAL Disclosed Raincoat Seam, which would have been in late 1993, at the latest. On cross, he then testified that he did not know about it until one to two years ago. Finally, Mr. Wong admitted during cross-examination that he knew that TAL Apparel made raincoat seams with one set stitch and one top stitch <u>before</u> he filed his patent application on May 17, 1994. He further admitted that in early 1994, he took apart and tested raincoat seams with set stitches and raincoat seams without set stitches. During his May 3, 2006 deposition, Mr. Wong testified that he knew TAL was using two different structures for its raincoat seams – one with a set stitch and one without a set stitch – as early as 1992. (Ex. 839 John Wong Dep. May 3, 2006 at 16).

114.    The Court finds that Mr. Wong knew that TAL Apparel made raincoat seams with one set stitch and one top stitch (i.e., the "John Wong Undisclosed Raincoat Seam") prior to filing his patent application on May 17, 1994. Any testimony of Mr. John Wong to the contrary is not credible.

### 4.    H.P. Wong Undisclosed Raincoat Seam

115.    Hak Piu ("H.P.") Wong testified by deposition taken on June 7, 2006. Mr. H.P. Wong was called as a witness by counsel for Esquel. Since 1974, Mr. H.P. Wong has worked for TAL Apparel in the Thailand factory. Since 2000, he has held the position as director of the Thailand factory. (H.P. Wong Dep. at 7). In his over 30 years at TAL's Thailand factory, Mr. H.P. Wong has been involved in the production of raincoats for TAL Apparel. (H.P. Wong Dep. at 6).

FINDINGS OF FACT and CONCLUSIONS OF LAW   36–

116.    Mr. H.P. Wong testified about a raincoat seam that was used by TAL

Apparel's Thailand factory to make raincoats in 1992, and he drew it, as shown below.  (Ex.

699 (top drawing) (H.P. Wong Dep. at 51-53)):

**(H.P. Wong Undisclosed Raincoat Seam)**



117.    Mr. John Wong did not disclose this particular raincoat seam to the Patent

Office at any time during the prosecution of the patents-in-suit.  The Court refers to this

seam as the "H.P. Wong Undisclosed Raincoat Seam."

118.    The H.P. Wong Undisclosed Raincoat Seam is almost identical in structure to

the TAL Disclosed Raincoat Seam.  One noteworthy difference is that there is a set stitch

present in the H.P. Wong Undisclosed Raincoat Seam.

119.    TAL Apparel sold raincoats in the United States with the H.P. Wong

Undisclosed Raincoat Seam more than one year before the May 17, 1994 patent application

filing date.

120.    H.P. Wong testified that TAL's Thailand factory used Vilene SL33 to make

smooth raincoat seams during the early 1990s.  (H.P. Wong Dep. at 24-25, 38).

121.    Mr. H.P. Wong testified that he never talked with Mr. John Wong about how to

make raincoats or raincoat seams; he never instructed Mr. John Wong about how raincoats

should be made; he never talked with Mr. John Wong about the "tape" (i.e., thermal

1
2
adhesive) that was being used to make the raincoat seams; and he never talked with Mr. John Wong about the manufacture of dress shirts.  (H.P. Wong Dep. at 73-74, 80-81).

3
4
5
6
122.    At trial, Mr. John Wong testified that he first learned of the H.P. Wong Undisclosed Raincoat Seam at trial, on October 3, 2006.  There is no evidence in the record to the contrary.

7
**5.    Standard Lap Seams**

8
9
10
11
123.    Since about 1985, TAL Apparel has made raincoats for sale in the United States using two standard lap seams for armhole seams in dress shirts – the LSr and the LSaw (the "Standard Lap Seams").  These standard lap seams were made without any fusible tape.

12
13
124.    Mr. John Wong knew that the Standard Lap Seams had been used in shirts sold in the United States for many years before the filing date of the Taltech patents.

14
15
16
17
18
19
20
125.    Indeed, Mr. John Wong took the thermal adhesive used in TAL Disclosed Raincoat Seam and used a standard lap seam, either LSr or LSaw, to create his invention. There are hundreds of different types of seams that could be used.  John Wong admitted he does know all types of possible seams and that a reasonable patent examiner would not necessarily be aware of all of the different standard lap seams available to make dress shirt seams.

21
22
23
126.    Mr. John Wong did not disclose either of the Standard Lap Seams that he used in connection with his invention to the Patent Office.

24
25
26

FINDINGS OF FACT and CONCLUSIONS OF LAW   38–

# III.

## CONCLUSIONS OF LAW

### A.    Jurisdiction

1.    This is an action under the patent laws of the United States, 35 U.S.C. §101, et seq., wherein Taltech alleges that Esquel infringes the '779 and '615 Patents under 35 U.S.C. §§ 271(b) and (g).[3]  Taltech seeks an injunction, but no damages.  Esquel seeks a declaratory judgment of non-infringement of the '615 and '779 Patents and asserts that the '779 and '615 Patents are invalid under 35 U.S.C. §§ 102, 103, 112, and unenforceable due to inequitable conduct.  Both parties allege that this case is exceptional, and both seek attorney fees under 35 U.S.C. § 285.  This Court has subject matter jurisdiction under 28 U.S.C. § 1338(a).  This Court has personal jurisdiction over both parties, and venue is proper in this district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b).  (Joint Agreed Conclusions of Law ("JACOL"), docket no. 264, ¶ 1).

### B.    Infringement

2.    Taltech argues that Esquel is liable for patent infringement under two theories.  First, Taltech alleges that Esquel and Esquel Apparel are violating 35 U.S.C. § 271(g) ("Section 271(g)") by importing into the United States, offering to sell, and/or selling within the United States men's dress shirts that are made by a process patented in the United States.  Second, Taltech alleges that Esquel and Esquel Apparel are violating 35 U.S.C. § 271(b) ("Section 271(b)") by inducing United States retailers to infringe Taltech's patents.

---

[3] At trial, Taltech conceded that Esquel is not liable under 35 U.S.C. § 271(a).

FINDINGS OF FACT and CONCLUSIONS OF LAW   39–

Taltech further alleges that Esquel and Esquel Apparel are willfully infringing the patents-in-suit.

3.      Section 271(g) provides that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent." (JACOL ¶ 13).

4.      The F.O.B. delivery of Esquel's pucker free, wrinkle free shirts does not determine the legal situs of the sale for purposes of 35 U.S.C. § 271(g).  See N. Am. Philips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576, 1578-80 (Fed. Cir. 1994).  The "situs of the tort of infringement-by-sale" includes, at a minimum, the location of the buyer.  See id. (holding "to sell an infringing product to a buyer in Illinois is to commit a tort there" and rejecting the proposition that the location of the sale should be defined in formal terms as the single point at which some legally operative act took place, such as the place where the sales transaction would be deemed to have occurred as a matter of commercial law).

5.      Esquel is judicially estopped from arguing that its sales took place only where the goods change hands due to Esquel's prior representations to the Court to the contrary. Esquel's Resp., docket no. 48, at 11 n.9; New Hampshire v. Maine, 532 U.S. 742, 749 (2001).

6.      An offer to sell requires a communication to a potential buyer of a description of the alleged infringing merchandise and the price at which it can be purchased.  See Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1254-55, 1257 (Fed. Cir. 2000) (interpreting

FINDINGS OF FACT and CONCLUSIONS OF LAW   40–

"offers to sell" under 35 U.S.C. § 271(a)); <u>3D Sys., Inc. v. Aarotech Labs., Inc.,</u> 160 F.3d 1373, 1378-79 (Fed. Cir. 1998) (same).

