UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TALTECH LIMITED,<br><br>  Plaintiff,<br><br>v.<br><br>ESQUEL ENTERPRISES LTD.,<br><br>  Defendant. | No. C04-974Z<br><br>ORDER |

This matter comes before the Court on Esquel's Motion for Attorneys' Fees and Costs, docket no. 303. Taltech has filed an opposition to Esquel's motion, docket no. 310. Esquel has filed a reply in support of its motion, docket no. 315. Having considered the parties' briefs, declarations, exhibits, and the entire record of the case, the Court GRANTS IN PART and DENIES IN PART Esquel's motion.

## BACKGROUND

This is a complex patent infringement case, which necessitated substantial fact and expert discovery, third party discovery, motion practice, mock jury presentations by both parties, and trial preparation. Hoeft Decl., docket no. 305, ¶¶ 11-20, 37-40, 48-59, 66. During discovery, the parties took 96 depositions in 12 cities, 25 of which were conducted in Asia. Id. ¶ 11. The parties made numerous visits to Asia, i.e., Hong Kong, China, and

ORDER 1–

Malaysia, to take discovery, conduct factory inspections, and conduct depositions.  Id. ¶¶ 11-12.  Taltech served seven sets of Interrogatories and ten sets of document requests in the Seattle and ITC actions, while Esquel served four sets of Interrogatories and five sets of document requests.  Id. ¶ 14.  Taltech's experts generated 15 expert reports and Esquel's experts generated 18 expert reports.  The parties produced over 100,000 pages of documents, some of which had to be translated into English.  Id. ¶ 15.  Without any doubt, all of the attorneys involved in the case vigorously represented their clients' interests throughout the entire litigation process.

On March 9, 2007, the Court entered Findings of Fact and Conclusions of Law ("FFCL"), docket no. 301, after a two-week bench trial.  The Court held, in pertinent part, that Esquel had established inequitable conduct by clear and convincing evidence based upon Mr. John Wong's failure to disclose the John Wong Undisclosed Raincoat Seam to the Patent Office, and based upon Mr. John Wong's and his representatives' misrepresentations regarding the TAL Disclosed Raincoat Seam to the Patent Office during the prosecution of the patents-in-suit.  FFCL 83, 94, 95.  Accordingly, the Court held that Taltech's patent, United States Patent No. 5,568,779 ("the '779 Patent") was unenforceable.  FFCL 95.  The Court further held that there was clear and convincing evidence that this was an "exceptional" case under 35 U.S.C. § 285 ("Section 285") based on the inequitable conduct before the Patent Office and based on Taltech's and TAL Apparel's litigation tactics.  FFCL 97, 101.  The Court concluded that an award of attorneys' fees in this exceptional case was warranted in favor of Esquel Enterprises, Ltd. and Esquel Apparel, Inc.  FFCL 102.  The Court held TAL Apparel and Taltech jointly and severally liable for the reasonable attorneys' fees incurred by Esquel Enterprises, Ltd. and Esquel Apparel, Inc. in defending this case.  FFCL 103.

ORDER  2–

Having already determined that this case is "exceptional" and that fees are warranted, the issue now before the Court is the reasonableness of Esquel's[1] request for fees and costs. Esquel's motion seeks $6,944,270.67 in attorneys' fees, $1,130,634.60 in costs, and $653,395.32 in pre-judgment interest, for a total proposed award of $8,728,300.59,[2] plus post-judgment interest. Esquel asserts that it has made some effort to streamline its fee request. Specifically, Esquel is not seeking approximately $700,000 in fees resulting from duplicative efforts or incurred by legal professionals who billed less than 40 hours in total in the case. Suppl. Hoeft Decl. ¶ 17. Esquel is also not seeking $150,738.02 in costs that it asserts might be recoverable under Section 285. Id. ¶ 18. Although Esquel is seeking $226,942.42 in deposition fees that it incurred in the course of discovery in the ITC proceeding, Esquel is not seeking approximately $2.3 million of other ITC-related fees. Id. ¶ 19.

