1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9

10  TALTECH LIMITED,

11                          Plaintiff,                    No.  C04-974Z

12  v.

13  ESQUEL ENTERPRISES LTD.,                              ORDER

14                          Defendant.

15

16      THIS MATTER comes before the Court on remand from the United States Court of

17  Appeals for the Federal Circuit to reconsider an award of attorney fees in favor of defendants

18  and against plaintiffs pursuant to 35 U.S.C. § 285, which provides that the Court "in

19  exceptional cases may award reasonable attorney fees to the prevailing party."  In

20  concluding, for purposes of granting such fees, that this case is "exceptional" within the

21  meaning of § 285, the Court relied on the following findings:  (i) in prosecuting the

22  application that ripened into United States Patent No. 5,568,779 ("the '779 Patent")[1], the

23  inventor engaged in inequitable conduct by failing to disclose to the United States Patent and

24

25  ─────────────────
[1] The '779 Patent bears the title "Pucker Free Garment Seam and Method of Manufacture."  *See* Exh. B to
26  Complaint (docket no. 1).  The patent contains 19 method claims and 12 claims relating to a "smooth seam"
    in a clothing garment; only one of the method claims, and only one of the "smooth seam" claims, is an
    independent claim.  *Id.*

ORDER - 1

1  Trademark Office ("PTO") prior art of which he was aware; (ii) the inventor also engaged in

2  inequitable conduct by making misrepresentations to the PTO with the intent to deceive the

3  patent examiner; and (iii) during the course of this litigation, plaintiffs engaged in abusive

4  and bad faith tactics.  _See_ Findings of Fact and Conclusions of Law at 59-71 (docket

5  no. 301).[2]

6         On appeal, as to the issue of inequitable conduct, plaintiffs argued that the undisclosed

7  prior art, namely a seam used in raincoats manufactured by plaintiff TAL Apparel Limited

8  (the "Undisclosed Raincoat Seam"), was cumulative of a certain patent disclosed to the PTO,

9  specifically German Patent No. 1 104 802 (the "Robers Patent").  The inventor named in the

10 '779 Patent, John Wong, was aware of the Undisclosed Raincoat Seam prior to filing his

11 patent application in May 1994.  _See_ Finding No. 114 (docket no. 301).  During his

12 deposition in May 2006, Mr. Wong drew the Undisclosed Raincoat Seam as follows:



---

22 [2] The Court issued written Findings of Fact and Conclusions of Law after conducting a ten-day bench trial in
23 this matter.  In addition to concluding that this case is exceptional within the meaning of § 285, the Court
   held _inter alia_ that defendants did not infringe Claim 18 of the '779 Patent, that Claim 18 of the '779 Patent
24 is invalid pursuant to 35 U.S.C. § 112 for failure to disclose the "best mode," and that the '779 Patent
   is unenforceable as a result of inequitable conduct before the PTO.  _See_ Final Judgment (docket no. 318).  The
25 Court awarded attorney fees and costs in favor of defendants and against plaintiffs in the amount of
   $6,790,044.86, together with interest at the rate of 4.99% per anum.  _Id._  The Federal Circuit affirmed the
26 Court's holdings concerning both invalidity based on the "best mode" violation and lack of infringement.
   _Taltech Ltd. v. Esquel Apparel, Inc.,_ Case No. 2007-1506, Slip Op. at 6-8 (Fed. Cir. May 22, 2008) (docket
   no. 335).

1  *See* Finding No. 112 (docket no. 301).  As indicated in the diagram, the Undisclosed

2  Raincoat Seam is comprised of two garment components, fusible tape, a set stitch, and a top

3  stitch.

4       The Robers Patent describes four embodiments, the first of which is illustrated in

5  three phases as follows:



12  Plaintiffs' Tr. Exh. 3 at 107 (reproduced in Exh. D to Brief on Remand (docket no. 356-5

13  at 6)); *see also* Defendants' Tr. Exh. 503 at L007524.  These figures from the Robers Patent

14  depict the sequence of stitching and folding used to produce the embodiment.  The thickest

15  line [1] represents a diagonally cut strip coated with a thermoplastic substance [1a], the short

16  broken or dashed line [4] is a "first seam," and the long broken or dashed line [5] is a

17  "second seam," which penetrates all of the layers.  Plaintiffs' Tr. Exh. 3 at 112-13;

18  Defendants' Tr. Exh. 503 at L007517.  The second embodiment in the Robers Patent is

19  likewise shown in stages:



ORDER - 3

1    Plaintiffs' Tr. Exh. 3 at 107; *see also* Defendants' Tr. Exh. 503 at L007524.  In these figures,

2    the short broken or dashed line [8] is a "first seam," and the long broken or dashed line [10]

3    is a "second seam," which penetrates all of the layers.  Plaintiffs' Tr. Exh. 3 at 113;

4    Defendants' Tr. Exh. 503 at L007517-18.  The remaining embodiments in the Robers Patent

5    have little or no relevance in this case.  The Federal Circuit was unable to "discern from the

6    record" whether the Robers Patent was "merely cumulative" of the Undisclosed Raincoat

7    Seam; it therefore vacated the determination of inequitable conduct and the award of attorney

8    fees, and remanded the matter to this Court.  *Taltech Ltd. v. Esquel Apparel, Inc.*, Case

9    No. 2007-1506, Slip Op. at 5-6 (Fed. Cir. May 22, 2008) (docket no. 335).

10   **A.    Scope of Authority on Remand**

11   Before addressing the merits of the pending issues, the Court must first resolve the

12   parties' dispute concerning the scope of the Court's authority on remand.  Without much

13   analysis or authority, plaintiffs assert that this Court is limited to a consideration of only

14   whether the Undisclosed Raincoat Seam is cumulative of the Robers Patent.  *See* Reply at 2-

15   3 (docket no. 361).  In contrast, defendants argue that the Court may reinstate the award of

16   attorney fees regardless of whether the undisclosed prior art is material because the two other

17   bases for finding the case "exceptional" constitute sufficient support for the Court's earlier

18   decision.  *See* Brief at 3, 15-19 (docket no. 358).

