UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TALTECH LIMITED,

                    Plaintiff,                              No.  C04-974Z

v.

ESQUEL ENTERPRISES LTD.,                                    ORDER

                    Defendant.

THIS MATTER comes before the Court on remand from the United States Court of

Appeals for the Federal Circuit to reconsider an award of attorney fees in favor of defendants

and against plaintiffs pursuant to 35 U.S.C. § 285, which provides that the Court "in

exceptional cases may award reasonable attorney fees to the prevailing party."  In

concluding, for purposes of granting such fees, that this case is "exceptional" within the

meaning of § 285, the Court relied on the following findings:  (i) in prosecuting the

application that ripened into United States Patent No. 5,568,779 ("the '779 Patent")[1], the

inventor engaged in inequitable conduct by failing to disclose to the United States Patent and

---

[1] The '779 Patent bears the title "Pucker Free Garment Seam and Method of Manufacture."  *See* Exh. B to
Complaint (docket no. 1).  The patent contains 19 method claims and 12 claims relating to a "smooth seam"
in a clothing garment; only one of the method claims, and only one of the "smooth seam" claims, is an
independent claim.  *Id.*

ORDER - 1

Trademark Office ("PTO") prior art of which he was aware; (ii) the inventor also engaged in inequitable conduct by making misrepresentations to the PTO with the intent to deceive the patent examiner; and (iii) during the course of this litigation, plaintiffs engaged in abusive and bad faith tactics. _See_ Findings of Fact and Conclusions of Law at 59-71 (docket no. 301).[2]

On appeal, as to the issue of inequitable conduct, plaintiffs argued that the undisclosed prior art, namely a seam used in raincoats manufactured by plaintiff TAL Apparel Limited (the "Undisclosed Raincoat Seam"), was cumulative of a certain patent disclosed to the PTO, specifically German Patent No. 1 104 802 (the "Robers Patent"). The inventor named in the '779 Patent, John Wong, was aware of the Undisclosed Raincoat Seam prior to filing his patent application in May 1994. _See_ Finding No. 114 (docket no. 301). During his deposition in May 2006, Mr. Wong drew the Undisclosed Raincoat Seam as follows:



---

[2] The Court issued written Findings of Fact and Conclusions of Law after conducting a ten-day bench trial in this matter. In addition to concluding that this case is exceptional within the meaning of § 285, the Court held _inter alia_ that defendants did not infringe Claim 18 of the '779 Patent, that Claim 18 of the '779 Patent is invalid pursuant to 35 U.S.C. § 112 for failure to disclose the "best mode," and that the '779 Patent is unenforceable as a result of inequitable conduct before the PTO. _See_ Final Judgment (docket no. 318). The Court awarded attorney fees and costs in favor of defendants and against plaintiffs in the amount of $6,790,044.86, together with interest at the rate of 4.99% per anum. _Id._ The Federal Circuit affirmed the Court's holdings concerning both invalidity based on the "best mode" violation and lack of infringement. _Taltech Ltd. v. Esquel Apparel, Inc._, Case No. 2007-1506, Slip Op. at 6-8 (Fed. Cir. May 22, 2008) (docket no. 335).

*See* Finding No. 112 (docket no. 301).  As indicated in the diagram, the Undisclosed

Raincoat Seam is comprised of two garment components, fusible tape, a set stitch, and a top

stitch.

The Robers Patent describes four embodiments, the first of which is illustrated in

three phases as follows:



Plaintiffs' Tr. Exh. 3 at 107 (reproduced in Exh. D to Brief on Remand (docket no. 356-5

at 6)); *see also* Defendants' Tr. Exh. 503 at L007524.  These figures from the Robers Patent

depict the sequence of stitching and folding used to produce the embodiment.  The thickest

line [1] represents a diagonally cut strip coated with a thermoplastic substance [1a], the short

broken or dashed line [4] is a "first seam," and the long broken or dashed line [5] is a

"second seam," which penetrates all of the layers.  Plaintiffs' Tr. Exh. 3 at 112-13;

Defendants' Tr. Exh. 503 at L007517.  The second embodiment in the Robers Patent is

likewise shown in stages:



Plaintiffs' Tr. Exh. 3 at 107; _see also_ Defendants' Tr. Exh. 503 at L007524. In these figures, the short broken or dashed line [8] is a "first seam," and the long broken or dashed line [10] is a "second seam," which penetrates all of the layers. Plaintiffs' Tr. Exh. 3 at 113; Defendants' Tr. Exh. 503 at L007517-18. The remaining embodiments in the Robers Patent have little or no relevance in this case. The Federal Circuit was unable to "discern from the record" whether the Robers Patent was "merely cumulative" of the Undisclosed Raincoat Seam; it therefore vacated the determination of inequitable conduct and the award of attorney fees, and remanded the matter to this Court. _Taltech Ltd. v. Esquel Apparel, Inc._, Case No. 2007-1506, Slip Op. at 5-6 (Fed. Cir. May 22, 2008) (docket no. 335).

**A.    Scope of Authority on Remand**

Before addressing the merits of the pending issues, the Court must first resolve the parties' dispute concerning the scope of the Court's authority on remand. Without much analysis or authority, plaintiffs assert that this Court is limited to a consideration of only whether the Undisclosed Raincoat Seam is cumulative of the Robers Patent. _See_ Reply at 2-3 (docket no. 361). In contrast, defendants argue that the Court may reinstate the award of attorney fees regardless of whether the undisclosed prior art is material because the two other bases for finding the case "exceptional" constitute sufficient support for the Court's earlier decision. _See_ Brief at 3, 15-19 (docket no. 358).