7.     Taltech has proved by a preponderance of the evidence that Esquel Enterprises, Ltd. offers to sell within the United States Esquel's pucker free, wrinkle free dress shirts.

8.     Taltech has proved by a preponderance of the evidence that Esquel Enterprises, Ltd. sells within the United States Esquel's pucker free, wrinkle free dress shirts.

9.     Taltech has proved by a preponderance of the evidence that Esquel Apparel, Inc. imports into the United States Esquel's pucker free, wrinkle free dress shirts.

10.     Evaluating whether a patent is infringed requires a two-step analysis: (1) the Court construes the disputed claims of the patent; and (2) the Court compares the claims, as construed, to the accused products or methods to determine whether all of the claim elements are present either literally or by equivalents.  <u>Markman v. Westview Instruments, Inc.,</u> 52 F.3d 967, 976 (Fed. Cir. 1995); <u>see also</u> <u>Stiftung v. Renishaw PLC,</u> 945 F.2d 1173, 1178 (Fed. Cir. 1991).  (JACOL ¶ 2).

11.     The Asserted Claims are dependent claims.  A dependent claim incorporates all of the limitations of the independent claim to which it refers.  35 U.S.C. § 112.  If an accused product or method does not include either literally or by equivalents all of the claim limitations in an independent claim, then it cannot infringe the claims dependent from that independent claim.  <u>See</u> <u>Robotic Vision Sys., Inc. v. View Eng'g, Inc.,</u> 189 F.3d 1370, 1376 (Fed. Cir. 1999); <u>Wahpeton Canvas Co. v. Frontier, Inc.,</u> 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).  (JACOL ¶ 3).

FINDINGS OF FACT and CONCLUSIONS OF LAW   41–

12.    Taltech bears the burden of proving infringement of the '779 and '615 Patents by a preponderance of the evidence.  Merck & Co. v. Teva Pharm. USA, Inc., 228 F. Supp. 2d 480, 485 (D. Del. 2002) (citing SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988)), aff'd 347 F.3d 1367 (Fed. Cir. 2003).  (JACOL ¶ 5).

13.    On January 19, 2006, following briefing and a Markman hearing, the Court issued its claim construction Order, docket no. 150, construing the following claim terms, as indicated:

(A)    "Upper Surface" and "Lower Surface"

"Upper Surface" and "Lower Surface" are designated at the time the first set stitch is applied, and the upper and lower surfaces of a component/element are opposing surfaces through a thickness of the component/element, providing that the "upper surface" faces upward and the "lower surface" faces downward at the time of designation along the unfolded portions of the garment components, and providing that the upper surface and lower surface designations of the garment components remain consistent around folds required in the claim.

(B)    "Set Stitch"

A stitch that "sets" or joins at least a garment component and a bonding element together, or at least two garment components together, to define their relationship in the garment seam, but does not pass through the outer garment component in the finished seam.

(C)    "Abuts"

Abuts means touching (i.e., having direct contact).

FINDINGS OF FACT and CONCLUSIONS OF LAW   42–

(D)    "Garment Component"

A structural part of a garment, such as a front panel, yoke, rear panel, and sleeve. A bonding element, an interlining, and thread are not garment components.

(E)    "Bonding Element"

One or more substances or constituents of a whole that bind, fasten, fuse, confine or hold together.

(F)    "Adjacent Relationship" and "Juxtaposed Relationship"

These terms have the identical meaning: next to but not necessarily touching.

(G)    "Seam"

The place where at least two pieces of fabric are joined by at least two rows of stitches.

(H)    "First" and "Second" Stitch:

"First stitch" means one stitch and "second stitch" means another stitch after the first stitch, but not necessarily the next stitch after the first stitch.

(I)    "A method . . . comprising the steps"

Claim 1 of the '779 Patent recites a method requiring that step (c) be performed after steps (a) and (b), that steps (d) and (e) be performed after step (b), that step (f) be performed after step (c), and that step (g) be performed after step (e).

Claim 1 of the '615 Patent recites a method requiring that step (d) be performed after steps (a), (b) and (c), that step (e) be performed after step (d), and that steps (f) and (g) be performed after step (e).

1

2    (J)    "Folding. . . Such That"

3        Folding, which creates or results in the relationship described following "such that."

4    (K)    "Thermal Adhesive Web"

5        A random array of thermal adhesive material that is less solid structured than a

6    thermal adhesive net.

7    (L)    "Thermal Adhesive Net"

8        A regular array of thermal adhesive material that is more solid structured than a

9    thermal adhesive web.

10        14.    During the <u>Markman</u> proceedings, the Court was not asked to construe "placing

11    . . . such that," but the parties now ask the Court to construe this term.  To the extent that

12    further claim construction is required at the trial stage, "the district court has considerable

13    latitude in determining when to resolve issues of claim construction."  <u>CytoLogix Corp. v.</u>

14    <u>Ventana Med. Sys., Inc.</u>, 424 F.3d 1168, 1172 (Fed. Cir. 2005).  Before the second step of

15    the infringement analysis, i.e., comparing the accused method to the asserted claim, can

16    occur, the Court must construe the term "placing . . . such that."

17

18        15.    Claim terms must be construed consistently throughout all of the claims.

19    <u>Nazomi Commc'ns, Inc. v. ARM Holdings, PLC</u>, 403 F.3d 1364, 1370 (Fed. Cir. 2005).  The

20    Court has already construed "such that" when it construed the term "folding . . . such that."

21    The parties agree that the Court should construe "placing . . . such that" in a similar manner

22    as "folding . . . such that."  Accordingly, the Court construes "placing . . . such that" to mean

23    "placing, which creates or results in the relationship described following 'such that.'"

24

25

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   44–

16.    Literal infringement exists where each element or step of at least one claim of the patent is found in the alleged infringer's product or process.  Merck, 228 F. Supp. 2d at 485 (citing Panduit Corp. v. Dennison Mfg. Corp., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987)).  Literal infringement requires that " the accused product or process meets every element or limitation of a claim."  Rohm and Haas Co. v. Brotech Corp., 127 F.3d 1089, 1092 (Fed. Cir. 1997); see also Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a single limitation is sufficient to negate infringement of the claim. . . ").  (JACOL ¶ 6).

17.    "Infringement, whether literal or under the doctrine of equivalents, is a question of fact."  Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1318 (Fed. Cir. 2004); Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989). (JACOL ¶¶ 7, 8).

18.    Even if elements of the claimed invention are missing from the allegedly infringing product, infringement may be established under the doctrine of equivalents, if the accused device performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed device."  Merck, 228 F. Supp. 2d at 485 (citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950); Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997) (declining to overrule Graver Tank); Malta v. Schulmerich Carillons, Inc., 952 F.2d 1320, 1325 (Fed. Cir. 1991)). (JACOL ¶ 9).  In other words, "the role played by each element in the context of the specific patent claim" must be analyzed to "inform the inquiry as to whether a substitute element matches the function, way and result of the claimed element, or whether the substitute

1 element plays a role substantially different from the claimed element." Warner-Jenkinson

2 Co., 520 U.S. at 40. A step in the accused method is equivalent to a claim limitation if the

3
4 differences between the two are "insubstantial" to one of ordinary skill in the art. See id.