Taltech opposes Esquel's motion in two main ways. First, Taltech argues that Esquel's request for fees should be reduced by at least two-thirds to reflect the prevailing market rate for similar litigation. Second, Taltech makes specific objections to Esquel's requested fees and costs, arguing that they are excessive and unreasonable. The Court addresses each of these challenges in turn.

---

[1] This Order's reference to "Esquel" includes both Esquel Enterprises, Ltd. and Esquel Apparel, Inc. Similarly, this Order's reference to "Taltech" includes both Taltech Limited and TAL Apparel, Inc. The Court refers to the parties in this way for consistency with the parties' briefs and for ease of reference; no legal significance should be attached to the Court's use of these shorthand references to the parties. In limited circumstances, the Order refers to TAL rather than Taltech to emphasize that TAL, not Taltech, sells shirts.

[2] Esquel's opening motion requests $6,740,813.17 in attorneys' fees and $1,119,208.16 in costs, for a total of $7,860,021.33 in fees and costs. Esquel's opening motion also reserves the right to request fees incurred in preparing Esquel's motion for fees and costs and to request a specific amount of pre-judgment interest. In its reply brief, Esquel requests $216,717.50 in fees and $11,426.44 in costs incurred in preparing its motion for fees and costs, see Suppl. Hoeft Decl., docket no. 316, ¶ 26, and agrees to a reduction of $13,260.00 in fees, see id. ¶ 19, bringing the total requested fees to $6,944,270.67 and the total requested costs to $1,130,634.60. Esquel's reply also requests $653,395.32 in pre-judgment interest.

ORDER  3–

# DISCUSSION

## A. Standard of Review

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "The purpose of Section 285 is to reimburse a party injured when forced to undergo an 'exceptional' case." Mathis v. Spears, 857 F.2d 749, 753 (Fed. Cir. 1988). "The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." Id. "No award under Section 285 can fully compensate a defendant subjected to bad faith litigation, e.g., for loss of executives' time and missed business opportunities." Id. at 754. As a result, in determining the compensatory quantum of an award under Section 285, courts are not "limited to ordinary reimbursement of only those amounts paid by the injured party for purely legal services of lawyers," and are not "precluded from ordinary reimbursement of legitimate expenses defendant was forced to pay." Id. At the same time, "Section 285's requirement that the fees awarded be 'reasonable' is a safeguard against excessive reimbursement." Id. "The district court's inherent equitable power and informed discretion remain available in determining the level of exceptionality rising out of the offender's particular conduct, and in then determining, in light of that conduct, the compensatory quantum of the award, including the amount of attorney fees, what if any expenses shall be included, and the rate of prejudgment interest, if any, on the award." Id. "The methodology of assessing a reasonable award under 35 U.S.C. § 285 is within the discretion of the district court." Id.

In determining an appropriate award of attorneys' fees, the Court may use the lodestar approach. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Under this approach, the Court first determines a lodestar figure by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. See id. The Court "may then adjust this lodestar calculation by other factors." Blanchard v. Bergeron, 489 U.S. 87, 94 (1989). "[T]he most critical factor" in determining the reasonableness of a fee award "is the degree

ORDER  4–

of success obtained." Farrar v. Hobby, 506 U.S. 103, 114 (1992) (quoting Hensley, 461 U.S. at 436). The Federal Circuit has rejected a patentee's argument that the prevailing defendant should only recover the fees related to inequitable conduct. Brasseler U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1386 (Fed. Cir. 2001) ("Stryker would not have incurred any of the fees generated in defense of this suit had Brasseler not committed inequitable conduct in pursuit of its patent and had it not filed a claim for infringement of that patent, known by Brasseler to have been improperly obtained. Thus, Brasseler should be charged with the expense of defending against this frivolous lawsuit."). The reasonable hourly rate is usually determined by reference to the rates charged by lawyers in the same legal community with comparable skills and reputations. See Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). Courts have recognized that "[p]atent law is a specialized area and requires special expertise; therefore, hourly rates are somewhat higher than those of general practitioners." SunTiger, Inc. v. Scientific Research Funding Group, 9 F. Supp. 2d 601, 608 (E.D. Va. 1998), aff'd, 194 F.3d 1335 (Fed. Cir. 1999). In this matter, Taltech does not dispute the reasonableness of the hourly rates sought by Esquel. The Court finds that the hourly rates charged by Esquel's attorneys were reasonable. The parties disagree as to the reasonableness of the hours spent by Esquel's attorneys.