19   In patent cases, the precedent of the regional circuit, rather than of the Federal Circuit,

20   governs the manner in which a mandate is interpreted because the issue involves "a

21   procedural matter not unique to patent law."  *See* *Exxon Corp. v. United States*, 931 F.2d

22   874, 877 n.4 (Fed. Cir. 1991) (citing *Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 839 F.2d

23   1544, 1550 n.20 (Fed. Cir. 1988)).  The applicable standard is sometimes called the "mandate

24   rule" and, at other times, the "law of the case doctrine."  *See* *United States v. Thrasher*, 483

25   F.3d 977, 982 (9th Cir. 2007) (noting that courts "have not been consistent in describing the

26   mandate doctrine," with some circuits considering the "mandate doctrine as 'nothing more

1    than a specific application of the 'law of the case' doctrine'"). Although the circuits are split

2    on the question, in the Ninth Circuit, the mandate rule is jurisdictional, implicating the

3    "power," not just the preferred or common practice, of the district courts. _Id._ (distinguishing

4    _Castro v. United States_, 540 U.S. 375, 384 (2003)).

5          The mandate rule precludes a lower court from reconsidering an issue previously

6    decided by a higher court in the same case,[3] but it applies only to issues "decided explicitly

7    or by necessary implication" by the appellate court. _Milgard Tempering, Inc. v. Selas Corp._

8    _of Am._, 902 F.2d 703, 715 (9th Cir. 1990); _see also_ _Liberty Mut. Ins. Co. v. Equal_

9    _Employment Opportunity Comm'n_, 691 F.2d 438, 441 (9th Cir. 1982) ("Lower courts are free

10   to decide issues on remand so long as they were not decided on a prior appeal.").[4] In

11   contending that the scope of this Court's authority on remand is limited, plaintiffs rely on the

12   following language of the Federal Circuit's opinion in this matter:

13          Therefore, we vacate the determination of inequitable conduct and remand the
            case to the district court to determine whether Robers was, as TAL suggests,
14          merely cumulative to the undisclosed raincoat seam, _thus negating inequitable_
            _conduct_.

15   Slip Op. at 5-6 (docket no. 335) (emphasis added). This sentence and the highlighted clause

16   therein must be read in context. In the first sentence of the previous paragraph, the Federal

17   Circuit focused its analysis on one of the two bases for finding inequitable conduct, stating

18   that "the district court found TAL liable for inequitable conduct because inventor John Wong

19   had not disclosed the raincoat seam that inspired his invention to the PTO." _Id._ at 5.

20

---

21   [3] The mandate rule has three exceptions: (1) the earlier ruling was clearly erroneous; (2) an intervening

22   change in the law occurred; or (3) the evidence on remand was substantially different. _See_ _United States v._
     _Lummi Indian Tribe_, 235 F.3d 443, 452-53 (9th Cir. 2000); _Milgard Tempering, Inc. v. Selas Corp. of Am._,

23   902 F.2d 703, 715 (9th Cir. 1990). None of the parties in this case allege that any of the three exceptions to
     the law of the case doctrine apply.

24   [4] The Ninth Circuit's formulation of the law of the case doctrine is consistent with the jurisprudence of the

25   Federal Circuit. _See_ _Exxon Corp. v. United States_, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Law of the case,
     then, merely requires a trial court to follow the rulings of an appellate court. It does _not_ constrain the trial

26   court with respect to issues not actually considered by an appellate court, and thus has long been held not to
     require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or
     implicitly, by the appellate court's judgment." (emphasis in original, footnote and citation omitted)).

ORDER - 5

1    Between that introductory sentence and the language cited by plaintiffs, no mention is made

2    of the other basis for finding inequitable conduct, namely material misrepresentations made

3    with the intent to deceive the patent examiner, or of the additional ground for finding the case

4    exceptional, namely abusive litigation tactics.  Moreover, in the sentence directly following

5    the one on which plaintiffs rely, the Federal Circuit made clear that it understood this Court

6    based its "exceptional case" finding on more than the failure to disclose prior art:  "We also

7    vacate the order of attorney fees under 35 U.S.C. § 285 because the district court based its

8    conclusion that this was an exceptional case *at least in part* upon its finding of inequitable

9    conduct."  *Id.* at 6 (emphasis added).  Thus, the earlier language quoted by plaintiffs does not

10   have the restrictive meaning that they ascribe to it.

11       Moreover, the case on which plaintiffs rely, *Laitram Corp. v. NEC Corp.*, 115 F.3d

12   947 (Fed. Cir. 1997), does not advance their position.  Rather, the *Laitram* opinion supports a

13   broader view of this Court's authority on remand than plaintiffs have proposed.[5]  As in

14   *Laitram*, this case involves three separate grounds for relief, and as in *Laitram*, in this case,

15   the Federal Circuit explicitly addressed only one of the three independent bases for decision.

16   The Federal Circuit did not expressly or by "necessary implication" confine the remand in

17   this case to simply whether the Undisclosed Raincoat Seam is cumulative of the Robers

18   Patent, and the Court is free to consider whether the other grounds for finding this case

19   "exceptional" are themselves sufficient to justify the award of attorney fees.

20

_____

21   [5] In *Laitram*, after the jury rendered a verdict in favor of the plaintiff, the trial court granted judgment as a
     matter of law ("JMOL") as to one of three issues raised by the defendants, namely lack of infringement.  115

22   F.3d at 949.  With regard to the other two issues, the district court denied JMOL on mootness grounds, not on
     the merits.  *Id.*  On appeal, the Federal Circuit reversed the grant of JMOL and remanded "with instructions to

23   reinstate the jury's verdict."  *Id.* (quoting *Laitram Corp. v NEC Corp.*, 62 F.3d 1388, 1395 (Fed. Cir. 1995)).
     On remand, the trial court denied the defendants' Rule 60(b) motion, which sought relief from the earlier

24   denial of their other JMOL motions as moot; the trial court concluded that the mandate explicitly required
     reinstatement of the jury's verdict in its entirety.  *Id.* at 950.  The Federal Circuit reversed, holding that the

25   mandate from the earlier appeal did not preclude the district court from hearing and deciding the JMOL
     motions previously denied as moot.  *Id.* at 956.  In reaching its decision, the Federal Circuit noted that the two

26   other grounds for JMOL were never decided on the merits and that those grounds were distinct from the
     issues decided on review.  *Id.* at 951-52.