In patent cases, the precedent of the regional circuit, rather than of the Federal Circuit, governs the manner in which a mandate is interpreted because the issue involves "a procedural matter not unique to patent law." _See_ _Exxon Corp. v. United States_, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991) (citing _Jamesbury Corp. v. Litton Indus. Prod., Inc._, 839 F.2d 1544, 1550 n.20 (Fed. Cir. 1988)). The applicable standard is sometimes called the "mandate rule" and, at other times, the "law of the case doctrine." _See_ _United States v. Thrasher_, 483 F.3d 977, 982 (9th Cir. 2007) (noting that courts "have not been consistent in describing the mandate doctrine," with some circuits considering the "mandate doctrine as 'nothing more

than a specific application of the 'law of the case' doctrine'"). Although the circuits are split on the question, in the Ninth Circuit, the mandate rule is jurisdictional, implicating the "power," not just the preferred or common practice, of the district courts. _Id._ (distinguishing _Castro v. United States_, 540 U.S. 375, 384 (2003)).

The mandate rule precludes a lower court from reconsidering an issue previously decided by a higher court in the same case,[3] but it applies only to issues "decided explicitly or by necessary implication" by the appellate court. _Milgard Tempering, Inc. v. Selas Corp. of Am._, 902 F.2d 703, 715 (9th Cir. 1990); _see also_ _Liberty Mut. Ins. Co. v. Equal Employment Opportunity Comm'n_, 691 F.2d 438, 441 (9th Cir. 1982) ("Lower courts are free to decide issues on remand so long as they were not decided on a prior appeal.").[4] In contending that the scope of this Court's authority on remand is limited, plaintiffs rely on the following language of the Federal Circuit's opinion in this matter:

> Therefore, we vacate the determination of inequitable conduct and remand the case to the district court to determine whether Robers was, as TAL suggests, merely cumulative to the undisclosed raincoat seam, _thus negating inequitable conduct_.

Slip Op. at 5-6 (docket no. 335) (emphasis added). This sentence and the highlighted clause therein must be read in context. In the first sentence of the previous paragraph, the Federal Circuit focused its analysis on one of the two bases for finding inequitable conduct, stating that "the district court found TAL liable for inequitable conduct because inventor John Wong had not disclosed the raincoat seam that inspired his invention to the PTO." _Id._ at 5.

---

[3] The mandate rule has three exceptions: (1) the earlier ruling was clearly erroneous; (2) an intervening change in the law occurred; or (3) the evidence on remand was substantially different. _See United States v. Lummi Indian Tribe_, 235 F.3d 443, 452-53 (9th Cir. 2000); _Milgard Tempering, Inc. v. Selas Corp. of Am._, 902 F.2d 703, 715 (9th Cir. 1990). None of the parties in this case allege that any of the three exceptions to the law of the case doctrine apply.

[4] The Ninth Circuit's formulation of the law of the case doctrine is consistent with the jurisprudence of the Federal Circuit. _See Exxon Corp. v. United States_, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Law of the case, then, merely requires a trial court to follow the rulings of an appellate court. It does _not_ constrain the trial court with respect to issues not actually considered by an appellate court, and thus has long been held not to require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or implicitly, by the appellate court's judgment." (emphasis in original, footnote and citation omitted)).

Between that introductory sentence and the language cited by plaintiffs, no mention is made of the other basis for finding inequitable conduct, namely material misrepresentations made with the intent to deceive the patent examiner, or of the additional ground for finding the case exceptional, namely abusive litigation tactics. Moreover, in the sentence directly following the one on which plaintiffs rely, the Federal Circuit made clear that it understood this Court based its "exceptional case" finding on more than the failure to disclose prior art: "We also vacate the order of attorney fees under 35 U.S.C. § 285 because the district court based its conclusion that this was an exceptional case *at least in part* upon its finding of inequitable conduct." *Id.* at 6 (emphasis added). Thus, the earlier language quoted by plaintiffs does not have the restrictive meaning that they ascribe to it.

Moreover, the case on which plaintiffs rely, *Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997), does not advance their position. Rather, the *Laitram* opinion supports a broader view of this Court's authority on remand than plaintiffs have proposed.[5] As in *Laitram*, this case involves three separate grounds for relief, and as in *Laitram*, in this case, the Federal Circuit explicitly addressed only one of the three independent bases for decision. The Federal Circuit did not expressly or by "necessary implication" confine the remand in this case to simply whether the Undisclosed Raincoat Seam is cumulative of the Robers Patent, and the Court is free to consider whether the other grounds for finding this case "exceptional" are themselves sufficient to justify the award of attorney fees.

---

[5] In *Laitram*, after the jury rendered a verdict in favor of the plaintiff, the trial court granted judgment as a matter of law ("JMOL") as to one of three issues raised by the defendants, namely lack of infringement. 115 F.3d at 949. With regard to the other two issues, the district court denied JMOL on mootness grounds, not on the merits. *Id.* On appeal, the Federal Circuit reversed the grant of JMOL and remanded "with instructions to reinstate the jury's verdict." *Id.* (quoting *Laitram Corp. v NEC Corp.*, 62 F.3d 1388, 1395 (Fed. Cir. 1995)). On remand, the trial court denied the defendants' Rule 60(b) motion, which sought relief from the earlier denial of their other JMOL motions as moot; the trial court concluded that the mandate explicitly required reinstatement of the jury's verdict in its entirety. *Id.* at 950. The Federal Circuit reversed, holding that the mandate from the earlier appeal did not preclude the district court from hearing and deciding the JMOL motions previously denied as moot. *Id.* at 956. In reaching its decision, the Federal Circuit noted that the two other grounds for JMOL were never decided on the merits and that those grounds were distinct from the issues decided on review. *Id.* at 951-52.