5 (JACOL ¶ 10).

6     19.    The doctrine of equivalents cannot be used to erase a limitation from a claim.

7 Warner-Jenkinson, 520 U.S. at 29 ("It is important to ensure that the application of the

8 doctrine [of equivalents], even as to an individual element, is not allowed such broad play as

9
10 to effectively eliminate that element in its entirety."); Asyst Techs., Inc. v. Emtrak, Inc., 402

11 F.3d 1188, 1195 (Fed. Cir. 2005) ("the 'all elements rule' provides that the doctrine of

12 equivalents does not apply if applying the doctrine would vitiate an entire claim limitation");

13 Novartis Pharm. Corp. v. Eon Labs. Mfg., Inc., 363 F.3d 1306, 1312 (Fed. Cir. 2004).

14 (JACOL ¶ 11).

15     20.    Esquel contends that its method of seam manufacturing does not infringe claim

16
17 18 of the '779 Patent because the "placing . . . such that" limitation in step (b) of claim 1 of

18 the '779 Patent is not met. Step (b) of claim 1 of the '779 Patent requires: "placing a

19 bonding element having at least a thermal adhesive component along the seam such that a

20 lower surface of the bonding element abuts an upper surface of the first garment

21 component."

22     21.    Similarly, as part of its Federal Rule of Civil Procedure 52(c) motion, Esquel

23
24 contended that its method of seam manufacturing does not infringe claim 11 of the '615

25 Patent because the "placing . . . such that" limitation in step (c) of claim 1 of the '615 Patent

26 is not met. As previously noted, step (c) of claim 1 of the '615 Patent requires, in pertinent

FINDINGS OF FACT and CONCLUSIONS OF LAW 46–

part: ". . . placing the bonding element along the seam formed by the positioning of the first garment component and the second garment component such that the lower surface of the bonding element contacts at the seam the upper surface of the first garment component."

22.    In light of the Court's Findings of Fact 90 and 91 relating to the placing of the bonding element, the placement of the bonding element along the seam does not create or result in the relationship described following "such that" – i.e., the abutment of a lower surface of the bonding element and an upper surface of the first garment component.

23.    The Court rejects Taltech's argument that "at the point in the seam manufacturing process when the first set stitch is applied, the bonding element is placed along the seam such that a lower surface of the bonding element abuts an upper surface of the first garment component."  Taltech's Brief on Infringement, docket no. 262, at 15-16. The placement of the bonding element along the seam occurs <u>prior</u> to the sewing of the first set stitch in Esquel's method of seam manufacturing.

24.    Although Taltech is correct that "upper surface" and "lower surface" are not designated until the first set stitch is sewn, <u>see</u> <u>Markman</u> Order, docket no. 150, at 11, that does not mean that these surfaces do not exist prior to the sewing of the first set stitch.

25.    Taltech's "upper surface" and "lower surface" argument would require that steps (b) and (c) occur simultaneously in claim 1 of the '779 Patent and that steps (c) and (d) occur simultaneously in claim 1 of the '615 Patent.  This argument would violate the Court's construction of "a method . . . comprising the steps," which requires that step (c) be performed after step (b) in claim 1 of the '779 Patent, and that step (d) be performed after step (c) in claim 1 of the '615 Patent.

FINDINGS OF FACT and CONCLUSIONS OF LAW   47–

1

2

3

4

5

26.     Esquel's method of seam manufacturing does not contain the "placing . . . such that" limitation in step (b) of independent claim 1 of the '779 Patent, and thus Esquel's method of seam manufacturing does not literally infringe dependent claim 18 of the '779 Patent.

6

7

8

9

10

11

27.     Esquel's method of seam manufacturing does not infringe dependent claim 18 of the '779 Patent under the doctrine of equivalents.  Taltech cannot point to any equivalent to the "placing . . . such that" limitation in step (b) of independent claim 1 of the '779 Patent. Instead, by ignoring the causality aspect of "placing . . . such that," Taltech's argument would eliminate an entire claim limitation in step (b) of claim 1 of the '779 Patent.

12

13

14

15

16

28.     Esquel's method of seam manufacturing does not contain the "placing . . . such that" limitation in step (c) of independent claim 1 of the '615 Patent, and thus Esquel's method of seam manufacturing does not literally infringe dependent claim 11 of the '615 Patent.

17

18

19

20

21

22

29.     Esquel's method of seam manufacturing does not infringe dependent claim 11 of the '615 Patent under the doctrine of equivalents.  Taltech cannot point to any equivalent to the "placing . . . such that" limitation in claim (c) of independent claim 1 of the '615 Patent.  Instead, by ignoring the causality aspect of "placing . . . such that," Taltech's argument would eliminate an entire claim limitation in step (c) of claim 1 of the '615 Patent.

23

24

25

26

30.     Esquel contends that its method of seam manufacturing does not infringe claim 18 of the '779 Patent because the "folding . . . such that" limitation in step (e) of claim 1 of the '779 Patent is not met.  Step (e) of claim 1 of the '779 Patent requires: "folding a portion

FINDINGS OF FACT and CONCLUSIONS OF LAW   48–

1
2
of the second garment component such that a lower surface of the second garment
component abuts the lower surface of the bonding element."

3
4
5
6
7
8
31.    In light of the Court's Findings of Fact 92 and 93 relating to the folding of
the second garment component, the folding of a portion of the second garment component
does not create or result in the relationship described following "such that" – i.e., the
abutment of a lower surface of the second garment component and the lower surface of the
bonding element.

9
10
11
12
13
32.    Esquel's method of seam manufacturing does not contain the "folding . . . such
that" limitation in step (e) of independent claim 1 of the '779 Patent, and thus Esquel's
method of seam manufacturing does not literally infringe dependent claim 18 of the '779
Patent.

14
15
16
17
18
19
33.    Esquel's method of seam manufacturing does not infringe dependent claim 18
of the '779 Patent under the doctrine of equivalents.  Taltech cannot point to any equivalent
of the "folding . . . such that" limitation in step (e) of independent claim 1 of the '779 Patent.
Instead, by ignoring the causality aspect of "folding . . . such that," Taltech's argument
would eliminate an entire claim limitation in step (e) of claim 1 of the '779 Patent.

20
21
22
23
24
25
34.    Esquel contends that its method of seam manufacturing does not infringe claim
18 of the '779 Patent because step (e) is performed prior to step (b) in claim 1 of the '779
Patent.  The Court's construction of "a method . . . comprising the steps" requires that step
(e) be performed after step (b) in claim 1 of the '779 Patent.  See Markman Order, docket no.
150, at 38.

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   49–

35.    The issue of whether, in Esquel's method of seam manufacturing, step (e) is performed prior to, or after, step (b) in claim 1 of the '779 Patent, is mooted by the Court's conclusion that Esquel's method of seam manufacturing does not contain all of the claim limitations in steps (b) and (e) of claim 1 of the '779 Patent.

36.    In the alternative, and in light of Finding of Fact 94 relating to the order of steps, the Court concludes that Esquel's method of seam manufacturing does not infringe claim 18 of the '779 Patent, either literally or under the doctrine of equivalents, because the folding of a portion of the second garment component in step (e) is performed before the placement of the bonding element along the seam in step (b).  The doctrine of equivalents cannot vitiate an element of a claim, and the Court's claim construction required, as an element, a particular ordering of the steps in claim 18 of the '779 Patent.