In addition to attorneys' fees, Esquel moves for costs pursuant to Federal Rule of Civil Procedure 54(b), 28 U.S.C. §§ 1821 and 1920. These rules are described below, as necessary, in the context of Taltech's specific objections.

**B.    Taltech's "Prevailing Market Rate" Argument**

Taltech relies on a report by the American Intellectual Property Law Association ("AIPLA") to argue that Esquel's request for almost $7 million in fees is not in line with the prevailing market rate for similar litigation. Taltech Exhibits, docket no. 310, Ex. A (AIPLA report). The Federal Circuit has approved district courts' reliance on the AIPLA report to assist the Court's determination of reasonable billing rates and hours expended. See View

ORDER   5–

Eng'g, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 987-88 (Fed. Cir. 2000) (reducing rates because higher than normal rates were charged); see also Vardon Golf Co. v. Karsten Mfg. Corp., No. 99 C 2785, 2003 WL 1720066 at *2 (N.D. Ill. Mar. 31, 2003) (noting that the fee request of just over $2 million seems reasonable in light of the $3.5 million median cost of similar litigation).

The AIPLA report categorizes patent infringement litigation as having "less than $1 million at risk," "$1-$25 million at risk," and "more than $25 million at risk." Taltech Ex. A (AIPLA report); Suppl. Hoeft Decl. Ex. J (same). Taltech argues that only $1-25 million is at risk in this litigation, whereas Esquel argues that more than $25 million is at risk. In support of its position, Taltech points out that: (1) Esquel's expert calculated a $83,711 royalty due Taltech if Esquel were found to infringe, (2) Taltech's expert calculated potential damages at no more than $600,000, (3) Esquel's U.S. wrinkle-free shirt business generated a mere $1.3 million in profits, and (4) most of Esquel's shirts were sold at a loss. Taltech's Opp'n at 3, nn.2-3 (citing Taltech Exs. B-D).

Esquel responds that if the case had been worth only $85,000 to $600,000, the case would never have gone to trial. This is persuasive given that Esquel spent millions of dollars to go to trial with no assurance that its fees would be paid by Taltech. Furthermore, as Esquel points out, the threat of an injunction against Esquel's sales of wrinkle-free, pucker-free shirts in the United States is why the case went to trial. See Taltech's Statement with Respect to Damages, docket no. 218 (waiving claim for past damages). Future profits in this rapidly-growing market are at stake. Taltech's expert noted that TAL's "U.S. revenues from sales of all pucker-free shirts grew from 40 million dollars in 2001 to 78 million in 2002 and 95 million in 2003. By 2005 revenues had grown to $202 million." Taltech Ex. D (Neels Expert Report) at 2-3, and Ex. 3 attached thereto. Esquel submits evidence from trial showing that TAL is concerned that Esquel will be able to undercut TAL on price. Suppl. Hoeft Decl. Ex. G (Harry Lee testimony) at 68:4-10. Esquel contends that its revenue selling

ORDER  6–

shirts from the filing of the litigation (i.e., 2004) to the end of the patent term (i.e., 2014) could exceed $1 billion if it achieves just half of TAL's sales volume. Esquel's Reply at 1.