1    **B.    Undisclosed Raincoat Seam Versus Robers Patent**[6]

2        The Court begins with an analysis of whether the Undisclosed Raincoat Seam is

3    cumulative of the Robers Patent. The starting point for this discussion is the three-part

4    process for evaluating whether a patent should be invalidated due to inequitable conduct

5    before the PTO. The first stage requires the Court to assess whether undisclosed references

6    satisfy a threshold level of materiality. _Halliburton Co. v. Schlumberger Tech. Corp._, 925

7    F.2d 1435, 1439 (Fed. Cir. 1991). The second prong involves a determination whether a

8    threshold showing has been made of the applicant's intent to mislead or deceive the PTO. _Id._

9    The thresholds of materiality and intent must be proven by clear and convincing evidence.

10   _Star Scientific, Inc. v. R.J. Reynolds Tobacco Co._, 537 F.3d 1357, 1365 (Fed. Cir. 2008).

11   The final step is a balancing of the materiality and intent; the "more material the omission,

12   the less culpable the intent required, and vice versa." _Halliburton_, 925 F.2d at 1439. The

13   question the Court must answer is whether "the applicant's conduct before the PTO was

14   egregious enough to warrant holding the entire patent unenforceable."[7] _Star Scientific_, 537

15   F.3d at 1365. The burden of proving inequitable conduct rests with the accused infringer.

16   _Id._

17

18   ───────────────

19   [6] On remand, plaintiffs have provided a claim chart purporting to compare the elements of Claims 1, 17, 18,
     20, 25, and 26 of the '779 Patent to both the Robers Patent and the Undisclosed Raincoat Seam. _See_ Exh. A
20   to Brief (docket no. 356-2). Defendants have moved to strike the claim chart on grounds that it violates the
     Court's scheduling order and constitutes new, unsupported expert testimony. Reply at 7 n.5 (docket
21   no. 360). Defendants also object to the claim chart because it focuses on only six of the 31 claims in the
     '779 Patent; they argue that disregarding the other claims of the '779 Patent is improper because
22   "inequitable conduct may be found with regard to any claim in a patent, irrespective of whether the claim
     was asserted in the litigation." Reply at 11. The Court agrees that the chart is inappropriate and grants
23   defendants' motion to strike. _See Kingsdown Med. Consultants, Ltd. v. Hollister Inc._, 863 F.2d 867, 877
     (Fed. Cir. 1988) ("When a court has finally determined that inequitable conduct occurred in relation to one
24   or more claims during prosecution of the patent application, the entire patent is rendered unenforceable.").

25   [7] Although the standard for inequitable conduct focuses on whether the patent should be deemed
     unenforceable, for purposes of this case, the inequitable conduct analysis is relevant only with regard to the
26   award of attorney fees based on a finding that the case is "exceptional." The Court concluded for a
     different reason, namely failure to disclose the "best mode," that the '779 Patent was invalid, and the
     Federal Circuit affirmed the Court's holding. _See supra_ note 2.

ORDER - 7

1    Historically, the Federal Circuit has applied different standards of materiality.  *See*

2    *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1315 (Fed. Cir. 2006).  These

3    standards included:  (1) the "objective" standard, requiring a showing that the

4    misrepresentation "was so material that the patent should not have issued"; (2) the

5    "subjective" test, finding a misrepresentation material if it "actually caused the examiner to

6    approve the patent application when he [or she] would not otherwise have done so"; (3) the

7    "but it may have" standard, inquiring whether the "misrepresentation may have influenced

8    the patent examiner in the course of prosecution; and (4) the "reasonable examiner" test,

9    which was based on the PTO's adoption in 1977 of a rule defining information as material if

10   "there is a substantial likelihood that a reasonable examiner would consider it important in

11   deciding whether to allow the application to issue as a patent."  *Id.* (quoting 37 C.F.R. § 1.56

12   (1977)).

13       After 1977, the "reasonable examiner" standard articulated in PTO Rule 56, which

14   was broader than the other three tests, gradually became dominant, although "in no way did it

15   supplant or replace the case law precedent."  *Id.* at 1316.  In 1992, however, the PTO

16   amended Rule 56, which now reads in relevant part:

17
18       [I]nformation is material to patentability when it is not cumulative to
         information already of record or being made of record in the application, and

19           (1)  It establishes, by itself or in combination with other information, a
             prima facie case of unpatentability of a claim; or

20           (2)  It refutes, or is inconsistent with, a position the applicant takes in:

21               (i)  Opposing an argument of unpatentability relied on by
22               the Office, or

23               (ii)  Asserting an argument of patentability.

24   37 C.F.R. § 1.56(b) (2008).  The Federal Circuit has concluded that the amendment, which

25   constitutes a "narrower standard of materiality," did not replace or supplant the "reasonable

26

1  examiner" standard, but "merely provides an additional test of materiality." _Digital Control_,

2  437 F.3d at 1316.  Thus, if a misstatement or omission is material under the new PTO rule or

3  under any of the older tests,[8] then it is material; however, "to the extent that one standard

4  requires a higher showing of materiality than another standard, the requisite finding of intent

5  may be lower."  _Id._

6       Direct evidence of intent is often absent.  _Halliburton_, 925 F.2d at 1442.  Thus,

7  deceptive intent may be inferred from indirect and circumstantial evidence.  _Star Scientific_,

8  537 F.3d at 1366.  "Smoking gun" evidence is not required to establish an intent to deceive.

9  _Paragon Podiatry Lab., Inc. v. KLM Labs., Inc._, 984 F.2d 1182, 1189 (Fed. Cir. 1993).

10  Rather, the Court may impute to the applicant an intent to accomplish the "natural

11  consequences" of his or her actions.  _Id._ at 1190 (quoting _KangaROOS U.S.A., Inc. v. Caldor,

12  Inc._, 778 F.2d 1571, 1577 (Fed. Cir. 1985)).  Negligent conduct, however, supports an

13  inference of intent only when "'viewed in light of all the evidence, including evidence

14  indicative of good faith,' the conduct is culpable enough 'to require a finding of intent to

15  deceive.'" _Halliburton_, 925 F.2d at 1442-43.