**B.     Undisclosed Raincoat Seam Versus Robers Patent[6]**

The Court begins with an analysis of whether the Undisclosed Raincoat Seam is cumulative of the Robers Patent. The starting point for this discussion is the three-part process for evaluating whether a patent should be invalidated due to inequitable conduct before the PTO. The first stage requires the Court to assess whether undisclosed references satisfy a threshold level of materiality. *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed. Cir. 1991). The second prong involves a determination whether a threshold showing has been made of the applicant's intent to mislead or deceive the PTO. *Id.* The thresholds of materiality and intent must be proven by clear and convincing evidence. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008). The final step is a balancing of the materiality and intent; the "more material the omission, the less culpable the intent required, and vice versa." *Halliburton*, 925 F.2d at 1439. The question the Court must answer is whether "the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable." [7] *Star Scientific*, 537 F.3d at 1365. The burden of proving inequitable conduct rests with the accused infringer. *Id.*

---

[6] On remand, plaintiffs have provided a claim chart purporting to compare the elements of Claims 1, 17, 18, 20, 25, and 26 of the '779 Patent to both the Robers Patent and the Undisclosed Raincoat Seam. *See* Exh. A to Brief (docket no. 356-2). Defendants have moved to strike the claim chart on grounds that it violates the Court's scheduling order and constitutes new, unsupported expert testimony. Reply at 7 n.5 (docket no. 360). Defendants also object to the claim chart because it focuses on only six of the 31 claims in the '779 Patent; they argue that disregarding the other claims of the '779 Patent is improper because "inequitable conduct may be found with regard to any claim in a patent, irrespective of whether the claim was asserted in the litigation." Reply at 11. The Court agrees that the chart is inappropriate and grants defendants' motion to strike. *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988) ("When a court has finally determined that inequitable conduct occurred in relation to one or more claims during prosecution of the patent application, the entire patent is rendered unenforceable.").

[7] Although the standard for inequitable conduct focuses on whether the patent should be deemed unenforceable, for purposes of this case, the inequitable conduct analysis is relevant only with regard to the award of attorney fees based on a finding that the case is "exceptional." The Court concluded for a different reason, namely failure to disclose the "best mode," that the '779 Patent was invalid, and the Federal Circuit affirmed the Court's holding. *See supra* note 2.

Historically, the Federal Circuit has applied different standards of materiality.  *See Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1315 (Fed. Cir. 2006).  These standards included:  (1) the "objective" standard, requiring a showing that the misrepresentation "was so material that the patent should not have issued"; (2) the "subjective" test, finding a misrepresentation material if it "actually caused the examiner to approve the patent application when he [or she] would not otherwise have done so"; (3) the "but it may have" standard, inquiring whether the "misrepresentation may have influenced the patent examiner in the course of prosecution; and (4) the "reasonable examiner" test, which was based on the PTO's adoption in 1977 of a rule defining information as material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."  *Id.* (quoting 37 C.F.R. § 1.56 (1977)).

After 1977, the "reasonable examiner" standard articulated in PTO Rule 56, which was broader than the other three tests, gradually became dominant, although "in no way did it supplant or replace the case law precedent."  *Id.* at 1316.  In 1992, however, the PTO amended Rule 56, which now reads in relevant part:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> > (1)  It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> >
> > (2)  It refutes, or is inconsistent with, a position the applicant takes in:
> >
> > > (i)  Opposing an argument of unpatentability relied on by the Office, or
> > >
> > > (ii)  Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2008).  The Federal Circuit has concluded that the amendment, which constitutes a "narrower standard of materiality," did not replace or supplant the "reasonable

examiner" standard, but "merely provides an additional test of materiality." *Digital Control*, 437 F.3d at 1316. Thus, if a misstatement or omission is material under the new PTO rule or under any of the older tests,[8] then it is material; however, "to the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower." *Id.*

Direct evidence of intent is often absent. *Halliburton*, 925 F.2d at 1442. Thus, deceptive intent may be inferred from indirect and circumstantial evidence. *Star Scientific*, 537 F.3d at 1366. "Smoking gun" evidence is not required to establish an intent to deceive. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993). Rather, the Court may impute to the applicant an intent to accomplish the "natural consequences" of his or her actions. *Id.* at 1190 (quoting *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1577 (Fed. Cir. 1985)). Negligent conduct, however, supports an inference of intent only when "'viewed in light of all the evidence, including evidence indicative of good faith,' the conduct is culpable enough 'to require a finding of intent to deceive.'" *Halliburton*, 925 F.2d at 1442-43.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] In their briefs on remand, the parties did not discuss the complexity surrounding the standard for materiality. The Court notes, however, that the application ripening into the '779 Patent was filed after the effective date of the 1992 amendment to Rule 56, and that the *Digital Control* case was decided in February 2006, approximately eight months before this matter went to trial. Thus, the Court is satisfied that the standards set forth in *Digital Control* govern the Court's analysis on remand.

### 1.    **The Translations of the Robers Patent**

With these standards in mind, the Court now turns its attention to the prior art at issue. As an initial matter, the Court notes that, although the parties mentioned the Robers Patent in their summary judgment briefing, the Robers Patent was not presented to the Court prior to trial.[9] *See* Defendants' Response at 26 (docket no. 205) ("Taltech did not place the Robers patent . . . into the record.").