37.    Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b).  (JACOL ¶ 14).

38.    "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement."  Minnesota Mining and Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05 (Fed. Cir. 2002).

39.    Because Taltech has failed to prove by a preponderance of the evidence direct infringement under 35 U.S.C. § 271(g), Taltech has also failed to prove by a preponderance of the evidence indirect infringement under 35 U.S.C. § 271(b).

40.    There is no *willful* infringement in the absence of infringement.  Additionally, Esquel believed it had successfully designed around Taltech's patents, and this Court has agreed.  See Finding of Fact 52; Conclusions of Law 26-29, 32-33, 36.

FINDINGS OF FACT and CONCLUSIONS OF LAW   50–

**C.    Validity**

41.    Although at trial the Court denied Esquel's oral motion to amend its Answer to

add counterclaims, see Minutes, docket no. 273, the Court, having had more time to consider

the issue, now construes Esquel's invalidity and unenforceability affirmative defenses as

counterclaims with respect to claim 18 of the '779 Patent, the only claim remaining at the

end of trial.  FED. R. CIV. P. 8(c) ("When a party has mistakenly designated a defense as a

counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall

treat the pleading as if there had been a proper designation."); cf. Multiform Desiccants, Inc.

v. Medzam, Ltd., 133 F.3d 1473, 1481 (Fed. Cir. 1998) (noting discretion of district court to

decide affirmative defense as counterclaim under FED. R. CIV. P. 8(c)).  "The misdesignation

provision in Rule 8(c) . . . promotes the liberality with which courts generally construe

pleadings under the federal rules."  5 C. Wright & A. Miller, FEDERAL PRACTICE AND

PROCEDURE: CIVIL 3d § 1275, at 622 (2004).  The parties actively litigated the invalidity and

unenforceability issues throughout the case and the trial, including during closing arguments.

See Multiform Desiccants, 133 F.3d at 1481 (emphasizing "the useful general rule that trial

courts should decide all litigated issues, in the interest of finality").  Taltech and TAL have

been on notice that Esquel would attempt to prove invalidity and unenforceability since at

least April 6, 2005, when Esquel filed its first Answer, docket no. 60, which included these

issues as affirmative defenses.  The United States Supreme Court has declared it to "be the

better practice by inquiring fully into the validity" of a patent even if a court finds non-

infringement, because "of the two questions, validity has the greater public importance."

Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330 (1945).

42.    "A patent shall be presumed valid."  35 U.S.C. § 282; <u>see</u> <u>also</u> <u>Metabolite</u> <u>Labs., Inc. v. Lab. Corp. of Am. Holdings</u>, 370 F.3d 1354, 1365 (Fed. Cir. 2004).  (JACOL ¶ 18).

43.    "Each claim of a patent (whether in an independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."  35 U.S.C. § 282.  (JACOL ¶ 19).

44.    As the party asserting invalidity, Esquel bears "[t]he burden of establishing invalidity of a patent or any claim thereof."  35 U.S.C. § 282.

45.    Esquel has to prove patent invalidity under the clear and convincing evidentiary standard.  <u>Metabolite</u>, 370 F.3d at 1365.  (JACOL ¶ 20).  This is equivalent to "plac[ing] in the factfinder an 'abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  <u>Merck</u>, 228 F. Supp. 2d at 496 (quoting <u>Colorado v. New Mexico</u>, 467 U.S. 310, 316 (1984)).

46.    Invalidity must be determined in view of the properly construed claims.  <u>Power Mosfet Techs., L.L.C. v. Siemens AG</u>, 378 F.3d 1396, 1406 (Fed. Cir. 2004).  (JACOL ¶ 21).

47.    It is fundamental patent law that: "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."  <u>Verdegaal Bros. v. Union Oil Co. of Cal.</u>, 814 F.2d 628, 631 (Fed. Cir. 1987).  (JACOL ¶ 22).

48.    Although Esquel's Proposed Findings of Fact and Conclusions of Law fail to

assert that the claims of the '779 Patent are anticipated, <u>see</u> docket no. 244, at 69-80 (referring only to the claims of the '615 Patent), Esquel's Final Statement of Invalidity Contentions, docket no. 252, at 8 and Exhibit B at 19-25, asserts that claims 1, 17 and 18 of the '779 Patent are anticipated by the Scarbinsky pucker free seam invention.

49.    At trial, Esquel's counsel represented during closing argument that "if [the Court] find[s] . . . that . . . placing must occur before folding as the ['779] Patent requires, then Scarbinsky does not anticipate, because in Scarbinsky the folding occurs first."

50.    The Court's construction of "a method . . . comprising the steps" requires that the folding in step (e) be performed after the placing in step (b) in claim 1 of the '779 Patent. <u>See</u> <u>Markman</u> Order, docket no. 150, at 38.  In other words, the placing must occur before the folding.

51.    Esquel has failed to prove by clear and convincing evidence that claims 1, 17 and/or 18 of the '779 Patent are invalid due to anticipation under 35 U.S.C. § 102.  In Scarbinsky's invention, the folding occurs first.  Claim 18 of the '779 Patent is not anticipated because each and every step in this claim is not found in the Scarbinsky invention.

52.    On the issue of obviousness, "[t]he ultimate determination of whether an invention would have been obvious is a legal conclusion based on the totality of the evidence, including underlying factual inquiries such as: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." <u>Brown</u> <u>& Williamson Tobacco Corp. v. Philip Morris Inc.</u>, 229 F.3d 1120, 1124 (Fed. Cir. 2000)

1
2
(internal citation omitted) (citing <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17-18 (1966);  <u>In re</u>
<u>Dembiczak</u>, 175 F.3d 994, 998 (Fed. Cir. 1999)).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        53.     The first requirement for a determination of obviousness is "a showing of a
suggestion, teaching, or motivation to combine the prior art references."  <u>Brown &</u>
<u>Williamson</u>, 229 F.3d at 1124-25.  "The 'motivation-suggestion-teaching' requirement
protects against the entry of hindsight into the obviousness analysis."  <u>In re Kahn</u>, 441 F.3d
977, 986 ( Fed. Cir. 2006).  "This evidence may flow from the prior art references
themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the
nature of the problem to be solved."  <u>Id.</u> at 1125 (citing <u>Pro-Mold & Tool Co. v. Great Lakes</u>
<u>Plastics, Inc.</u>, 75 F.3d 1568, 1573 (Fed. Cir 1996)).  (JACOL ¶ 26).  "[T]he
'motivation-suggestion-teaching' test asks not merely what the references disclose, but
whether a person of ordinary skill in the art, possessed with the understandings and
knowledge reflected in the prior art, and motivated by the general problem facing the
inventor, would have been led to make the combination recited in the claims."  <u>In re Kahn</u>,
441 F.3d at 988 (citing <u>Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d
1293, 1321-24 (Fed. Cir. 2005)).  (JACOL ¶ 27).

20
21
22
23
24
        54.     The second requirement for a determination of obviousness is that "the ultimate
determination of obviousness does not require absolute predictability of success. . . . All that
is required is a reasonable expectation of success."  <u>Brown & Williamson</u>, 229 F.3d at 1125
(citations omitted).