The Court does not have sufficient information to make any findings related to the profits that would flow from Esquel's projected future revenues. For many reasons, the Court is unable to assess the monetary risk of an injunction. Thus, the Court cannot determine whether more than $25 million is at risk in this litigation, although it certainly seems possible. The Court considers both sets of AIPLA statistics – i.e., those for cases in which $1-25 million is at risk, and those for cases in which more than $25 million is at risk. The AIPLA's 2005 report finds that the mean (average) total cost[3] for litigating patent infringement cases in which $1-25 million is at risk is $2.6 million, the median (midpoint) cost is $2 million, and 50% of cases fall within a range of between $1.2 and $3.5 million. For patent infringement cases in which more than $25 million is at risk, the mean (average) cost is $5.2 million, the median (midpoint) cost is $4.5 million, and 50% of cases fall within a range of between $2.5 and $6 million. Taltech Ex. A (duplicate Suppl. Hoeft Decl. Ex. J) at I-109, I-110. Taltech emphasizes the median statistic, whereas Esquel emphasizes the mean statistic. The Court focuses on the median statistic because the mean is more prone to variation due to singular extreme cases. The AIPLA report also breaks down its statistics into regions of the country. In "Other West," which would include Seattle, Washington, the median cost of patent infringement litigation in which $1-25 million is at risk is $2 million, and the median cost of patent infringement litigation in which more than $25 million is at risk is $5 million.

The AIPLA statistics show that Esquel's request for almost $8.7 million is on the high end of the spectrum, even if the Court assumes that more than $25 million is at risk in the

---

[3] "Total cost" includes outside legal and paralegal services, local counsel, associates, paralegals, travel and living expenses, fees and costs for court reporters, photocopies, courier services, exhibit preparation, analytical testing, expert witnesses, translators, surveys, jury advisors, and similar expenses. Taltech Ex. A. at 22.

ORDER   7–

litigation. While the Court keeps this in mind when fashioning its fee award, the Court rejects the notion of a cap based on the AIPLA statistics. The Court has an obligation under Section 285 to determine whether the actual time spent and fees charged by Esquel were reasonable, and thus the Court turns to Taltech's specific objections.

### C.    Taltech's Specific Objections to Esquel's Requested Fees and Costs

Taltech asks the Court to reduce Esquel's request for fees and expenses by $1,535,174.91. See Taltech Ex. E ("Summary of Excessive Billing"). Taltech also asks the Court not to award pre-judgment interest.

#### 1.    Fees – Accommodations and Interpreter

Taltech challenges Esquel's request for $10,097.00 in attorneys' fees incurred by partners at Lane Powell (Esquel's local counsel) in arranging hotel accommodations and finding interpreters during trial. It is unreasonable to bill attorneys' rates for time devoted to clerical tasks. See Eli Lilly and Co. v. Zenith Goldline Pharms., Inc., 264 F. Supp. 2d 753, 776 (S.D. Ind. 2003) (rejecting $100 rate for legal assistants who spent time shopping and coordinating travel arrangements and trial logistics); Missouri v. Jenkins, 491 U.S. 274, 287-88, n.10 (1989) ("Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them."). Accordingly, the Court reduces Esquel's request for fees by $10,097.00.

#### 2.    Fees – Redactions

Taltech argues that $82,545.78 in Esquel's fees are excessive because they come from redacted time entries with no adjustment of time for the redactions. Taltech's Ex. F (purple boxes). Esquel asserts that it redacted some of the narrative descriptions of the time entries because the narrative implicated attorney-client privilege or work product information; because the services did not relate directly to this litigation; or because Esquel decided not to seek reimbursement for those services. Hoeft Decl. ¶ 26; Suppl. Hoeft Decl. ¶¶ 15-16. Esquel has offered to provide a copy of its legal bills without redactions for an *in camera*

ORDER   8–

inspection. The Court declines to undertake an *in camera* inspection because even unredacted entries will not necessarily inform the Court of the reasonable amount of time spent on legitimate tasks. In light of Esquel's burden to demonstrate the reasonableness of its fees, and taking all of the circumstances into account, the Court agrees with Taltech's objection and reduces Esquel's request for fees by $82,545.78.