16  / / /
17  / / /
18  / / /
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /

24  ———————————

25  [8] In their briefs on remand, the parties did not discuss the complexity surrounding the standard for materiality.  The Court notes, however, that the application ripening into the '779 Patent was filed after the effective date of the 1992 amendment to Rule 56, and that the _Digital Control_ case was decided in

26  February 2006, approximately eight months before this matter went to trial.  Thus, the Court is satisfied that the standards set forth in _Digital Control_ govern the Court's analysis on remand.

1

## 1.   The Translations of the Robers Patent

2          With these standards in mind, the Court now turns its attention to the prior art at issue.

3   As an initial matter, the Court notes that, although the parties mentioned the Robers Patent in

4   their summary judgment briefing, the Robers Patent was not presented to the Court prior to

5   trial.[9]  *See* Defendants' Response at 26 (docket no. 205) ("Taltech did not place the Robers

6   patent . . . into the record.").

7          At trial, the parties provided two different translations of the Robers Patent.

8   According to plaintiffs' translation, the Robers Patent discloses:

9              a process for the production of a puckerfree **closure** seam, in particular for
             popeline [sic] and gabardine materials, wherein a **seam** of or containing a
10            thermoplastic is sewn into the seam by a method already known, and the part of
             the material adjoining the seam is then ironed while under slight tension.

11

12   Plaintiffs' Tr. Exh. 3 at 114 (docket no. 356-5 at 13) (emphasis added).  Plaintiffs' translation

    also indicates that the Robers Patent discloses a dependent claim consisting of:

13            [t]he process as claimed in Claim 1, wherein a strip is used which consists of
14            diagonally cut fabric coated on one or both sides with a thermoplastic.

15   *Id.*  Defendants' translation differs as follows:

16            1.       Method for making crimp-free **assembly** seams, especially for
             poplin and gabardine materials, characterized by the fact that, as known from
17            other applications, a **ribbon** made of or with a thermoplast is sewn in, which
             ribbon is then ironed onto the parts of the material surrounding the seam while
18            at the same time stretching the seam.

19            2.       Method according to Claim 1, characterized by the fact that the
             ribbon used is a ribbon made of a diagonally cut fabric that features a
20            thermoplast on one side or on both sides.

21   Defendants' Exh. 503 at L007519 (emphasis added).

22

    _____

23   [9] Indeed, in preparation for trial and during trial, the parties focused minimal attention on the issue of
    whether the Robers Patent is cumulative of the Undisclosed Raincoat Seam.  They provided no trial briefs
24   and included no specific mention of the issue in the Pretrial Order (docket no. 250).  Plaintiffs' proposed
    findings of fact and conclusions of law referenced the issue in only two conclusory sentences of a 186-page
25   document containing over eleven hundred separately-numbered paragraphs.  *See* Proposed Finding No. 1011
    (docket no. 245) ("The John Wong Raincoat Seam is less relevant to claims at issue than the disclosed
26   raincoat seam or the seam diagramed in Robers.  Accordingly, this seam was merely cumulative and not
    material prior art.").

1    The Court notes that the translators chose different English words having, for the most

2    part, equivalent meanings, for example "process" as opposed to "method," and "puckerfree"

3    versus "crimp-free."  Two crucial exceptions, however, are the selection of "closure" instead

4    of "assembly" and "seam" in lieu of "ribbon."  Although "closure" has several meanings, in

5    this context, the most suitable definition is "a means of filling a space or gap esp. by sealing

6    it or of closing an opening (as in a garment or luggage): as (1) : FASTENER, CLOSING < styled

7    with fly-front ~ > < pocket with zipper ~ >."  Webster's Third New Int'l Dictionary 428

8    (2002) [hereinafter "Webster's"].  In contrast, "assembly" conveys a broader concept,

9    namely to "bring," "put or join" or "fit together," or "building up a complete unit."

10   Webster's at 131 ("assemble" and "assembly").  Thus, plaintiffs' translation limits the claims

11   of the Robers Patent to seams associated with fastenings, for example, buttonholes, which are

12   specifically discussed therein.  _See_ Plaintiffs' Tr. Exh. 3 at 111 (docket no. 356-5 at 10)

13   ("The process claimed for the invention may also be used, for example, on one or both sides

14   of a buttonhole for the purpose of reinforcement . . . .").  Plaintiffs' translation was the one

15   before the patent examiner during prosecution of the '779 Patent, and the Court will consider

16   only the language before the PTO.  _See Semiconductor Energy Lab. Co. v. Samsung Elecs._

17   _Co._, 204 F.3d 1368, 1378 (Fed. Cir. 2000) (a patent examiner is presumed to have considered

18   only the English translated portions of, and not the original, foreign language document).

19   Understanding what the patent examiner might have gleaned from the Robers Patent

20   becomes more difficult when examining the following portion of plaintiffs' translation:  "a

21   **seam** of or containing a thermoplastic is sewn into the seam."  In ordinary or common

22   parlance, a seam is "a joining by a line of stitching of two pieces of cloth, leather, or other

23   material usu. near the edge."  Webster's at 2047.[10]  When construed in light of this definition,

24

25   [10] At the _Markman_ stage, the parties asked the Court to construe the term "seam," and the Court concluded
     that, for purposes of the '779 Patent, a "seam" is "the place where at least two pieces of fabric are joined by
26   at least two rows of stitches."  Order at 28 (docket no. 150).  This definition differs from the common
     understanding only with regard to the number of required stitching rows, the '779 Patent having disclosed a

1    plaintiffs' translation of the Robers Patent become nonsensical.  It essentially describes a

2    joint between two pieces, such joint being comprised solely of or containing a thermoplastic,

3    and which joint is then itself sewn into a joint between two pieces.

4         Defendants' translation avoids this circularity by using the term "ribbon" to describe

5    the component made of or coated with a thermoplastic that is incorporated into the seam.

6    Defendants' translation, however, was not before the PTO.  Moreover, having been provided

7    plaintiffs' translation, the patent examiner could reasonably have concluded that no

8    additional or different translation was "necessary."  *See* *Semiconductor Energy Lab.*, 204

9    F.3d at 1377-78 (quoting Manual of Patent Examining Procedure § 609C(2) ("The examiner

10   need not have the information translated unless it appears necessary to do so.")).  Given the

11   inadequacy of plaintiffs' translation, the Court concludes that the patent examiner would not

12   have understood the Robers Patent to teach anything material to patentability of the "smooth

13   seam" method and product claims at issue.  For this reason alone, the Court would not view

14   the Robers Patent as cumulative, but the Court also finds defendants' arguments persuasive.