At trial, the parties provided two different translations of the Robers Patent. According to plaintiffs' translation, the Robers Patent discloses:

> a process for the production of a puckerfree **closure** seam, in particular for popeline [sic] and gabardine materials, wherein a **seam** of or containing a thermoplastic is sewn into the seam by a method already known, and the part of the material adjoining the seam is then ironed while under slight tension.

Plaintiffs' Tr. Exh. 3 at 114 (docket no. 356-5 at 13) (emphasis added).  Plaintiffs' translation also indicates that the Robers Patent discloses a dependent claim consisting of:

> [t]he process as claimed in Claim 1, wherein a strip is used which consists of diagonally cut fabric coated on one or both sides with a thermoplastic.

*Id.*  Defendants' translation differs as follows:

> 1.    Method for making crimp-free **assembly** seams, especially for poplin and gabardine materials, characterized by the fact that, as known from other applications, a **ribbon** made of or with a thermoplast is sewn in, which ribbon is then ironed onto the parts of the material surrounding the seam while at the same time stretching the seam.

> 2.    Method according to Claim 1, characterized by the fact that the ribbon used is a ribbon made of a diagonally cut fabric that features a thermoplast on one side or on both sides.

Defendants' Exh. 503 at L007519 (emphasis added).

---

[9] Indeed, in preparation for trial and during trial, the parties focused minimal attention on the issue of whether the Robers Patent is cumulative of the Undisclosed Raincoat Seam.  They provided no trial briefs and included no specific mention of the issue in the Pretrial Order (docket no. 250).  Plaintiffs' proposed findings of fact and conclusions of law referenced the issue in only two conclusory sentences of a 186-page document containing over eleven hundred separately-numbered paragraphs.  *See* Proposed Finding No. 1011 (docket no. 245) ("The John Wong Raincoat Seam is less relevant to claims at issue than the disclosed raincoat seam or the seam diagramed in Robers.  Accordingly, this seam was merely cumulative and not material prior art.").

The Court notes that the translators chose different English words having, for the most part, equivalent meanings, for example "process" as opposed to "method," and "puckerfree" versus "crimp-free." Two crucial exceptions, however, are the selection of "closure" instead of "assembly" and "seam" in lieu of "ribbon." Although "closure" has several meanings, in this context, the most suitable definition is "a means of filling a space or gap esp. by sealing it or of closing an opening (as in a garment or luggage): as (1) : FASTENER, CLOSING < styled with fly-front ~ > < pocket with zipper ~ >." Webster's Third New Int'l Dictionary 428 (2002) [hereinafter "Webster's"]. In contrast, "assembly" conveys a broader concept, namely to "bring," "put or join" or "fit together," or "building up a complete unit." Webster's at 131 ("assemble" and "assembly"). Thus, plaintiffs' translation limits the claims of the Robers Patent to seams associated with fastenings, for example, buttonholes, which are specifically discussed therein. _See_ Plaintiffs' Tr. Exh. 3 at 111 (docket no. 356-5 at 10) ("The process claimed for the invention may also be used, for example, on one or both sides of a buttonhole for the purpose of reinforcement . . . ."). Plaintiffs' translation was the one before the patent examiner during prosecution of the '779 Patent, and the Court will consider only the language before the PTO. _See Semiconductor Energy Lab. Co. v. Samsung Elecs. Co._, 204 F.3d 1368, 1378 (Fed. Cir. 2000) (a patent examiner is presumed to have considered only the English translated portions of, and not the original, foreign language document).

Understanding what the patent examiner might have gleaned from the Robers Patent becomes more difficult when examining the following portion of plaintiffs' translation: "a **seam** of or containing a thermoplastic is sewn into the seam." In ordinary or common parlance, a seam is "a joining by a line of stitching of two pieces of cloth, leather, or other material usu. near the edge." Webster's at 2047.[10] When construed in light of this definition,

---

[10] At the _Markman_ stage, the parties asked the Court to construe the term "seam," and the Court concluded that, for purposes of the '779 Patent, a "seam" is "the place where at least two pieces of fabric are joined by at least two rows of stitches." Order at 28 (docket no. 150). This definition differs from the common understanding only with regard to the number of required stitching rows, the '779 Patent having disclosed a

plaintiffs' translation of the Robers Patent become nonsensical. It essentially describes a joint between two pieces, such joint being comprised solely of or containing a thermoplastic, and which joint is then itself sewn into a joint between two pieces.

Defendants' translation avoids this circularity by using the term "ribbon" to describe the component made of or coated with a thermoplastic that is incorporated into the seam. Defendants' translation, however, was not before the PTO. Moreover, having been provided plaintiffs' translation, the patent examiner could reasonably have concluded that no additional or different translation was "necessary." *See* *Semiconductor Energy Lab.*, 204 F.3d at 1377-78 (quoting Manual of Patent Examining Procedure § 609C(2) ("The examiner need not have the information translated unless it appears necessary to do so.")). Given the inadequacy of plaintiffs' translation, the Court concludes that the patent examiner would not have understood the Robers Patent to teach anything material to patentability of the "smooth seam" method and product claims at issue. For this reason alone, the Court would not view the Robers Patent as cumulative, but the Court also finds defendants' arguments persuasive. They will be discussed seriatim.