25
26
        55.     In considering whether or not an invention would have been obvious, objective
evidence of nonobviousness, when available, must also be considered.  <u>See Brown &</u>

FINDINGS OF FACT and CONCLUSIONS OF LAW   54–

<u>Williamson</u>, 229 F.3d at 1129; <u>Ruiz v. A.B. Chance Co.</u>, 234 F.3d 654, 667 (Fed. Cir. 2000).

Secondary considerations include "(1) commercial success; (2) long-felt but unsolved needs;

and (3) failure of others." <u>Brown & Williamson</u>, 229 F.3d at 1129 (citing <u>Graham</u>, 383 U.S.

at 17). (<u>See</u> JACOL ¶¶ 28, 29).

56.    Esquel's Final Statement of Invalidity Contentions, docket no. 252, at 10 and

Exhibit B at 19-25, asserts that claim 18 of the '779 Patent would have been obvious to one

of ordinary skill in the art at the time of John Wong' invention based on the "Scarbinsky

invention" combined with the "TAL Double Needle Lap Seam" or the "TAL Disclosed

Raincoat Seam" combined with the "TAL Double Needle Lap Seam."

57.    "To antedate (or establish priority) of an invention, a party must show either an

earlier reduction to practice, or an earlier conception followed by a diligent reduction to

practice." <u>Purdue Pharma L.P. v. Boehringer Ingelheim GMBH</u>, 237 F.3d 1359, 1365 (Fed.

Cir. 2001) (citing <u>Price v. Symsek</u>, 988 F.2d 1187, 1190 (Fed. Cir. 1993)). Esquel has failed

to prove that the Scarbinsky invention is prior art.

58.    Esquel has failed to demonstrate a suggestion, teaching, or motivation to

combine these prior art references.

59.    Esquel has failed to prove by clear and convincing evidence that claim 18 of

the '779 Patent is invalid due to obviousness under 35 U.S.C. § 103.

60.    On the issue of best mode, an inventor "shall set forth the best mode

contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. (JACOL

¶ 33).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

61.    "The best mode requirement creates a statutory bargained-for-exchange by which a patentee obtains the right to exclude others from practicing the claimed invention for a certain time period, and the public receives knowledge of the preferred embodiments for practicing the claimed invention." Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 963 (Fed. Cir. 2001) (citing Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1532 (Fed. Cir. 1987)).

62.    The Federal Circuit has established a two-prong inquiry to determine whether an inventor has met the best mode requirement. Eli Lilly and Co., 251 F.3d at 963 (citing Chemcast Corp. v. Arco Indus. Corp., 913 F.2d 923, 927-28 (Fed. Cir. 1990)). "First, the factfinder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention." Id. (citing Fonar Corp. v. General Elec. Co., 107 F.3d 1543, 1548 (Fed. Cir. 1997); United States Gypsum Co. v. National Gypsum Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996)). "Second, if the inventor had a best mode of practicing the invention, the fact-finder must determine whether the best mode was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation." Old Town Canoe Co. v. Confluence Holdings Corp., 448 F.3d 1309, 1321 (Fed. Cir. 2006). "The first prong involves a subjective inquiry, focusing on the inventor's state of mind at the time of filing." Eli Lilly and Co., 251 F.3d at 963 (citing United States Gypsum, 74 F.3d at 1212; Chemcast, 913 F.2d at 928). "The second prong involves an objective inquiry, focusing on the scope of the claimed invention and the level of skill in the art." Id. (citing United States Gypsum, 74 F.3d at 1212; Chemcast, 913 F.2d at 928). (See JACOL ¶ 34).

FINDINGS OF FACT and CONCLUSIONS OF LAW   56–

1
2
63.    "[W]here the inventor has failed to disclose the only mode he ever

3
contemplated of carrying out his invention, the best mode requirement is violated."

4
Chemcast, 913 F.2d at 930; see e.g., Dana Corp. v. IPC Ltd. P'ship, 860 F.2d 415, 418-20

5
(Fed. Cir. 1988); Spectra-Physics, 827 F.2d at 1531.

6
64.    "[T]he best mode requirement does not extend to production details or routine

7
details." Eli Lilly and Co., 251 F.3d at 963 (citing Young Dental Mfg. Co. v. Q3 Special

8
Prods., Inc., 112 F.3d 1137, 1143 (Fed. Cir. 1997).  (JACOL ¶ 35).  "Production details,

9
10
which do not concern the quality or nature of the claimed invention, relate to commercial and

11
manufacturing considerations such as equipment on hand, certain available materials, prior

12
relationships with suppliers, expected volume of production, and costs."  Id. (internal

13
quotations and citations omitted).  "Routine details, on the other hand, implicate the quality

14
and nature of invention, but their disclosure is unnecessary because they are readily apparent

15
to one of ordinary skill in the art."  Id. (citing Young Dental, 112 F.3d at 1143).

16
17
65.    In light of Findings of Fact 29, 45-48, Mr. John Wong possessed a best mode

18
for practicing his pucker free seam invention at the time he filed the first patent application

19
on May 17, 1994.

20
66.    Indeed, as of the May 17, 1994 date of filing the patent application, using a

21
double layer of Vilene SL33 was the only mode Mr. Wong contemplated for carrying out his

22
invention.  See Findings of Fact 29, 31-33, 48.

23
24
67.    Mr. Wong concealed from the public the details, including the trade name and

25
supplier, of the Vilene SL33 thermal adhesive that he determined worked best as a bonding

26
element in his invention due to its optimal thickness.  Mr. Wong was under a duty to disclose

FINDINGS OF FACT and CONCLUSIONS OF LAW   57–

this information.  See Chemcast, 913 F.2d at 928-930 (holding that best mode requirement was violated where the inventor failed to disclose details, including trade name and supplier, of the compound he determined worked best at the time of his application); United States Gypsum, 74 F.3d at 1212-15 (inventor violated best mode requirement when he failed to disclose the particular compound he believed to be most effective to his invention).

68.     Mr. Wong's selection of Vilene SL33 was neither a production detail nor a routine detail.  See United States Gypsum, 74 F.3d at 1213 (compound that was believed to be "essential to improving the invention" is not a routine detail).

69.     In light of Findings of Fact 49-50, the written description of the patents-in-suit failed to disclose the best mode such that one reasonably skilled in the art could practice it as a result of Mr. Wong's non-disclosure of his best mode.  The patents-in-suit teach nothing that would assist a person of ordinary skill in the art to determine Mr. Wong's preferred thickness of the bonding element or any particular bonding element, including Vilene SL33, or that the thickness of the bonding element must correspond with the thickness of the material.  At trial, John Wong did not even know how to calculate the thickness of the Vilene SL33 bonding element he used for his invention.  Mr. Wong only disclosed potential choices of a bonding element falling within preferred materials and within a wide range of densities, which can be counted in the hundreds, if not thousands.  Mr. Wong himself required much experimentation with various thicknesses of bonding elements before he was able to construct a seam that was pucker-free.  Mr. Wong admitted he used SL33 because it performed the best.  The disclosed information does not allow one reasonably skilled in the art to practice Mr. Wong's best mode without undue experimentation.

FINDINGS OF FACT and CONCLUSIONS OF LAW   58–

70.    Esquel has proved by clear and convincing evidence that Mr. Wong failed to satisfy the "best mode" requirement. Accordingly, claim 18 of Taltech's patent, United States Patent No. 5,568,779, is invalid under 35 U.S.C. §112.