### 3. Fees – Duplicative Work

Taltech argues that $150,924.92 in Esquel's fees are unreasonable because they represent duplicative work. Taltech's Ex. F (red boxes). For example, Taltech challenges Stuart Berkson's time entry for 10 hours to travel to Hong Kong and review of materials for depositions. Taltech Opp'n at 402 (Esquel's billing records at 299). Stuart Berkson is a partner in McDermott Will & Emery's Chicago office who was the primary contact between Esquel's U.S. attorneys and its Hong Kong attorneys. Hoeft Decl. ¶ 31. Other Esquel attorneys, including Joseph Paquin and Steven Hoeft, also traveled to Hong Kong and prepared for depositions. Taltech Opp'n at 402. Taltech also challenges Esquel's large trial team, noting that Esquel had seven attorneys at trial even though only one had a substantial speaking role. Taltech Opp'n at 597-615 (red boxes). Esquel attempts to justify its fee request by contending that Taltech's ten-attorney trial team was larger than Esquel's seven-attorney team, Suppl. Hoeft Decl. ¶ 8; that each of its attorneys had a specific role in preparing for trial, id. ¶¶ 9-12; and that it sent two of its attorneys home four or five days before trial ended, id. ¶ 11. Esquel also argues that it did not overstaff depositions. Id. ¶ 13. Although it was Esquel's prerogative to involve more than one attorney on the same task and to have numerous counsel present at trial to assist Mr. Hoeft or at depositions, the Court will not order Taltech to pay for Esquel's decision to overstaff. Both sides in this case expended an enormous amount of resources in an effort to be zealous advocates for their clients, which no doubt could have been achieved with more efficiency in some circumstances. The Court

ORDER  9–

agrees with Taltech's duplicative work objection and accordingly reduces Esquel's request for fees by $150,924.92.

### 4. **Fees – Jurisdictional Discovery**

Taltech challenges Esquel's request for $250,314.50 in attorneys' fees incurred as a result of jurisdictional discovery taken by Esquel. Taltech Ex. F (blue boxes). Esquel was justified in conducting jurisdictional discovery in preparation of its response to Taltech's motion to dismiss for lack of personal jurisdiction. The Court declines to reduce Esquel's request for fees based on Taltech's jurisdictional discovery objection.

### 5. **Fees – Prior Art**

Taltech challenges Esquel's request for $461,698.62 in fees for over 1034 hours expended in performing and reviewing a prior art search that identified 663 items of prior art. Esquel compiled the extravagant list of 663 items of prior art despite the fact that Esquel had already identified two prior art patents/publications as anticipating the Taltech claims and six additional references as rendering the claims obvious in the proceedings before the ITC. In response to a motion to strike by Taltech, the Court ordered Esquel to narrow its list to 25 items of prior art, docket no. 107. Esquel narrowed its list of prior art in June 2006, docket no. 194, only to assert approximately 650 items of prior art two months later, in August 2006, docket no. 216. In response to a motion in limine by Taltech, docket no. 228, the Court ordered Esquel to file a revised statement of invalidity contentions on the eve of trial, docket no. 251. None of the "new" prior art patents or publications was mentioned by Esquel during the trial. Esquel argues that Taltech confuses diligence with excess and that Esquel had an ethical responsibility to locate and review all prior art that might be relevant. Although Esquel asserts that Taltech's calculation of $461,698.62 includes time entries that cover tasks unrelated to prior art, Esquel does not estimate the amount of fees incurred as a result of the unrelated tasks. See Suppl. Hoeft Decl. ¶ 14, and Ex. M. Although it is easy to say in hindsight that a task was unnecessary to the successful outcome of litigation, the Court

ORDER  10–

believes that Esquel's fees incurred as a result of the prior art search represent excessive fees that should not be shifted to Taltech. Accordingly, the Court reduces Esquel's request for fees by $461,698.62.