15   They will be discussed seriatim.

16        **2.     Component of Garment (Closure Versus Armhole Seam)**

17        Defendants contend that the Robers Patent is not cumulative because it describes only

18   a closure (specifically, a buttonhole) seam, while the Undisclosed Raincoat Seam is a type of

19   armhole seam, which is the narrow scope of dependent Claims 6, 7, 24, and 25 of the '779

20   Patent.  In response, plaintiffs offer two arguments:  (i) the Robers Patent discloses a

21   "universally applicable" seam; and (ii) the Undisclosed Raincoat Seam is not an armhole

22   seam.  Plaintiffs' assertions lack merit.

23        Plaintiffs' translation of the Robers Patent restricted its scope to "closure" seams,

24   meaning seams associated with fastenings, for example, buttonholes.  Although the

25

26   particular type of seam comprised of two or more such rows.  For purposes of interpreting the Robers Patent,
     the Court resorts to ordinary parlance rather than the specific meaning used in the '779 Patent.

specification of the Robers Patent uses the phrase "universally applicable," such language must be understood in context. The full sentence reads: "The invention is universally applicable; for example, it may be applied even for garments which are only laundered and not ironed after drying." Plaintiffs' Tr. Exh. 3 at 112 (docket no. 356-5 at 11). This language does not purport to broaden the scope of seams for which the invention might be useful; rather, it merely attempts to expand the universe of garments into which the described closure seams might be incorporated. Thus, plaintiffs' reliance on the "universally applicable" wording is misplaced.

This conclusion is further supported by an examination of the next sentence of the specification in the Robers Patent: "It is possible, for example, to employ such a _closure seam_ also for the breastplate of shirts and so forth, the advantage of a smooth shirt breast also being achieved in addition to that of avoiding puckering." Plaintiffs' Tr. Exh. 3 at 112 (emphasis added). This language confirms the narrowness of the Robers Patent, suggesting use of the described closure seam in what can only be interpreted as the "center placket" of a shirt. Although "breastplate" appears to be a literal translation from the German "Brustplack," _see_ Plaintiff's Tr. Exh. 3 at 105, Col. 4, Line 20, the term "breastplate" has no meaning in the garment industry. As outlined in the '779 Patent, a shirt is comprised of the following components: front panels (left and right), a rear panel, a yoke, a collar, sleeves (left and right), and a center placket. '779 Patent, Col. 3, Lines 22-24, & Figs. 1 & 2 (Exh. B to Complaint (docket no. 1 at 17, 21)). The center placket runs the length of the shirt and contains a row of buttonholes. It is the only "closure" seam on the front or breast area of a shirt. Thus, the Court concludes that "Brustplack" or "breastplate" refers to the center placket, and that the Robers Patent discloses only a narrow class of seams, namely those associated with closures or fastenings.

1    The Court's ruling is consistent with the representations plaintiffs made prior to trial

2    in this matter:

3        409.    Robers does not teach or suggest the subject matter of claim 25 of the
         '779 Patent because it does not teach or suggest a dress shirt armhole seam.
4
5        410.    Robers only generally discloses use of a thermoplastic strip in assembly
         seams, but does not specifically state the use of a thermoplastic strip in an
6        armhole seam.  Further, with regard to the embodiment of Figures 4 and 5,
         Robers specifically states that the strip should be a "stiffening strip."  Use of a
7        stiffening strip would not be desirable in an armhole seam, which should be
         thin and flexible.  Robers never intended to apply Figures 4 and 5 to a dress
         shirt armhole seam.
8
9    Proposed Findings Nos. 409 & 410 (docket no. 245).  Thus, the Robers Patent is not

10   cumulative of any prior art involving armhole seams.

11       As a result, the Robers Patent is not cumulative of the Undisclosed Raincoat Seam.

12   The Court has already found that the Undisclosed Raincoat Seam is "an armhole seam with

13   one set stitch and one top stitch."  Finding No. 110 (docket no. 301).  Plaintiffs contend that

14   the Court's finding is not supported by the record.  Plaintiffs' argument lacks merit.

15       In his May 2006 deposition, after drawing a diagram of the Undisclosed Raincoat

16   Seam, John Wong indicated that the seam had been used in raincoats manufactured at TAL

17   Apparel's Malaysia facility from 1992 to 1994, while Mr. Wong was the plant manager.

18   J. Wong Dep. at 14:9-17 (May 3, 2006) (docket no. 202-11 at 5).  Mr. Wong explained that

19   he had procured a sample raincoat from the Malaysia factory in February or March 1994 to

20   prepare for a trip to a "chilly area."  _Id._ at 19:12-25 (docket no. 202-11 at 6).  While wearing

21   the raincoat and looking in a mirror, Mr. Wong noticed that the seam was firm, but

22   puckering.  _Id._ at 20:15-17, 42:4-6 (docket no. 202-11 at 6, 7).  Out of curiosity, he

23   "destructured" the raincoat, taking apart the seam and discovering fusible tape inside.  _Id._ at

24   20:18-21:4 (docket no. 202-11 at 6).  The raincoat had not been washed, _id._ at 42:9-11, and

25   Mr. Wong formed an opinion that puckering was a sign that the adhesive in the seam had not

26   completely melted during the manufacturing process.  _Id._ at 45:12-13 (docket no. 202-11

     at 7).

1   During his May 2006 deposition, Mr. Wong also testified that, before he reverse-

2   engineered the raincoat seam, he had already created his puckerfree armhole seam for a shirt,

3   *id.* at 46:7-9 (docket no. 202-11 at 8) ("I produce that at the end of 1993"), but he later

4   admitted that the raincoat seam was in fact the inspiration for his idea of incorporating

5   fusible tape in the shirt seam, *id.* at 51:15-18 (docket no. 202-11 at 10); *see also* Tr.