## 2. Component of Garment (Closure Versus Armhole Seam)

Defendants contend that the Robers Patent is not cumulative because it describes only a closure (specifically, a buttonhole) seam, while the Undisclosed Raincoat Seam is a type of armhole seam, which is the narrow scope of dependent Claims 6, 7, 24, and 25 of the '779 Patent. In response, plaintiffs offer two arguments: (i) the Robers Patent discloses a "universally applicable" seam; and (ii) the Undisclosed Raincoat Seam is not an armhole seam. Plaintiffs' assertions lack merit.

Plaintiffs' translation of the Robers Patent restricted its scope to "closure" seams, meaning seams associated with fastenings, for example, buttonholes. Although the

particular type of seam comprised of two or more such rows. For purposes of interpreting the Robers Patent, the Court resorts to ordinary parlance rather than the specific meaning used in the '779 Patent.

specification of the Robers Patent uses the phrase "universally applicable," such language must be understood in context.  The full sentence reads:  "The invention is universally applicable; for example, it may be applied even for garments which are only laundered and not ironed after drying."  Plaintiffs' Tr. Exh. 3 at 112 (docket no. 356-5 at 11).  This language does not purport to broaden the scope of seams for which the invention might be useful; rather, it merely attempts to expand the universe of garments into which the described closure seams might be incorporated.  Thus, plaintiffs' reliance on the "universally applicable" wording is misplaced.

This conclusion is further supported by an examination of the next sentence of the specification in the Robers Patent:  "It is possible, for example, to employ such a _closure seam_ also for the breastplate of shirts and so forth, the advantage of a smooth shirt breast also being achieved in addition to that of avoiding puckering."  Plaintiffs' Tr. Exh. 3 at 112 (emphasis added).  This language confirms the narrowness of the Robers Patent, suggesting use of the described closure seam in what can only be interpreted as the "center placket" of a shirt.  Although "breastplate" appears to be a literal translation from the German "Brustplack," _see_ Plaintiff's Tr. Exh. 3 at 105, Col. 4, Line 20, the term "breastplate" has no meaning in the garment industry.  As outlined in the '779 Patent, a shirt is comprised of the following components:  front panels (left and right), a rear panel, a yoke, a collar, sleeves (left and right), and a center placket.  '779 Patent, Col. 3, Lines 22-24, & Figs. 1 & 2 (Exh. B to Complaint (docket no. 1 at 17, 21)).  The center placket runs the length of the shirt and contains a row of buttonholes.  It is the only "closure" seam on the front or breast area of a shirt.  Thus, the Court concludes that "Brustplack" or "breastplate" refers to the center placket, and that the Robers Patent discloses only a narrow class of seams, namely those associated with closures or fastenings.

The Court's ruling is consistent with the representations plaintiffs made prior to trial in this matter:

> 409. Robers does not teach or suggest the subject matter of claim 25 of the '779 Patent because it does not teach or suggest a dress shirt armhole seam.

> 410. Robers only generally discloses use of a thermoplastic strip in assembly seams, but does not specifically state the use of a thermoplastic strip in an armhole seam. Further, with regard to the embodiment of Figures 4 and 5, Robers specifically states that the strip should be a "stiffening strip." Use of a stiffening strip would not be desirable in an armhole seam, which should be thin and flexible. Robers never intended to apply Figures 4 and 5 to a dress shirt armhole seam.

Proposed Findings Nos. 409 & 410 (docket no. 245). Thus, the Robers Patent is not cumulative of any prior art involving armhole seams.

As a result, the Robers Patent is not cumulative of the Undisclosed Raincoat Seam. The Court has already found that the Undisclosed Raincoat Seam is "an armhole seam with one set stitch and one top stitch." Finding No. 110 (docket no. 301). Plaintiffs contend that the Court's finding is not supported by the record. Plaintiffs' argument lacks merit.

In his May 2006 deposition, after drawing a diagram of the Undisclosed Raincoat Seam, John Wong indicated that the seam had been used in raincoats manufactured at TAL Apparel's Malaysia facility from 1992 to 1994, while Mr. Wong was the plant manager. J. Wong Dep. at 14:9-17 (May 3, 2006) (docket no. 202-11 at 5). Mr. Wong explained that he had procured a sample raincoat from the Malaysia factory in February or March 1994 to prepare for a trip to a "chilly area." _Id._ at 19:12-25 (docket no. 202-11 at 6). While wearing the raincoat and looking in a mirror, Mr. Wong noticed that the seam was firm, but puckering. _Id._ at 20:15-17, 42:4-6 (docket no. 202-11 at 6, 7). Out of curiosity, he "destructured" the raincoat, taking apart the seam and discovering fusible tape inside. _Id._ at 20:18-21:4 (docket no. 202-11 at 6). The raincoat had not been washed, _id._ at 42:9-11, and Mr. Wong formed an opinion that puckering was a sign that the adhesive in the seam had not completely melted during the manufacturing process. _Id._ at 45:12-13 (docket no. 202-11 at 7).