**D.    Unenforceability/Inequitable Conduct**

71.    The ultimate question of whether inequitable conduct occurred is equitable in nature and is committed to the discretion of the trial court. See Kingsdown Med. Consultants Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988). (JACOL ¶ 36).

72.    Inequitable conduct means withholding material information from the Patent Office with an intent to deceive. To prevail on an inequitable conduct defense, a defendant must produce clear and convincing evidence of both materiality of what was misrepresented or withheld and an intent to deceive by the applicant. Kingsdown Med. Consultants, 863 F.2d at 872. Once threshold findings of materiality and intent are made, the Court must weigh them together to determine whether a conclusion of inequitable conduct is warranted. Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1439 n.3 (Fed. Cir. 1991). (JACOL ¶ 37).

73.    The dominant standard of materiality has traditionally been the "reasonable examiner" standard. Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1314-1316 (Fed. Cir. 2006). "For many years [the Federal Circuit] ha[s] held that 'materiality for purposes of an inequitable conduct determination requires a showing that a reasonable examiner would have considered such [withheld] prior art important in deciding whether to allow the patent application.'" Id. at 1314 (quoting Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed. Cir. 2003)). In addition to the reasonable

examiner standard, information is material if it is not cumulative, and if it establishes, by itself or in combination with other information, a prima facie case of unpatentability, or if it refutes, or is inconsistent with, a position the applicant takes in asserting an argument of patentability.  37 C.F.R. § 1.56(b) (2004) ("Rule 56"); <u>Agfa Corp. v. Creo Products Inc.</u>, 451 F.3d 1366, 1373 (Fed. Cir. 2006) (explaining that "the PTO's Rule 56 did not supplant the earlier, and arguably broader, 'reasonable examiner' standard for materiality.")

74.     Because direct evidence of intent to deceive is rarely available, intent "may be inferred by the totality of the evidence."  <u>Digital Control</u>, 473 F.3d at 1319.

75.     "[T]he more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct."  <u>Akzo N.V. v. United States Int'l Trade Comm'n</u>, 808 F.2d 1471, 1481-82 (Fed. Cir. 1986).

76.     To establish inequitable conduct, Esquel is relying on the two undisclosed TAL raincoat seams (i.e., the "John Wong" and "H.P. Wong" Undisclosed Raincoat Seams), the undisclosed Standard Lap Seams, and material misrepresentations that the applicant made to the Patent Office in connection with the 1996 Amendments to distinguish the TAL Disclosed Raincoat Seam from the claimed invention.

77.     The "John Wong" and "H.P. Wong" Undisclosed Raincoat Seams and the Standard Lap Seams for dress shirts are prior art under 35 U.S.C. § 102(b) because they were manufactured by TAL Apparel and sold in the United States prior to one year before the May 17, 1994 filing date of the Taltech patents.  <u>See</u> Findings of Fact 110, 116, 123.

78.     Mr. Wong determined that the TAL Disclosed Raincoat Seam was material since he submitted it to the Patent Office.  The John Wong Undisclosed Raincoat Seam was

clearly more material than the TAL Disclosed Raincoat Seam because the John Wong Undisclosed Raincoat Seam contained a set stitch and a single top stitch, whereas the TAL Disclosed Raincoat Seam contained no set stitches and two top stitches.  The claims in the Taltech patents require at least one set stitch and a single top stitch.

79.    The materiality of the John Wong Undisclosed Raincoat Seam to Mr. Wong's invention is clear in light of Mr. Wong's testimony that in early 1994, he deconstructed and experimented with this type of seam in the course of developing his pucker seam invention for shirts.  The John Wong Undisclosed Raincoat Seam was also material because its existence was inconsistent with an argument of patentability made during the prosecution of the patent.  Mr. John Wong argued in the 1996 Amendments that TAL raincoat seams were wholly inadequate for dress shirts in part because of the appearance of two top stitches.  The John Wong Undisclosed Raincoat Seam has only one top stitch, like most dress shirt seams. The undisclosed information refutes Mr. Wong's position that TAL raincoat seams were wholly inadequate for dress shirts based on the visibility of the two top stitches and was therefore material.

80.    A reasonable examiner would have considered the John Wong Undisclosed Raincoat Seam important in deciding whether to allow the patent application because it contained a set stitch and a single top stitch and because this seam, along with the TAL Disclosed Raincoat Seam, provided the inspiration for John Wong's pucker free dress shirt armhole seam invention.

81.    There is ample evidence that the withholding of the John Wong Undisclosed Raincoat Seam was designed to deceive the Patent Office.  Mr. John Wong knew that TAL

Apparel made raincoat seams with one set stitch and one top stitch (i.e., the "John Wong Undisclosed Raincoat Seam") prior to filing his patent application on May 17, 1994. He conducted tests comparing raincoat seams having set stitches against raincoat seams with no set stitches prior to filing his patent application and in the course of developing his pucker free seam invention. See Finding of Fact 113. There is no evidence before the Court to explain why Mr. Wong disclosed the TAL Disclosed Raincoat Seam, which did not contain a set stitch or a single top stitch, as pointed out by Mr. Wong in the 1996 Amendments, but failed to disclose the John Wong Undisclosed Raincoat Seam, which contained this seam structure.

82.     Furthermore, Mr. Wong's intent to deceive can be inferred in part from his pattern of inconsistent testimony about the timing of his knowledge of the John Wong Undisclosed Raincoat Seam. See Finding of Fact 113. The withholding of the seam from the Patent Office is consistent with Mr. Wong's pattern of denying knowledge of the seam when he thought it would be damaging to his patent.

83.     Esquel has established inequitable conduct by clear and convincing evidence based upon Mr. Wong's failure to disclose the John Wong Undisclosed Raincoat Seam.

84.     Esquel has failed to establish inequitable conduct by clear and convincing evidence based upon Mr. John Wong's failure to disclose the H.P. Wong Undisclosed Raincoat Seam. Even if the Court assumes the materiality of the H.P. Wong Undisclosed Raincoat seam, there is no evidence that Mr. Wong, or anyone else with a duty to disclose, knew about this seam at any time during the prosecution of the patents-in-suit. Accordingly,

1    there is no evidence of an intent to deceive the Patent Office based upon the H.P. Wong

2    Undisclosed Raincoat Seam.

3        85.    Esquel has failed to establish inequitable conduct by clear and convincing

4    evidence based upon Mr. John Wong's failure to disclose the Standard Lap Seams. Although

5    a patentee has a duty to cite references which the patentee is aware of that a reasonable

6    examiner would likely consider important, that duty does not extend to references that are

7    merely cumulative. GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed. Cir. 2001). A

8    reasonable examiner would have considered the Standard Lap Seams, LSr and LSaw,

9    important in deciding whether to allow the patent application because these seams formed

10   the seam structure of Mr. Wong's invention, absent the thermal adhesive. However, Mr.

11   Wong explained that he did not disclose the Standard Lap Seams because he assumed that

12   the examiner would be aware of these commonly used seams, or, in other words, that the

13   information was cumulative to the examiner's basic knowledge. Taltech argues that an

14   inference of examiner knowledge is supported by the citation of the Benstock patent, U.S.

15   Patent No. 5,003,902, which in turn cited the publication, FEDERAL STANDARD, STITCHES,

16   SEAMS, AND STITCHINGS (Gen. Servs. Admin. 1965). (Ex. 3 at 127). This publication

17   describes the Standard Lap Seams used in Mr. Wong's invention. See Finding of Fact 30.