### 6. Fees – ITC Proceeding

As previously mentioned, Esquel is seeking $226,942.42 in attorneys' fees that it incurred in the course of discovery in the ITC proceeding, and it is not seeking approximately $2.3 million of other ITC-related fees. Taltech challenges Esquel's request for ITC-related fees in two respects.

First, Taltech objects to Esquel's request for $13,260.00 in fees for depositions relating to domestic industry. Esquel agrees to this reduction. Suppl. Hoeft Decl. ¶ 19 ("Esquel agrees to reduce this figure by $13,260, which TAL argues were fees related to the domestic industry question, a question not at issue in this litigation."). Accordingly, the Court reduces Esquel's request for fees by $13,260.00.

Second, Taltech objects to Esquel's request for $52,737.50 in fees for depositions of experts taken in the ITC proceeding. Taltech points out that the parties *in this litigation* stipulated to limitations on the use of expert deposition testimony taken in the ITC proceeding. Stipulation, docket no. 71, ¶ 5 (limiting use to impeachment). Esquel responds that the expert deposition testimony taken in the ITC proceeding was used to prepare expert reports and to prepare for expert depositions taken in this litigation and would have been used to impeach experts, if necessary, at trial. In light of the stipulated limitation on the use of ITC-expert deposition testimony in this litigation, coupled with the fact that experts were deposed again in the course of this litigation, the Court reduces Esquel's request for fees by $52,737.50.

In summary, the Court reduces Esquel's ITC-related fees by $65,997.50, representing the $13,260.00 "domestic industry" fees plus the $52,737.50 "expert deposition" fees.

ORDER  11–

### 7. Fees – Abandoned Defenses, Unsuccessful Motions

Taltech challenges Esquel's request for $142,447.24 in fees incurred in connection with Esquel's unsuccessful defenses and motions. Taltech's Ex. F (pink boxes). For example, Taltech highlights fees expended toward asserting affirmative defenses of unclean hands, laches and estoppel, election of remedies and misuse, and points out that these defenses were either dropped by Esquel or dismissed by the Court after Taltech filed motions for summary judgment. See docket nos. 151, 176, 198, 215, 231. Although Esquel has provided some case authority that would support the Court's granting of fees for defenses that were abandoned or unsuccessful in light of Esquel's overall success in the litigation, the Court believes that a reduction for unsuccessful defenses and motions is appropriate in this case because they did not contribute to Esquel's ultimate success. Cf. Hensley, 461 U.S. at 435 ("no fee may be awarded for services on the unsuccessful claim"). Accordingly, the Court reduces Esquel's request for fees by $142,447.24.

### 8. Costs – Expert Witness Fees

Esquel seeks expert witness fees in the amount of $331,519.66. Section 285 authorizes "reasonable attorney fees" to the prevailing party in exceptional cases. 35 U.S.C. § 285. The Federal Circuit has made it clear: "[A]n award under section 285 encompasses only attorney fees; expert witness fees fall under 28 U.S.C. § 1920, subject to the 28 U.S.C. § 1821(b) limitation." Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 377 (Fed. Cir. 1994) (citing West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83 (1991)). West Virginia overruled prior precedents of the Federal Circuit that had held that Section 285 authorized an award of expert witness fees. Amsted, 23 F.3d at 377. Accordingly, the Court denies Esquel's motion for expert witness fees under Section 285.