6   Transcript at 233:16-18 (docket no. 288).  Mr. Wong indicated that he did not disassemble

7   any other raincoat besides the sample obtained from the Malaysia plant, *see* J. Wong Dep. at

8   45:3-8 (docket no. 202-11 at 7) ("just looked at the other raincoat seams"), and the seams

9   that he took apart or examined in early 1994 included armhole seams, *id.* at 49:16-20 (docket

10  no. 202-11 at 9).  Mr. Wong further stated that he paid attention to the armhole seams of

11  raincoats only after early 1994, following his "destructure [of] that coat."  *Id.* at 50:16-17

12  (docket no. 202-11 at 10).[11]  Thus, the evidence at trial fully supported the Court's finding

13  that the Undisclosed Raincoat Seam was an armhole seam.  Even assuming, however, that

14  the Undisclosed Raincoat Seam was not an armhole seam, it still was not cumulative of the

15  Robers Patent.  The Robers Patent is limited to closure (*i.e.*, buttonhole or "center placket")

16  seams, and a reasonable patent examiner would have considered the Undisclosed Raincoat

17  Seam, which was not likewise restricted to closure seams, important or material in deciding

18  whether to issue the '779 Patent.

19

20

21  _____

22  [11] The parties designated John Wong's May 2006 deposition for use at trial, but they have not provided the
    full transcript of that deposition in their materials on remand.  The Court, however, has independently

23  located within the record the relevant portions of Mr. Wong's deposition, which were presented earlier in
    connection with dispositive motions.  In asserting that Finding No. 110 is not supported by the record,

24  plaintiffs have focused on the citation therein to page 14 of Mr. Wong's deposition, and have confined their
    submissions on remand to that specific page of the transcript.  *See* Exh. F to Brief (docket no. 356-7).  The

25  Court observes, however, that the record contains mini-transcripts of Mr. Wong's deposition, which include
    four reduced pages on one sheet, and that page 14 of the mini-transcript shows pages 50 through 53 of the

26  deposition transcript, sections of which relate to the armhole seam issue.  *See* Exh. I to Stolte Decl. (docket
    no. 202-11 at 10).  Thus, although the Court's citation to page 14 might have been confusing, the conclusion
    does not follow that Finding No. 110 is inconsistent with or unsupported by the evidence.

1      ### 3.  <u>Adhesive Element (Thermoplastic Versus Vilene SL33)</u>

2          Defendants also contend that the Robers Patent is not cumulative because it discloses

3      only a generic thermoplastic component, while the Undisclosed Raincoat Seam incorporated

4      Vilene SL33, which was the withheld "best mode" for the invention in the '779 Patent.

5      Plaintiffs provide two responses:  (i) the evidence does not support the conclusion that the

6      Undisclosed Raincoat Seam used Vilene SL33; and (ii) the patent examiner would not have

7      considered the specific element of Vilene SL33 important.  Plaintiffs' arguments border on

8      frivolous.  At trial, John Wong testified that the fusible tape being used by the outerwear

9      department at the Malaysia facility was Vilene SL33.  Tr. Transcript at 234:14-23 (docket

10     no. 288).  He also indicated that he obtained the fusible tape he used in his prototype shirt

11     armhole seam from the outerwear department.  <u>*Id.*</u> at 233:24-234:1; <u>*see also*</u> Tr. Transcript at

12     314:2-3 (docket no. 281) (indicating that the TAL Apparel raincoat was the source of the

13     adhesive for the shirt seam).  Thus, by the time Mr. Wong applied for the patent at issue, he

14     was fully aware that the Undisclosed Raincoat Seam contained Vilene SL33.

15         Plaintiffs' assertion that Vilene SL33 would not have been relevant to the patent

16     examiner belies the importance Mr. Wong himself placed on the element.  In a deposition

17     taken in November 2004, Mr. Wong testified that "the thermal adhesive bonding between the

18     garment is the most important step" and that the "type of adhesive is the most important"

19     manufacturing variable.  J. Wong Dep. at 58:15-16, 59:16-17 (Nov. 22, 2004) (docket

20     no. 209-4 at 3, 4).  Plaintiffs' contention on remand is also inconsistent with the position they

21     took at trial, when plaintiffs proposed the following findings of fact:

22         428.  The Robers German patent . . . refers to the bonding element in a
           "thermoplastic" or "thermoplast."  No other description or assistance as to its
23         characteristics is contained in the patent.  At the time Robers issued, there
           were, perhaps, hundreds of materials and resins which could be characterized
24         as "thermoplastics."  This lack of disclosure would severely confound a skilled
           practitioner.

25
           429.  Robers is silent on the method of application of the undisclosed
26         thermoplastic materials.  Robers teaches the use of interlinings, which are to be
           coated with thermoplastic material on one or both sides, but does not disclose

1
2
whether they are to be applied in powder, pure or solvent forms; for a
practitioner of the art seeking to solve the pucker problem in 1994. [sic]  These
are important operational information.

3
4
430.    Robers mentions the use of tapes without interlinings, but discloses little
if any details of the material composition and properties of desired or workable
tapes.

5  Proposed Findings Nos. 428-430 (docket no. 245).  Given the undisputed generality of the

6  Robers Patent, which plaintiffs previously asserted "would severely confound a skilled

7  practitioner," how a patent examiner could consider the Robers Patent cumulative of prior art

8  incorporating the specific "thermal adhesive component" known as Vilene SL33 defies

9  imagination.

10       Both independent claims of the '779 Patent contain a "bonding element having at least

11  a thermal adhesive component."  Claims 1 & 20 (docket no. 1 at 22 & 23).  Some of the

12  dependent claims of the '779 Patent limit the "thermal adhesive component" as follows:

13  (i) being composed of a "thermoplastic material," Claims 2 & 21 (docket no. 1 at 22 & 23);

14  or (ii) being composed of a "thermoplastic material selected from the group consisting of

15  polyamide, polyester, olefinic, polyurethane, and ethylene vinylacetate copolymer materials,"

16  Claims 3 & 22 (docket no. 1 at 22 & 23).  The Robers Patent discloses only the generic

17  element "thermoplastic," which is described as a seam, a component of a seam, or a coating

18  on one or both sides of a diagonally cut strip of fabric.  Plaintiffs' Tr. Exh. 3 at 114 (docket

19  no. 356-5 at 13).  Neither party contends that the element "thermoplastic," within the

20  meaning of the Robers Patent, constitutes a small enough class of materials to itself describe

21  all members of the class; in other words, the parties appear to agree that use of the term