During his May 2006 deposition, Mr. Wong also testified that, before he reverse-engineered the raincoat seam, he had already created his puckerfree armhole seam for a shirt, *id.* at 46:7-9 (docket no. 202-11 at 8) ("I produce that at the end of 1993"), but he later admitted that the raincoat seam was in fact the inspiration for his idea of incorporating fusible tape in the shirt seam, *id.* at 51:15-18 (docket no. 202-11 at 10); *see also* Tr. Transcript at 233:16-18 (docket no. 288). Mr. Wong indicated that he did not disassemble any other raincoat besides the sample obtained from the Malaysia plant, *see* J. Wong Dep. at 45:3-8 (docket no. 202-11 at 7) ("just looked at the other raincoat seams"), and the seams that he took apart or examined in early 1994 included armhole seams, *id.* at 49:16-20 (docket no. 202-11 at 9). Mr. Wong further stated that he paid attention to the armhole seams of raincoats only after early 1994, following his "destructure [of] that coat." *Id.* at 50:16-17 (docket no. 202-11 at 10).[11] Thus, the evidence at trial fully supported the Court's finding that the Undisclosed Raincoat Seam was an armhole seam. Even assuming, however, that the Undisclosed Raincoat Seam was not an armhole seam, it still was not cumulative of the Robers Patent. The Robers Patent is limited to closure (*i.e.*, buttonhole or "center placket") seams, and a reasonable patent examiner would have considered the Undisclosed Raincoat Seam, which was not likewise restricted to closure seams, important or material in deciding whether to issue the '779 Patent.

---

[11] The parties designated John Wong's May 2006 deposition for use at trial, but they have not provided the full transcript of that deposition in their materials on remand. The Court, however, has independently located within the record the relevant portions of Mr. Wong's deposition, which were presented earlier in connection with dispositive motions. In asserting that Finding No. 110 is not supported by the record, plaintiffs have focused on the citation therein to page 14 of Mr. Wong's deposition, and have confined their submissions on remand to that specific page of the transcript. *See* Exh. F to Brief (docket no. 356-7). The Court observes, however, that the record contains mini-transcripts of Mr. Wong's deposition, which include four reduced pages on one sheet, and that page 14 of the mini-transcript shows pages 50 through 53 of the deposition transcript, sections of which relate to the armhole seam issue. *See* Exh. I to Stolte Decl. (docket no. 202-11 at 10). Thus, although the Court's citation to page 14 might have been confusing, the conclusion does not follow that Finding No. 110 is inconsistent with or unsupported by the evidence.

### 3. **Adhesive Element (Thermoplastic Versus Vilene SL33)**

Defendants also contend that the Robers Patent is not cumulative because it discloses only a generic thermoplastic component, while the Undisclosed Raincoat Seam incorporated Vilene SL33, which was the withheld "best mode" for the invention in the '779 Patent. Plaintiffs provide two responses: (i) the evidence does not support the conclusion that the Undisclosed Raincoat Seam used Vilene SL33; and (ii) the patent examiner would not have considered the specific element of Vilene SL33 important. Plaintiffs' arguments border on frivolous. At trial, John Wong testified that the fusible tape being used by the outerwear department at the Malaysia facility was Vilene SL33. Tr. Transcript at 234:14-23 (docket no. 288). He also indicated that he obtained the fusible tape he used in his prototype shirt armhole seam from the outerwear department. _Id._ at 233:24-234:1; _see also_ Tr. Transcript at 314:2-3 (docket no. 281) (indicating that the TAL Apparel raincoat was the source of the adhesive for the shirt seam). Thus, by the time Mr. Wong applied for the patent at issue, he was fully aware that the Undisclosed Raincoat Seam contained Vilene SL33.

Plaintiffs' assertion that Vilene SL33 would not have been relevant to the patent examiner belies the importance Mr. Wong himself placed on the element. In a deposition taken in November 2004, Mr. Wong testified that "the thermal adhesive bonding between the garment is the most important step" and that the "type of adhesive is the most important" manufacturing variable. J. Wong Dep. at 58:15-16, 59:16-17 (Nov. 22, 2004) (docket no. 209-4 at 3, 4). Plaintiffs' contention on remand is also inconsistent with the position they took at trial, when plaintiffs proposed the following findings of fact:

> 428. The Robers German patent . . . refers to the bonding element in a "thermoplastic" or "thermoplast." No other description or assistance as to its characteristics is contained in the patent. At the time Robers issued, there were, perhaps, hundreds of materials and resins which could be characterized as "thermoplastics." This lack of disclosure would severely confound a skilled practitioner.
>
> 429. Robers is silent on the method of application of the undisclosed thermoplastic materials. Robers teaches the use of interlinings, which are to be coated with thermoplastic material on one or both sides, but does not disclose

whether they are to be applied in powder, pure or solvent forms; for a practitioner of the art seeking to solve the pucker problem in 1994. [sic] These are important operational information.

430.  Robers mentions the use of tapes without interlinings, but discloses little if any details of the material composition and properties of desired or workable tapes.

Proposed Findings Nos. 428-430 (docket no. 245).  Given the undisputed generality of the Robers Patent, which plaintiffs previously asserted "would severely confound a skilled practitioner," how a patent examiner could consider the Robers Patent cumulative of prior art incorporating the specific "thermal adhesive component" known as Vilene SL33 defies imagination.