18   Although Mr. Wong admitted that a patent examiner would not necessarily be aware of all

19   the different lap seams available to make dress shirts, this alone does not rise to the level of

20   clear and convincing evidence that Mr. Wong intended to deceive the Patent Office. The

21   Standard Lap Seams were likely cumulative to information generally known in the art or

22   cumulative to the examiner's specific knowledge based on the Benstock patent.

FINDINGS OF FACT and CONCLUSIONS OF LAW   63–

86.     "Applicants for patents are required to prosecute patent applications in the [Patent Office] with candor, good faith, and honesty."  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995) (citing Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 818 (1945)). "This duty extends also to the applicant's representatives."  Id.

87.     As a patent applicant, Mr. Wong and his representatives breached their duty of candor because the 1996 Amendments made affirmative misrepresentations of material facts, and failed to disclose material facts, with an intent to deceive the Patent Office.  See Molins, 48 F.3d at 1178.

88.     The 1996 Amendments represent that "[i]n addition to the current prior art of record, applicant's representative has *recently become aware* that applicant has made prior sales in the United States of raincoats that incorporate an adhesive structure along a raincoat seam."  At trial, however, Mr. Wong testified, on direct, that he knew that TAL Apparel was making raincoats using a thermal adhesive back in 1993, and that the use of such thermal adhesives in raincoats was the very source of his idea to use thermal adhesives in dress shirts. He later testified that in February or March 1994 he took apart a raincoat seam that had the same seam structure, with a double top stitch, as the TAL Disclosed Raincoat Seam depicted in the 1996 Amendments.  In light of this testimony, the representation in the 1996 Amendments that the applicant's representative has "recently become aware" of the fact that TAL Apparel made raincoats with thermal adhesives was misleading.  Mr. Wong had a duty to inform his attorneys of all material prior art at the time the patent applications were filed, and it is clear that he failed to fulfill this duty.

FINDINGS OF FACT and CONCLUSIONS OF LAW   64–

89.     Despite the representation in the 1996 Amendments that "the [overlock] stitch is unacceptable in most applications, particularly shirts, " Mr. Wong admitted that prior to 1985, most of TAL Apparel's dress shirts used overlock stitches, and in the early 1990s about five to six percent of TAL Apparel's dress shirts sold used overlock stitches. See Finding of Fact 41.  Mr. Wong's explanation at trial that overlock stitches would not be acceptable in high-priced dress shirts was misleading.  The claims contained in the patents-in-suit are not limited to high-priced dress shirts.  Therefore, Mr. Wong's statement to the examiner that most retail firms find overlock seam structures unacceptable, "particularly in dress shirts" was material and false.

90.     In a further effort to distinguish the Admitted TAL Raincoat Seam from the claimed inventions, the 1996 Amendments state:

> Still further, the appearance of two top stitches protruding through the upper garment ply may be acceptable in the seams of heavy raincoats, but such a configuration is wholly inadequate for most garments, particularly dress shirts.

Yet, at trial, Mr. John Wong testified that he did not mean what he said ("I only talking about the frayed edge, not the double needle") and that a seam with two top stitches is a "very normal, normal seam."  He also admitted at trial that TAL Apparel made and sold in the United States shirts, including five percent of its dress shirts, which featured two top stitches in the armhole seam.  See Finding of Fact 42.  Mr. John Wong's representation that two top stitches is "wholly inadequate for . . . dress shirts" was false.  Mr. Wong withheld material information from the Patent Office.

91.     In making these misrepresentations, Mr. Wong sought to persuade the examiner that the TAL Disclosed Raincoat Seam was distinguishable from the claimed

1    invention.  Notice of allowability followed shortly after these false statements were made.

2        92.    Evidence of Mr. John Wong's intent to deceive can be found in the fact that he

3    was making these statements to the examiner about raincoats and shirts that were made by

4    his company and with which he was very familiar.  Mr. John Wong knew or should have

5    known that these statements were untrue.  The Court concludes that he intentionally made

6

7    them to deceive the examiner.

8        93.    In addition to making misrepresentations, the 1996 Amendments failed to point

9    out the similarity between the TAL Disclosed Raincoat Seam and Mr. Wong's pucker free

10   seam invention regarding the placement of the thermal adhesive under the top layer of fabric

11   within the seam.  TAL's proposed findings of fact state that "A person of ordinary skill in the

12

13   art, if knowledgeable about the use of fusibles in garments, would not know to place and sew

14   the fusible in the location defined in the asserted claims, given the numerous options

15   available."  Clearly, a reasonable patent examiner would want to know that Mr. John Wong

16

17   placed the thermal adhesive in his invention in the same place within the seam as the TAL

18   Disclosed Raincoat Seam.

19       94.    Esquel has established inequitable conduct by clear and convincing evidence

20   based upon Mr. Wong's and his representatives' misrepresentations regarding the TAL

21   Disclosed Raincoat Seam to the Patent Office.

22

23       95.    Based on this evidence, the Court concludes that Mr. Wong and his

24   representatives who prosecuted the patents-in-suit committed inequitable conduct.

25   Accordingly, Taltech's patent, United States Patent No. 5,568,779, is unenforceable.

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   66–

E.     **Attorney Fees**

96.     "The Court in exceptional cases may award reasonable attorney fees to the

prevailing party."  35 U.S.C. § 285.  The Court must undertake a two-step inquiry when

considering a request for attorney fees.  Evident Corp. v. Church & Dwight Co. Inc., 399

F.3d 1310, 1315 (Fed. Cir. 2005).  First, the Court must determine whether there is clear and

convincing evidence that the case is exceptional; second, the Court must decide whether an

award of attorney fees to the prevailing party is warranted.  Id.; Cybor Corp. v. FAS Techs.,

138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc).  Normally, exceptional cases are those

involving inequitable conduct by the patentee in procuring the patent or bad faith litigation.

Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1380 (Fed. Cir. 2001); see

also Evident Corp., 399 F.3d at 1315-16 (affirming district court's award of attorney fees due

to patent holder's inequitable conduct); Korody-Colyer Corp. v. Gen. Motors Corp., 760

F.2d 1293, 1295 (Fed. Cir. 1985) (affirming district court holding that exceptional case

existed where the patent applicant failed to disclose relevant information to the Patent Office

Examiner and where the nondisclosure was a substantial cause or crucial factor in obtaining

the patent).

97.     There is clear and convincing evidence that this is an exceptional case based on

Mr. John Wong's inequitable conduct during the prosecution of the patents-in-suit.  John

Wong engaged in a course of conduct beginning in 1994 and continuing until 2006 that

constituted a fraud on the Patent Office and ultimately on this Court.  Mr. Wong obtained the

idea to make a dress shirt armhole seam using a thermal adhesive as a bonding element from

his personal knowledge of and experimentation with the TAL raincoat seams.  See Findings

FINDINGS OF FACT and CONCLUSIONS OF LAW   67–

of Fact 22, 24-25, 34, 43-44, 110, 113-114.  Yet he disclosed the TAL Disclosed Raincoat

Seam to the Patent Office two years after filing his patent application, without any

explanation for the delay, and made material misrepresentations in connection therewith

regarding the materiality of this seam to his invention.  See Findings of Fact 37-42;

Conclusions of Law 87-93.  He also failed to disclose to the Patent Office the John Wong

Undisclosed Raincoat Seam, which was more material than the TAL Disclosed Raincoat

Seam, and he made arguments for patentability in connection with the TAL Disclosed

Raincoat Seam that would have been undermined by the disclosure of the John Wong

Undisclosed Raincoat Seam.  See Findings of Fact 37-42, 111; Conclusions of Law 78-83.