Esquel alternatively moves for expert witness fees under the Court's inherent power to impose sanctions for Taltech's and John Wong's inequitable conduct in obtaining its patents and for Taltech's bad faith litigation tactics. "[A] court must use caution when

ORDER   12–

invoking its inherent power to impose sanctions . . . [i]n particular . . . when statutes or rules provide an adequate sanction for bad faith." Amsted, 23 F.3d at 378 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991)). "[N]ot every case qualifying as 'exceptional' under section 285 will qualify for sanctions under the court's inherent power." Id. Indeed, "a finding of fraud or abuse of the judicial process" is required "before a trial court can invoke its inherent sanctioning power to impose expert witness fees in excess of the section 1821(b) cap." Id. (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991) and Mathis v. Spears, 857 F.2d 749 (Fed. Cir. 1988)). The Court must determine whether the case "goes sufficiently beyond 'exceptional' within the meaning of section 285 to justify an award of expert fees as a sanction under the court's inherent power." Id. at 378-79. The Court believes that Section 285 provides an adequate sanction for Taltech's and John Wong's inequitable conduct in this case and declines to invoke its inherent sanctioning power to impose expert witness fees in excess of the Section 1821(b) cap.

Section 1821(b) limits expert witness fee awards under 28 U.S.C. § 1920 to "an attendance fee of $40 per day." 28 U.S.C. § 1821(b). Esquel has not calculated its expert witness fees according to 28 U.S.C. § 1821(b). In the absence of any documentation of Esquel's expert witness fees according to 28 U.S.C. § 1821(b), the Court reduces Esquel's request for costs by $331,519.66.

### 9. Costs – Prior Art

For the same reasons as outlined above with regard to Esquel's attorneys' fees incurred as a result of Esquel's prior art search, the Court reduces Esquel's request for prior art costs by $10,258.25.

### 10. Costs – Travel and Lodging Fees for Travel Between Chicago and Seattle

Esquel seeks $307,398.42 in travel and lodging costs. Hoeft Decl. ¶ 67, Ex. 18 (summary) and Ex. 19 (travel and lodging receipts and invoices). Taltech objects to $29,371.44 in costs that were incurred as a result of travel between Chicago and Seattle. It

ORDER 13–

would be unreasonable for Taltech to bear the burden of fees incurred as a result of Esquel's decision to file this action in Seattle, but retain Chicago counsel.  See Thermovac Indus. Corp. v. Virtis Co., 1968 WL 8409, 159 U.S.P.Q. 349, 354 (S.D.N.Y. 1968) (declining to award costs for the selection of counsel in Chicago for a trial in the Southern District of New York).  Accordingly, the Court reduces Esquel's request for fees by $29,371.44.

### 11. Conclusion Re: Taltech's Specific Objections

In response to Taltech's specific objections, the Court reduces Esquel's $6,944,270.67 fee request by $913,711.06, and Esquel's $1,130,634.60 cost request by $371,149.35.  Accordingly, the Court awards Esquel $6,030,559.61 in fees, and $759,485.25 in costs, for a total award of fees and costs in the amount of $6,790,044.86.

## D. Pre-judgment Interest

Esquel seeks $653,395.32 in pre-judgment interest on the attorneys' fees charged by McDermott Will & Emery from April 2004 through December 2006.  Suppl. Hoeft Decl. ¶ 25, Ex. S.  Esquel argues that pre-judgment interest should be awarded at the prime rate and compounded monthly.  Whether to award pre-judgment interest is a discretionary decision.  See CPG Prods. Corp. v. Pegasus Luggage, Inc., 776 F.2d 1007, 1011 (Fed. Cir. 1985).  In recognition of the fact that Esquel's $6.8 million award is almost $2 million more than the median cost of patent infringement litigation in which more than $25 million is at risk in "Other West" locations, and in light of the Court's belief that $6.8 million amply compensates Esquel for Taltech's "exceptional" conduct, the Court declines to award pre-judgment interest.

## E. Post-judgment Interest

The Court grants Esquel's unopposed request for post-judgment interest according to 28 U.S.C. §1961.

ORDER  14–

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Esquel's Motion for Attorneys' Fees and Costs, docket no. 303, as outlined above, and awards Esquel $6,790,044.86 in fees and costs, plus post-judgment interest.

IT IS SO ORDERED.

DATED this 10th day of July, 2007.

_____
Thomas S. Zilly
United States District Judge

ORDER  15–