22  "thermoplastic" does not necessarily disclose the subsets of materials known as polyamides,

23  polyesters, olefines, polyurethanes, or ethylene vinylacetates.  *See* *Sanofi-Synthelabo v.*

24  *Apotex, Inc.*, 470 F.3d 1368, 1375-78 (Fed. Cir. 2006) (discussing the preclusive effect of

25  prior art that discloses a "genus" or "class" having a limited number of "species" or

26  "members").  In contrast to the Robers Patent's use of the general term "thermoplastic," the

ORDER - 17

1   Undisclosed Raincoat Seam incorporates a particular thermoplastic, namely Vilene SL33,

2   which is a form of polyamide.  *See* Tr. Transcript at 268:23 (docket no. 288) (indicating that

3   SL33 is a polyamide).  Because the broad language of the Robers Patent does not disclose the

4   specific element "polyamide," a reasonable examiner would have considered the Undisclosed

5   Raincoat Seam, and its use of the particular polyamide "Vilene SL33," important or material

6   in deciding whether to issue the '779 Patent.

7           **4.    Intent to Deceive**

8           The Court previously ruled that Mr. Wong's withholding of the Undisclosed Raincoat

9   Seam was "designed to deceive the Patent Office."  Conclusion No. 81 (docket no. 301).  On

10  remand, plaintiffs have presented no argument to contradict the Court's conclusion.  To

11  reiterate, however, the Court inferred intent to deceive from *inter alia* Mr. Wong's disclosure

12  to the PTO in 1996 of a different TAL Apparel raincoat seam, which has no set stitch and

13  two top stitches (the "Double Top-Stitch Seam").  In so doing, Mr. Wong took the position

14  that the Double Top-Stitch Seam was "wholly inadequate for dress shirts in part because of

15  the appearance of two top stitches."  Conclusion No. 79 (docket no. 301).  In addition, in his

16  1996 amendment, he represented to the PTO that he had "recently become aware" of the

17  Double Top-Stitch Seam, *see* Conclusion No. 88 (docket no. 301), a statement that was

18  misleading because Mr. Wong was aware of both the Double Top-Stitch Seam and the

19  Undisclosed Raincoat Seam before filing his patent application in May 1994.  Mr. Wong's

20  conduct in connection with the 1996 amendment evidences an intent to deceive; he disclosed

21  only the seam with two top stitches, which he argued was not suitable for his invention,

22  while contemporaneously withholding the seam with only one top stitch, which more closely

23  approximates the seam used in high-priced dress shirts.  Moreover, Mr. Wong remained

24  silent about the best mode for his invention,[12] namely Vilene SL33, while failing to disclose a

25  _____

26  [12] In arguing that Vilene SL33 (and therefore the Undisclosed Raincoat Seam) would not have been important
    to the patent examiner, plaintiffs point out that Vilene SL33 is not a limitation of any of the claims of the '779
    Patent.  Although plaintiffs' reading of the patent language is accurate, it is misleading because it ignores the

1   known seam employing that particular material.  In light of this course of conduct before the

2   PTO, the Court remains persuaded that Mr. Wong's intent to deceive is established by clear

3   and convincing evidence, and that he has provided no credible, good faith explanation for his

4   actions.  *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008) (intent to

5   deceive may be inferred when "(1) highly material information is withheld; (2) 'the applicant

6   knew of the information [and] . . . knew or should have known of the materiality of the

7   information; and (3) the applicant has not provided a credible explanation for the

8   withholding'"); *see also Star Scientific*, 537 F.3d at 1368 ("patentee need not offer any good

9   faith explanation unless the accused infringer first carried his burden to prove a threshold

10  level of intent to deceive by clear and convincing evidence").

11      **5.      Balancing Materiality and Intent**

12          The Court is satisfied by clear and convincing evidence that the Undisclosed Raincoat

13  Seam is material, and not cumulative of the Robers Patent.  The materiality of the

14  Undisclosed Raincoat Seam is apparent from "the overall degree of similarity between the

15  omitted reference and the claimed invention in light of the other prior art before the

16  examiner."  *Praxair*, 543 F.3d at 1314-15.  The level of materiality meets the threshold

17  "reasonable examiner" standard, but also satisfies the heightened test of PTO Rule 56, in that

18  the Undisclosed Raincoat Seam "refutes, or is inconsistent with, a position the applicant

19  takes in . . . [a]sserting an argument of patentability."  *See* 37 C.F.R. § 1.56(b).  Nothing in

20  the Robers Patent alters the Court's earlier conclusion that the Undisclosed Raincoat Seam,

21  with its single top stitch, contradicts or is inconsistent with Mr. Wong's representation to the

22  _____

23  finding, affirmed by the Federal Circuit, that the written description at issue failed to disclose "the best mode such
    that one reasonably skilled in the art could practice it."  *Taltech Ltd. v. Esquel Apparel, Inc.*, Slip Op. at 6 (Fed.
24  Cir. May 22, 2008) (docket no. 335) (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 963 (Fed. Cir.
    2001)).  Plaintiffs may not rely on the absence of a claim term when the silence itself was improper.  Moreover,
25  plaintiffs' contention that Vilene SL33 would not have justified rejection of the patent application, *see* Brief at
    14 (docket no. 356), confuses the issues of patentability and cumulativeness.  Whether prior art disclosing a
    specific thermoplastic or polyamide would have affected the examiner's anticipation or obviousness analysis
26  constitutes a different question from whether such prior art is cumulative of a patent disclosing only generally
    the use of a thermoplastic.  The latter question is squarely before the Court, the former is not.

1    PTO that TAL Apparel's raincoat seams are unsuitable for high-priced dress shirts because

2    of the double top-stitching.  _See_ Conclusion No. 79 (docket no. 301).  The Undisclosed

3    Raincoat Seam[13] meets the most stringent of the materiality standards, and the requisite level

4    of intent is therefore correspondingly low.  In this case, however, the culpability of the

5    patentee is high, and the Court remains convinced that the '779 Patent was obtained through

6    improper means and is, as a result, unenforceable.