Both independent claims of the '779 Patent contain a "bonding element having at least a thermal adhesive component."  Claims 1 & 20 (docket no. 1 at 22 & 23).  Some of the dependent claims of the '779 Patent limit the "thermal adhesive component" as follows: (i) being composed of a "thermoplastic material," Claims 2 & 21 (docket no. 1 at 22 & 23); or (ii) being composed of a "thermoplastic material selected from the group consisting of polyamide, polyester, olefinic, polyurethane, and ethylene vinylacetate copolymer materials," Claims 3 & 22 (docket no. 1 at 22 & 23).  The Robers Patent discloses only the generic element "thermoplastic," which is described as a seam, a component of a seam, or a coating on one or both sides of a diagonally cut strip of fabric.  Plaintiffs' Tr. Exh. 3 at 114 (docket no. 356-5 at 13).  Neither party contends that the element "thermoplastic," within the meaning of the Robers Patent, constitutes a small enough class of materials to itself describe all members of the class; in other words, the parties appear to agree that use of the term "thermoplastic" does not necessarily disclose the subsets of materials known as polyamides, polyesters, olefines, polyurethanes, or ethylene vinylacetates.  _See Sanofi-Synthelabo v. Apotex, Inc._, 470 F.3d 1368, 1375-78 (Fed. Cir. 2006) (discussing the preclusive effect of prior art that discloses a "genus" or "class" having a limited number of "species" or "members").  In contrast to the Robers Patent's use of the general term "thermoplastic," the

Undisclosed Raincoat Seam incorporates a particular thermoplastic, namely Vilene SL33, which is a form of polyamide. *See* Tr. Transcript at 268:23 (docket no. 288) (indicating that SL33 is a polyamide). Because the broad language of the Robers Patent does not disclose the specific element "polyamide," a reasonable examiner would have considered the Undisclosed Raincoat Seam, and its use of the particular polyamide "Vilene SL33," important or material in deciding whether to issue the '779 Patent.

### 4. **Intent to Deceive**

The Court previously ruled that Mr. Wong's withholding of the Undisclosed Raincoat Seam was "designed to deceive the Patent Office." Conclusion No. 81 (docket no. 301). On remand, plaintiffs have presented no argument to contradict the Court's conclusion. To reiterate, however, the Court inferred intent to deceive from *inter alia* Mr. Wong's disclosure to the PTO in 1996 of a different TAL Apparel raincoat seam, which has no set stitch and two top stitches (the "Double Top-Stitch Seam"). In so doing, Mr. Wong took the position that the Double Top-Stitch Seam was "wholly inadequate for dress shirts in part because of the appearance of two top stitches." Conclusion No. 79 (docket no. 301). In addition, in his 1996 amendment, he represented to the PTO that he had "recently become aware" of the Double Top-Stitch Seam, *see* Conclusion No. 88 (docket no. 301), a statement that was misleading because Mr. Wong was aware of both the Double Top-Stitch Seam and the Undisclosed Raincoat Seam before filing his patent application in May 1994. Mr. Wong's conduct in connection with the 1996 amendment evidences an intent to deceive; he disclosed only the seam with two top stitches, which he argued was not suitable for his invention, while contemporaneously withholding the seam with only one top stitch, which more closely approximates the seam used in high-priced dress shirts. Moreover, Mr. Wong remained silent about the best mode for his invention,[12] namely Vilene SL33, while failing to disclose a

---

[12] In arguing that Vilene SL33 (and therefore the Undisclosed Raincoat Seam) would not have been important to the patent examiner, plaintiffs point out that Vilene SL33 is not a limitation of any of the claims of the '779 Patent. Although plaintiffs' reading of the patent language is accurate, it is misleading because it ignores the

known seam employing that particular material.  In light of this course of conduct before the PTO, the Court remains persuaded that Mr. Wong's intent to deceive is established by clear and convincing evidence, and that he has provided no credible, good faith explanation for his actions.  *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008) (intent to deceive may be inferred when "(1) highly material information is withheld; (2) 'the applicant knew of the information [and] . . . knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding'"); *see also Star Scientific*, 537 F.3d at 1368 ("patentee need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence").

### 5. Balancing Materiality and Intent

The Court is satisfied by clear and convincing evidence that the Undisclosed Raincoat Seam is material, and not cumulative of the Robers Patent.  The materiality of the Undisclosed Raincoat Seam is apparent from "the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner."  *Praxair*, 543 F.3d at 1314-15.  The level of materiality meets the threshold "reasonable examiner" standard, but also satisfies the heightened test of PTO Rule 56, in that the Undisclosed Raincoat Seam "refutes, or is inconsistent with, a position the applicant takes in . . . [a]sserting an argument of patentability."  *See* 37 C.F.R. § 1.56(b).  Nothing in the Robers Patent alters the Court's earlier conclusion that the Undisclosed Raincoat Seam, with its single top stitch, contradicts or is inconsistent with Mr. Wong's representation to the

finding, affirmed by the Federal Circuit, that the written description at issue failed to disclose "the best mode such that one reasonably skilled in the art could practice it."  *Taltech Ltd. v. Esquel Apparel, Inc.*, Slip Op. at 6 (Fed. Cir. May 22, 2008) (docket no. 335) (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 963 (Fed. Cir. 2001)).  Plaintiffs may not rely on the absence of a claim term when the silence itself was improper.  Moreover, plaintiffs' contention that Vilene SL33 would not have justified rejection of the patent application, *see* Brief at 14 (docket no. 356), confuses the issues of patentability and cumulativeness.  Whether prior art disclosing a specific thermoplastic or polyamide would have affected the examiner's anticipation or obviousness analysis constitutes a different question from whether such prior art is cumulative of a patent disclosing only generally the use of a thermoplastic.  The latter question is squarely before the Court, the former is not.

PTO that TAL Apparel's raincoat seams are unsuitable for high-priced dress shirts because of the double top-stitching. *See* Conclusion No. 79 (docket no. 301). The Undisclosed Raincoat Seam[13] meets the most stringent of the materiality standards, and the requisite level of intent is therefore correspondingly low. In this case, however, the culpability of the patentee is high, and the Court remains convinced that the '779 Patent was obtained through improper means and is, as a result, unenforceable.