Consistent with his pattern of withholding information, Mr. John Wong failed to disclose the

best mode for carrying out his invention.  See Findings of Fact 27, 29, 45-50; Conclusions of

Law 60-70.

98.    John Wong is the sole inventor of the patents-in-suit.  See Finding of Fact 9.

Mr. Wong was the only applicant listed on the patent applications.  See id.  In July 1994, he

assigned the pucker free seam invention, which was set forth in a patent application that

eventually issued as the '779 Patent, to TAL Apparel.  See Finding of Fact 10.  TAL Apparel

was the record owner of the invention and the patent application "during a significant period

of time" before the '779 Patent issued.  See Evident Corp. v. Church & Dwight Co., Inc., 339

F.3d at 1315.  "Inventors, patent owners and attorneys associated with the filing or

prosecution of a patent application have an affirmative and continuing duty to disclose

material information to the PTO."  Id. at 1315-16 (citing 37 C.F.R. § 1.56(c)).  TAL Apparel

was such a party and had both the duty and the opportunity to make full disclosure to the

PTO.  In 1999, TAL Apparel assigned its rights in the '779 Patent, as well as the patent

rights in the '615 Patent, to Taltech.  See Finding of Fact 10.  At all times material, TAL

Apparel has had an oral, non-exclusive, and royalty free license to practice the inventions

asserted in the '779 and '615 Patents.  See Finding of Fact 3.  Both TAL Apparel and Taltech

have licensed rights in the patents-in-suit to third parties.  See Finding of Fact 11.  At all

times material Mr. Wong was employed by TAL Apparel or its related companies.  Findings

of Fact 19-22.  The patent applications and amendments were filed by attorney Bradford E.

Kile, on behalf of Mr. Wong.  A "large entity" filing fee of $1,200 and a "large entity"

surcharge of $130 were paid in connection with the filing of the patent application for the

'779 Patent, indicating that the real party in interest was TAL Apparel, not John Wong.  Ex.

3 at 2, 42, 43; see also Ex. 4 at 49.  The applicant indicated in the calculation of the payment

fee for the '779 Patent that the patent application was being filed by "other than small

entity."  Ex. 3 at 265.  See also Ex. 4 at 192.  At all times material Mr. Kile has been and is

presently the attorney for TAL Apparel and Taltech.  At all times material TAL Apparel was

associated with the inventor and responsible for the conduct of the applicant before the

Patent Office.  See 37 C.F.R. § 1.56(c).  During trial, Plaintiffs' attorney Mr. Kile,

represented to the Court that the assignment from Mr. Wong to TAL Apparel occurred

"along with the filing of the applications."  Another attorney for Plaintiffs, Mr. Brian Bodine,

also represented to the Court that "I don't believe that Mr. Wong was involved in the

prosecution."  The Court concludes that although Mr. Wong signed the amendments to the

patent applications, as applicant, at all times material after the filing of the applications, the

prosecution of the patents at issue was for the benefit of TAL Apparel.

FINDINGS OF FACT and CONCLUSIONS OF LAW   69–

99.    Taltech Limited and TAL Apparel Limited are the only plaintiffs in this case. Mr. John Wong is not a party to this litigation.  However, Mr. Wong is the inventor and was an important witness during this litigation.

100.    In connection with the ITC matter and in the discovery phase of this litigation, John Wong provided false testimony that can only be characterized as an attempt to "cover-up" the fraud on the Patent Office.  He repeatedly denied having any knowledge about the TAL Disclosed Raincoat Seam, later admitting that he not only knew about it prior to filing his patent application, but also admitting that it was the very source of his idea for putting a thermal adhesive in a dress shirt armhole seam to reduce pucker.  See Findings of Fact 43-44. John Wong similarly denied any knowledge about the John Wong Undisclosed Raincoat Seam until he was pressed on cross-examination at trial to admit that he knew that TAL Apparel made raincoat seams with one set stitch and one top stitch before he filed his patent application on May 17, 1994, and that he took apart and tested raincoat seams with set stitches and raincoat seams without set stitches prior to filing his patent application in May 1994.  See Findings of Fact 113-114.

101.    In addition to the inequitable conduct before the PTO, there is clear and convincing evidence that this is an exceptional case because Esquel Enterprises, Ltd. and Esquel Apparel, Inc. have had to needlessly expend significant resources as a result of Taltech and TAL Apparel's litigation tactics.  See Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996) (noting that litigation misconduct may suffice to make a case exceptional.)  There has been a pattern of making expansive claims, only to later withdraw them prior to an adjudication on the merits.  For example, Esquel Enterprises, Ltd.

and Esquel Apparel, Inc. expended needless resources conducting discovery regarding Plaintiffs' damages claims, preparing a damages defense, and preparing for a jury trial, only to have Plaintiffs dismiss the claim for damages and waive the jury demand just weeks before trial was scheduled to commence.  Another example occurred mid-trial when Plaintiffs voluntarily withdrew with prejudice five of seven of their remaining claims rather than respond on the merits to Esquel's motion pursuant to Federal Rule of Civil Procedure 52(c) for entry of judgment of non-infringement.  Lastly, the Court notes that Taltech and TAL withdrew the ITC Complaint shortly before that hearing was scheduled to commence.

102.    The Court also concludes that an award of attorneys fees in this exceptional case is warranted in favor of Esquel Enterprises, Ltd. and Esquel Apparel, Inc.  In light of all the facts and circumstances, the Court concludes it would be "grossly unjust" for Esquel Enterprises, Ltd. and Esquel Apparel, Inc. to bear the cost of this litigation.  Cf. J.P. Stevens Co. v. Lex Tex Ltd., 822 F.2d 1047, 1052 (Fed. Cir. 1987).

103.    The Court holds TAL Apparel and Taltech jointly and severally liable for the reasonable attorney fees incurred by Esquel Enterprises, Ltd. and Esquel Apparel, Inc. in defending this case.

**F.**    **Motion for Attorney Fees and Judgment**

104.    Esquel Enterprises, Ltd. and Esquel Apparel, Inc. are directed to file a motion for reasonable attorney fees incurred in defending this case by March 30, 2007.  The motion shall be noted for May 4, 2007.  Taltech and TAL Apparel may file a response to the motion by April 20, 2007.  Esquel Enterprises, Ltd. and Esquel Apparel, Inc. may file a reply by May 4, 2007.

FINDINGS OF FACT and CONCLUSIONS OF LAW   71–

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

105.    Esquel Enterprises, Ltd. and Esquel Apparel, Inc. are directed to file a proposed Judgment consistent with these Findings of Fact and Conclusions of Law by March 30, 2007.  Taltech and TAL Apparel may file objections to the proposed Judgment by April 20, 2007.  Esquel Enterprises, Ltd. and Esquel Apparel, Inc. may file a response to the objections by April 27, 2007.  Taltech and TAL Apparel may file a reply by May 4.  The Court will enter Judgment after reviewing the parties' submissions.

DATED this 9th day of March, 2007.

Thomas S. Zilly
United States District Judge

FINDINGS OF FACT and CONCLUSIONS OF LAW   72–