7    **C.    Exceptional Case**

8            The arguments on remand have served to further highlight the reasons why the Court

9    considered this case exceptional.  On remand, plaintiffs have continued to engage in the same

10   litigation tactics the Court previously found troubling.  Plaintiffs have ignored arguments

11   they made before and during trial, replacing them with minimally defensible positions and

12   presenting defendants with the proverbial "moving target."  Plaintiffs have requested an

13   evidentiary hearing and an opportunity for further briefing, but given Mr. Wong's pattern of

14   changing his testimony to suit the theory du jour and in light of plaintiffs' shifting

15   contentions, the Court is persuaded that the record cannot be improved, and that it is more

16   than adequate to support the Court's decision.  Having found that the Undisclosed Raincoat

17   Seam is not cumulative of the Robers Patent, the Court reinstates the award of attorney fees

18   and costs in favor of defendants and against plaintiffs.

19   _____

20   [13] Plaintiffs draw a distinction between the method claims and the "smooth seam" claims of the '779 Patent,
     arguing that the Undisclosed Raincoat Seam does not constitute prior art as to the method claims because no
21   sequence of manufacturing steps is described thereby and because the process, which is practiced outside the
     United States, was not evidenced by a printed publication.  _See_ Brief at 15 (docket no. 356) (citing 35 U.S.C.
22   §§ 102 & 103).  Plaintiffs do not, however, appear to contest the Court's earlier conclusion that the
     Undisclosed Raincoat Seam constitutes prior art, at least with regard to the "smooth seam" (or product)
23   claims of the '779 Patent, because it was "in public use or on sale in this country" more than one year prior
     to May 17, 1994, the filing date of the application at issue.  _See_ Conclusion No. 77 (docket no. 301); _see also_
24   35 U.S.C. § 102(b).  Moreover, to the extent that the Undisclosed Raincoat Seam is prior art for only the
     product claims of the '779 Patent, it cannot be cumulative of the Robers Patent, which discloses only method
25   claims, and plaintiffs' attempt to deny knowledge on Mr. Wong's part concerning how the Undisclosed
     Raincoat Seam is constructed actually contradicts their assertion of cumulativeness and runs contrary to the
26   evidence.

1    The Court further concludes that, even if the Undisclosed Raincoat Seam does not

2    support a finding of inequitable conduct, the misrepresentations to the PTO involving the

3    Double Top-Stitch Seam and the abusive litigation tactics on which the Court's exceptional

4    case finding is also based would each be, independently, sufficient to justify the award of

5    attorney fees and costs.  _See, e.g._, _Rambus Inc. v. Infineon Techs. AG_, 318 F.3d 1081, 1106

6    (Fed. Cir. 2003) ("Litigation misconduct and unprofessional behavior may suffice, by

7    themselves, to make a case exceptional under § 285 . . . .").  For example, the

8    misrepresentation made to the PTO in 1996, declaring that the "applicant's representative has

9    _recently become aware_" of the Double Top-Stitch Seam, when in fact knowledge of the

10    Double Top-Stitch Seam dated back two or three years, _see_ Conclusion No. 88 (docket

11    no. 301), fell far short of the standard for candor before the PTO.

12    Likewise, the assertions in the 1996 amendments indicating that overlock stitches

13    were "unacceptable in most applications, particularly shirts," and that the Double Top-Stitch

14    Seam would be "wholly inadequate" for dress shirts breached the duty of honesty to the

15    PTO; contrary to the statements made to the PTO, about five to six percent of the dress shirts

16    sold by TAL Apparel in the early 1990s contained overlock stitches, and roughly five percent

17    of the dress shirts sold by TAL Apparel in the United States featured two top stitches in the

18    armhole seam, demonstrating that such stitches were neither "unacceptable" nor "wholly

19    inadequate."  Conclusions Nos. 89 & 90; _see also_ Finding No. 42.  The entire course of

20    conduct before the PTO, from withholding the Double Top-Stitch Seam for two or more

21    years, to concealing the length of time during which the applicant knew about the Double

22    Top-Stitch Seam, to misleading the examiner about the significance of the Double Top-Stitch

23    Seam, evidenced a level of culpability justifying a finding that this case is exceptional and

24    warranting an award of attorney fees.

25    In addition, plaintiffs' litigation tactics caused defendants to needlessly expend

26    significant resources and further support an award of attorney fees.  For example, after

1  defendants conducted discovery and prepared a defense concerning plaintiffs' damages

2  claim, shortly before trial, plaintiffs dismissed their damages claim.  Conclusion No. 101.

3  Likewise, defendants' efforts in preparing for a jury trial proved for naught when, just weeks

4  before trial, plaintiffs waived their right to a jury.  *Id.*  Finally, after forcing defendants to

5  litigate all seven of plaintiffs' remaining claims, during the middle of trial, plaintiffs

6  voluntarily dismissed with prejudice five of their claims of infringement rather than

7  responding to defendants' motion for entry of judgment pursuant to Fed. R. Civ. P. 52(c).  *Id.*

8  This case was and is exceptional, and the award of attorney fees is reinstated.

9  **Conclusion**

10      For the foregoing reasons, the Court does hereby CONCLUDE and ORDER as

11  follows:

12      (1)    Defendants' motion, docket no. 360 at 7 n.5, to strike plaintiffs' claim chart,

13  Exh. A to Brief (docket no. 356), is GRANTED;

14      (2)    Plaintiffs' motion, docket no. 356 at 17-18, for an evidentiary hearing and/or

15  further briefing is DENIED;

16      (3)    The Undisclosed Raincoat Seam is material, and is not cumulative of the

17  Robers Patent;

18      (4)    This case is exceptional within the meaning of 35 U.S.C. § 285 for one or more

19  of the following reasons:  (a) withholding of the Undisclosed Raincoat Seam,

20  (b) misrepresentations to the PTO regarding the Double Top-Stitch Seam, and/or (c) abusive

21  litigation tactics;

22      (5)    The award of attorney fees and costs in the amount of $6,790,044.86 in favor

23  of defendants and against plaintiffs is REINSTATED, with judgment to run from July 13,

24  2007, at the post-judgment interest rate of 4.99% per annum; and

25      (6)    The Clerk is directed to reinstate judgment consistent with this Order and to

26  send a copy of this Order to all counsel of record.

ORDER - 22

1       IT IS SO ORDERED.

2       DATED this 8th day of April, 2009.

3

4       _____
        Thomas S. Zilly
5       United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 23