## C.   **Exceptional Case**

The arguments on remand have served to further highlight the reasons why the Court considered this case exceptional. On remand, plaintiffs have continued to engage in the same litigation tactics the Court previously found troubling. Plaintiffs have ignored arguments they made before and during trial, replacing them with minimally defensible positions and presenting defendants with the proverbial "moving target." Plaintiffs have requested an evidentiary hearing and an opportunity for further briefing, but given Mr. Wong's pattern of changing his testimony to suit the theory du jour and in light of plaintiffs' shifting contentions, the Court is persuaded that the record cannot be improved, and that it is more than adequate to support the Court's decision. Having found that the Undisclosed Raincoat Seam is not cumulative of the Robers Patent, the Court reinstates the award of attorney fees and costs in favor of defendants and against plaintiffs.

---

[13] Plaintiffs draw a distinction between the method claims and the "smooth seam" claims of the '779 Patent, arguing that the Undisclosed Raincoat Seam does not constitute prior art as to the method claims because no sequence of manufacturing steps is described thereby and because the process, which is practiced outside the United States, was not evidenced by a printed publication. *See* Brief at 15 (docket no. 356) (citing 35 U.S.C. §§ 102 & 103). Plaintiffs do not, however, appear to contest the Court's earlier conclusion that the Undisclosed Raincoat Seam constitutes prior art, at least with regard to the "smooth seam" (or product) claims of the '779 Patent, because it was "in public use or on sale in this country" more than one year prior to May 17, 1994, the filing date of the application at issue. *See* Conclusion No. 77 (docket no. 301); *see also* 35 U.S.C. § 102(b). Moreover, to the extent that the Undisclosed Raincoat Seam is prior art for only the product claims of the '779 Patent, it cannot be cumulative of the Robers Patent, which discloses only method claims, and plaintiffs' attempt to deny knowledge on Mr. Wong's part concerning how the Undisclosed Raincoat Seam is constructed actually contradicts their assertion of cumulativeness and runs contrary to the evidence.

The Court further concludes that, even if the Undisclosed Raincoat Seam does not support a finding of inequitable conduct, the misrepresentations to the PTO involving the Double Top-Stitch Seam and the abusive litigation tactics on which the Court's exceptional case finding is also based would each be, independently, sufficient to justify the award of attorney fees and costs. *See, e.g.*, *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003) ("Litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285 . . . ."). For example, the misrepresentation made to the PTO in 1996, declaring that the "applicant's representative has *recently become aware*" of the Double Top-Stitch Seam, when in fact knowledge of the Double Top-Stitch Seam dated back two or three years, *see* Conclusion No. 88 (docket no. 301), fell far short of the standard for candor before the PTO.

Likewise, the assertions in the 1996 amendments indicating that overlock stitches were "unacceptable in most applications, particularly shirts," and that the Double Top-Stitch Seam would be "wholly inadequate" for dress shirts breached the duty of honesty to the PTO; contrary to the statements made to the PTO, about five to six percent of the dress shirts sold by TAL Apparel in the early 1990s contained overlock stitches, and roughly five percent of the dress shirts sold by TAL Apparel in the United States featured two top stitches in the armhole seam, demonstrating that such stitches were neither "unacceptable" nor "wholly inadequate." Conclusions Nos. 89 & 90; *see also* Finding No. 42. The entire course of conduct before the PTO, from withholding the Double Top-Stitch Seam for two or more years, to concealing the length of time during which the applicant knew about the Double Top-Stitch Seam, to misleading the examiner about the significance of the Double Top-Stitch Seam, evidenced a level of culpability justifying a finding that this case is exceptional and warranting an award of attorney fees.

In addition, plaintiffs' litigation tactics caused defendants to needlessly expend significant resources and further support an award of attorney fees. For example, after

defendants conducted discovery and prepared a defense concerning plaintiffs' damages claim, shortly before trial, plaintiffs dismissed their damages claim. Conclusion No. 101. Likewise, defendants' efforts in preparing for a jury trial proved for naught when, just weeks before trial, plaintiffs waived their right to a jury. *Id.* Finally, after forcing defendants to litigate all seven of plaintiffs' remaining claims, during the middle of trial, plaintiffs voluntarily dismissed with prejudice five of their claims of infringement rather than responding to defendants' motion for entry of judgment pursuant to Fed. R. Civ. P. 52(c). *Id.* This case was and is exceptional, and the award of attorney fees is reinstated.

**Conclusion**

For the foregoing reasons, the Court does hereby CONCLUDE and ORDER as follows:

(1) Defendants' motion, docket no. 360 at 7 n.5, to strike plaintiffs' claim chart, Exh. A to Brief (docket no. 356), is GRANTED;

(2) Plaintiffs' motion, docket no. 356 at 17-18, for an evidentiary hearing and/or further briefing is DENIED;

(3) The Undisclosed Raincoat Seam is material, and is not cumulative of the Robers Patent;

(4) This case is exceptional within the meaning of 35 U.S.C. § 285 for one or more of the following reasons: (a) withholding of the Undisclosed Raincoat Seam, (b) misrepresentations to the PTO regarding the Double Top-Stitch Seam, and/or (c) abusive litigation tactics;

(5) The award of attorney fees and costs in the amount of $6,790,044.86 in favor of defendants and against plaintiffs is REINSTATED, with judgment to run from July 13, 2007, at the post-judgment interest rate of 4.99% per annum; and

(6) The Clerk is directed to reinstate judgment consistent with this Order and to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

DATED this 8th day of April, 2009.

Thomas S. Zilly
United States District Judge